## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| GRADUATE STUDENTS FOR ACADEMIC FREEDOM, INC., | |
| *Plaintiff,* | Case No. 1:24-cv-6143 |
| v. | |
| UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA; and UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA LOCAL 1103 – GRADUATE STUDENTS UNITED AT THE UNIVERSITY OF CHICAGO, | **COMPLAINT** |
| *Defendants.* | |

## INTRODUCTION

1.      Graduate students at the University of Chicago have been put to the choice of halting their academic pursuits, or funding antisemitism.  That is unlawful.

2.      In the Winter of 2023, graduate students at Chicago voted to unionize, and are now exclusively represented by GSU-UE—a local of United Electrical (UE).

3.      That is a real problem.  Among much else, UE has a *long* history of antisemitism.  It is an outspoken proponent of the movement to "Boycott, Divest, and Sanction" Israel (BDS)—something so clearly antisemitic that both Joe Biden and Donald Trump have condemned it as such.  Indeed, for years, the union has had a consuming fixation with the world's only Jewish state—a fixation peppered with all-too-common rhetoric.  UE has charged Israel with "occupying" Palestine; has branded Israel an "apartheid regime"; and has accused Israel of committing "ethnic cleansing."

4.  GSU-UE is cut from the same cloth. On campus, it has not only echoed its parent union's rhetoric, but has added to it. It took pains to publicly "reaffirm" its commitment to BDS just one week after the October 7 terrorist attacks. And it has joined the "UChicago United for Palestine Coalition," which gained notoriety for its protest encampment and hostile takeover of the Institute of Politics. Through it, GSU-UE has joined calls to "honor the martyrs"; fight against campus "Zionists"; resist "pigs" (*i.e.*, police); "liberate" Palestine from the "River to the Sea," and by "any means necessary"; and "bring the intifada home." Jimmy Hoffa's union this is not.

5.  Nonetheless, under a recent collective bargaining agreement extracted by the GSU-UE, graduate students at the University must now either become dues-paying members of the union, or pay it an equivalent "agency fee," as a condition of continuing their work as teaching assistants, research assistants, or similar positions.

6.  Constitutionally speaking, that is not kosher. The union's ability to obtain agency fees from nonconsenting students is the direct product of federal law—*i.e.*, it involves governmental action, subject to the First Amendment. But if GSU-UE wishes to wield such federally backed power, it must accept the responsibility that comes with it; it cannot use a government-backed cudgel, outside constitutional constraint. And if the First Amendment means anything, it means students cannot be compelled to fund a group they find abhorrent as the price of continuing their work.

7.  The stories of Plaintiff's members lay bare the stakes that are at issue here. One member is an Israeli; another a proud Jew with family fighting in Israel; and some are graduate students simply horrified by the union's antisemitism—as

well as its other (to put it mildly) controversial political positions, which reach well beyond collective bargaining to virtually every hot-button subject (*e.g.*, abortion, affirmative action, policing, gender ideology, even the judiciary). Although members come from different backgrounds, none can stomach sending a penny to this union.

8. But that is the position they find themselves in—put to the choice of funding the union, or stopping their academic work. Some have chosen to opt-out entirely, and have quit pursuing RA work so long as it comes at the cost of their values. Others do not have the luxury. One student is here on a visa from Israel—something, of course, GSU-UE denounces under BDS—and cannot stop his work as a TA if he wants to stay in the country. Another depends on his RA work to help cover cost-of-living expenses, and cannot forgo that income if he wishes to stay at Chicago. Others are deeply torn—tortured as to how to weigh their consciences against their careers.

9. The First Amendment was adopted to prevent these sorts of choices. Forcing a person to associate with—let alone fund—a particular ideological organization is always a fraught First Amendment endeavor. But the constitutional infirmity *here* is exceptionally stark. Unlike a garden variety agency fee in the private sector, the agency fees here work as an academic toll on graduate students' ability to pursue expressive activities at the very heart of the First Amendment: Students cannot perform certain teaching or research activities without first paying a kick-back to the union. And to make an intolerable situation worse, that compulsion is *especially* problematic here, given GSU-UE's decision to adopt a divisive political identity, based on issues well outside the ambit of traditional collective bargaining.

10.     What is happening at Chicago is thus as clear an example as it gets of an agency-fee scheme that violates the First Amendment, by the Supreme Court's own lights.  An agency fee scheme cannot "force[] men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought."  *Harris v. Quinn*, 573 U.S. 616, 631 (2014).  But that is *exactly* this case.  And for that reason, what is happening at Chicago is unlawful, and in violation of the First Amendment's most basic guarantees.  It needs to be stopped.

## JURISDICTION AND VENUE

11.     This is a suit arising under the First Amendment.

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.  *See also Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 742 (1988) (First Amendment suit against compelled private-sector union fees may proceed directly in federal court).

13.     Plaintiff has Article III standing.  Its members have suffered injuries-in-fact as a direct result of Defendants' actions, and those injuries can be redressed by this Court; the First Amendment interests at stake are germane to Plaintiff's organizational purpose; and neither the asserted claim nor the requested relief requires Plaintiff's members to participate directly in this suit.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199-201 (2023); *see also Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 890-91 (2018) (individual has standing to bring constitutional challenge against union regarding agency fees).  As for redress, this Court has authority to provide declaratory relief under the Declaratory Judgment Act (28 U.S.C. §§ 2201, 2202), and

Federal Rule of Civil Procedure 57; injunctive relief under its inherent equitable powers (*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999)), and Federal Rule of Civil Procedure 65; and nominal damages under the same inherent authority (*Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 874 (9th Cir. 2017); *see also, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 799-800 (2021)).

14.     Venue is proper in this District, because a substantial part of the events or omissions giving rise to this action occurred in Chicago.  *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

15.     Plaintiff Graduate Students for Academic Freedom, Inc. (GSAF) is a Virginia 501(c)(4) non-profit membership organization founded to promote academic freedom, and combat compelled speech and association across American campuses.

16.     Defendant United Electrical, Radio and Machine Workers of America (UE) is a national union based in Pittsburgh, PA.  It is the parent union of Graduate Students United (GSU), and signatory to the collective bargaining agreement at issue.

17.     Defendant United Electrical, Radio and Machine Workers of America UE Local 1103 – GSU (GSU-UE) is a local affiliate of UE based in Chicago, IL.  It is also a signatory to the collective bargaining agreement at issue—under which, it is the sole and exclusive bargaining agent of University of Chicago graduate students.

## FACTUAL ALLEGATIONS

### *The National Labor Relations Act*

18.     "The NLRA governs federal labor-relations law."  *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 255 (2009).  Enacted in 1935, the Act was designed to facilitate

and encourage collective bargaining. *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. 174*, 598 U.S. 771, 775 (2023); *see* 29 U.S.C. § 151. And it does so by "creat[ing] a regulatory framework governing collective bargaining agreements that differs significantly from the system that would otherwise exist." David Topel, *Union Shops, State Action, and the National Labor Relations Act*, 101 YALE L.J. 1135, 1146 (1992).

19. Three parts of this governing framework—all discussed later too—are helpful to understanding what happened at the University, and this challenge to it.

20. *First*, Section 9(a) says a union "designated or selected for the purposes of collective bargaining by the *majority* of the employees . . . shall be the *exclusive* representative[] of *all* the employees in such unit." 29 U.S.C. § 159 (emphases added).

21. "As the employees' exclusive bargaining representative, the [u]nion enjoys broad authority in the negotiation and administration of the collective bargaining contract." *14 Penn Plaza*, 556 U.S. at 255-56. Most of all, the union is empowered to set the "terms and conditions of employment" for *all* workers, and "b[i]nd" them to one agreement. *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967); *see Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 208 (1944) (Murphy, J., concurring) ("While such a union is essentially a private organization, its power to represent and bind all members of a class or craft is derived solely from Congress.").

22. *Second*, Section 8(a) of the NLRA specifically authorizes "union-security" clauses. 29 U.S.C. § 158(a)(3). A union-security clause is a provision that requires a worker—as a condition of employment—to financially contribute to the union, either by becoming a dues-paying member, or by paying what is called an "agency fee." *See*

*Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 38 (1998). An agency fee is "a fee on employees who are not union members but who are nevertheless represented by the union in collective bargaining." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 181 (2007). It is by law limited to those costs germane to collective bargaining. *Wegscheid v. Loc. 2911, Int'l Union*, 117 F.3d 986, 987 (7th Cir. 1997) (Posner, J.).

23. Section 8(a) bars an employer from making an employment decision that may "encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). But Congress carved from this any decision to include a union-security clause within a collective bargaining agreement. *Wegscheid*, 117 F.3d at 987. It thus "empowers the union to coerce the members of the bargaining unit" to either become a dues-paying union member, or pay the union an "agency fee." *Id.* at 987-88.

24. *Third*, the Act significantly encourages and facilitates the inclusion of union-security clauses within collective bargaining agreements. Sections 8(d) and 8(a)(5) of the NLRA make union-security clauses a mandatory subject of bargaining, and thus impose an obligation on employers to negotiate over such clauses in "good faith." *See NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 738, 744-45 (1963); *see also* 29 U.S.C. §§ 158(d), 158(a)(5). Meaning, employers commit an unfair labor practice— subject to sanction by the National Labor Relations Board—unless they exhibit a "serious intent to adjust differences and to reach an acceptable common ground." *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485 (1960); *see also NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 821 (7th Cir. 1991). The NLRB has explained that this requires an employer to present a "legitimate business purpose" for rejecting the

inclusion of a union-security clause. *CJC Holdings, Inc.*, 320 N.L.R.B. 1041, 1046 (1996). And as discussed later, this is a cabined ground: For instance, a "philosophical" objection to an agency fee, however fundamental, is not sufficient. The upshot is that under the federal labor laws, something like the agency-fee arrangement here is the strong default, and can only be displaced by the employer in defined circumstances.

### Unionization at the University of Chicago

25. The University of Chicago was founded in 1890. It now boasts over 7,500 undergraduates, and over 10,000 graduate students, spread across a host of programs.

26. Since its first days, a defining trait of the University has been its zealous commitment to academic freedom. Its first President, William Rainey Harper, proclaimed "complete freedom of speech on all subjects" is "fundamental" to the University. And its current President, Paul Alivisatos, has echoed that, remarking how the University is "built upon principles of academic freedom and free expression."

27. This commitment is perhaps best captured by the University's adoption of the Kalven Report—the canonical 1967 report authored by the Kalven Committee (led by Professor Harry Kalven Jr.), offering "a statement on the University's role in political and social action." The Report underscores that a university must preserve "freedom of inquiry" and safeguard "independence from political fashions, passions, and pressures." And it recognized that dragooning faculty or students into "collective action" will necessarily come "at the price of censuring any minority who do[es] not

agree with the view adopted." In a word, universities ought to be committed to "neutrality" as an animating principle—be it within the classroom, or on the campus.[1]

28.     Nonetheless, in 2007, a collection of graduate students took the first step toward creating a union—and later compelling all graduate students to support it.

29.     In 2007, Graduate Students United (GSU) was founded at Chicago to advocate for graduate student workers (*e.g.*, teaching and research assistants).

30.     From 2007 to 2016, GSU campaigned on a number of issues related to graduate student work—from wages, to healthcare, to fees, and the like. But GSU did not engage in any effort to unionize; it was a voluntary association of students.

31.     In Summer 2016, however, GSU decided to go a step further, and made its first attempt at formally unionizing. A majority of graduate students (about 70%) voted to unionize—but at the time, the University opposed the effort. GSU eventually withdrew its unionization petition from the NLRB. And in 2019, GSU ultimately tabled its effort to unionize graduate students—following a three-day strike.

32.     In Spring 2022, GSU began preparing a new unionization campaign. As part of this, GSU voted to formally affiliate with United Electrical, Radio and Machine Workers of America (UE). According to GSU's website, it only made this

---

[1] For the full Kalven Report, *see* https://perma.cc/N387-KGNN, attached as Exhibit 8.

decision after "thorough research" into UE's history.  And it stressed it was drawn to UE's "issue-oriented" work—something that, as explained soon, is no small remark.[2]

33.     In Winter 2023, GSU began organizing graduate students.  At first, the "bargaining unit" that GSU sought to represent did not include every graduate school—most notable, it did not include the Law School.  That February, a majority of the covered graduate students (*i.e.*, those who were within the defined bargaining unit, and voted) decided to unionize.  The NLRB soon certified the results of that election; and the University said that it would agree to recognize the graduate union.

34.     Given GSU's decision to affiliate with UE, this union was named the "United Electrical, Radio and Machine Workers of America UE Local 1103 – GSU" (GSU-UE).  UE is the "parent union" of GSU; and GSU-UE is a local chapter of UE.

35.     Over the next year, GSU-UE and the University bargained.  And on March 6, 2024, the parties reached a tentative collective bargaining agreement.

36.     Around this same time, GSU-UE was recruiting research assistants at the Law School to join the bargaining unit.  GSU-UE quickly announced a vote for that March, which caught many law students by surprise.  And while a number of law students strongly opposed this effort, they had little time and even fewer resources to coalesce a meaningful response.  On March 19, the law students voted 59-29 to join GSU-UE.  For reference, the Law School has about 600 JD students.

---

[2] About GSU-UE Local 1103: FAQs, GSU-UE, https://perma.cc/WDK9-JLGM, attached as Exhibit 9.

37.     On March 28, the GSU-UE's membership voted to ratify the collective bargaining agreement. It took effect April 1, and is effective through March 31, 2027.

*The Collective Bargaining Agreement*

38.     The parties to the agreement are the University, UE, and GSU-UE.[3]

39.     Article 2 of the agreement recognizes GSU-UE as the "sole and exclusive bargaining agent" for graduate student workers at the school—defined to include *all* TAs, RAs, etc.  But the agreement does not cover undergraduates, or "graduate students who are not employed to provide instructional or research services."

40.     As previewed above, Article 2 follows directly from the NLRA.  29 U.S.C. § 159(a).  Once a majority chooses a union, "only [that] union may contract the employee's terms and conditions of employment. . . .  The employee may disagree with many of the union decisions but is bound by them." *Allis-Chalmers*, 388 U.S. at 180; *see also, e.g.*, *Steele*, 323 U.S. at 198-99 (observing that the "representative is clothed with power not unlike that of a legislature" and "the authority to act for [workers] is derived not from their action or consent but wholly from the command of [Congress]").

41.     More, under the terms of this agreement, GSU-UE does not simply have the power to represent all graduate students—it also has the power to tax their work.

42.     Article 3 provides that all graduate students covered by the contract must "as a condition of employment (i.e., assignment) . . . become and remain

---

[3] For the full collective bargaining agreement, *see* https://perma.cc/J64T-QCBB, attached as Exhibit 10.

members of the Union in good standing insofar as the payment of periodic dues and initiation fees, . . . or in lieu of such membership, pay to the Union an agency fee."

43.     In other words, to remain a TA or RA (or some similar role), a graduate student must either become a dues-paying member of the union, or pay an agency fee (which is set to the same amount) drawn from a percentage of their regular earnings.

44.     This provision too follows from the NLRA.  29 U.S.C. § 158(a)(3); *see also Int'l Union of Operating Engineers Loc. 399 v. Vill. of Lincolnshire*, 905 F.3d 995, 1001 (7th Cir. 2018) (noting union-security clauses are mandatory subjects of bargaining).

45.     Article 3 also states the "amount of such agency fee shall be established by the Union in accordance with applicable law, but in no event shall such fee exceed full union dues."  As a statutory matter, the "applicable law" is that the NLRA only allows a union to charge an agency fee "necessary to finance collective-bargaining activities."  *Beck*, 487 U.S. at 759.  The NLRA does not permit a union to "expend compelled agency fees on political causes."  *Id.* at 745.  (But the line between such "chargeable" and "nonchargeable" has proven fuzzy at best.  *Janus*, 585 U.S. at 922.)

46.     Importantly, Article 3 makes clear that collecting dues and fees is the prerogative of the union, and the union alone.  The agreement allows graduate students to consent to have their dues or fees deducted directly from their paycheck (and transferred); or students can pay the union directly.  But either way, what is plain—under both the agreement, and federal law—is the payments are made from the students to the union, to satisfy an obligation running from the students to the union (so long as they wish to work).  29 U.S.C. § 186(a)(2) (making it "unlawful for

any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value . . . to any labor organization"); Article 3, Section 4 ("The University assumes no obligation, financial or otherwise, as a result of complying with the terms of this Article. . . . Once the funds are transmitted to the Union, their disposition will be the sole and exclusive obligation and responsibility of the Union.").

47.     GSU-UE announced on May 30, 2024, that it will start to calculate dues and fees on July 1—with actual funds collected starting by the end of the month.[4]

*The GSU-UE Constitution*

48.     On May 10, GSU-UE's membership ratified the union's constitution.[5]

49.     Article 3 of the constitution states GSU "shall be affiliated with" UE.

50.     Article 7 details how GSU-UE—as an affiliate and local chapter of UE—is supposed to forward UE regular payments, including from dues and initiation fees.

51.     Article 7 also sets the amount of the agency fee to be charged by the union.  According to Section VIII, "[a]gency fees shall be set to an amount equivalent to union dues."  This is so even though federal law requires that agency fees constitute only a *portion* of member dues—those germane to collective bargaining, and no more.

---

[4] While not expressly provided, GSU-UE and the University have represented that there is an exception to this dues-or-fees arrangement for religious objectors, who hold general "religious objections to joining or financially supporting a union." Office of the Provost, Graduate Student Unionization, U. CHI. (May 16, 2024), https://perma.cc/EA5V-9VFW, attached as Exhibit 11.

[5] For its full constitution, *see* About GSU-UE Local 1103: GSU-UE Constitution and Officers, GSU-UE, https://perma.cc/E72U-HHL9 (providing link to the constitution), attached as Exhibit 12.

*The GSU-UE's Antisemitism Problem*

52. When they are not negotiating collective bargaining agreements, UE—and following its lead, GSU-UE—spend an awful lot of time talking about Israel.

53. In 2015, UE became the first national union to join the "Boycott, Divest, and Sanction" movement.[6] And it has repeatedly "reaffirmed" its commitment since.[7]

54. Indeed, UE publishes a regular "policy book," collecting local chapters' "fundamental agreement" on a host of political issues. Chief among these "policies" is a diatribe on Israel, and a call for the "union at all levels to become engaged in BDS."[8]

55. UE is very proud of its support of BDS. But it shouldn't be. BDS is a "campaign aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist." It is, in a word, "antisemitic"—geared to the "eradication of the world's only Jewish state."[9]

---

[6] Press Release, UE Endorses BDS Movement for Peace and Justice in Israel and Palestine, UE (Sept. 1, 2015), https://perma.cc/7AZR-S8XM, attached as Exhibit 13.

[7] *See, e.g.*, UE Condemns Attacks on Palestinian People, Demands Biden Pursue Peace, UE (May 15, 2021), https://perma.cc/J6BD-AY65, attached as Exhibit 14.

[8] UE Policy, UE, https://perma.cc/6HQX-BKND (providing link to the UE Policy Book), attached as Exhibit 15.

[9] The Boycott, Divestment and Sanctions Campaign (BDS), ADL (May 24, 2022), https://perma.cc/FT5F-99NX, attached as Exhibit 16.

56.     BDS is so obviously antisemitic that both Joe Biden and Donald Trump have condemned it as such;[10] so too J-Street and AIPAC (perhaps an even broader gap to bridge).[11]   Thirty-eight U.S. states (including Illinois) have adopted laws, executive orders, or resolutions castigating BDS as antisemitic.[12]  Foreign countries, too, have issued statements or taken acts denouncing BDS as bigoted toward Jews.[13]

57.     But not GSU-UE.  In fact, GSU-UE is *so* committed to BDS that it made a point of publicly reaffirming (again) its support on October 16, 2023—when the slaughtered were still being pulled from the site of the Nova Musical Festival in Israel.

---

[10] Biden draws ire of Palestinian activists for shunning BDS efforts, AL JAZEERA (May 21, 2020), https://perma.cc/W8XA-VU7H, attached as Exhibit 17; BDS Israel boycott group is anti-Semitic, says US, BBC (Nov. 19, 2020), https://perma.cc/N36K-E4AA, attached as Exhibit 18.

[11] J Street policy principles on the Global BDS Movement and boycotts, divestment and sanctions efforts, J STREET, https://perma.cc/QH8M-2LEG, attached as Exhibit 19; The BDS Campaign Against Israel, AM. ISRAEL PUB. AFFS. COMM. (May 5, 2019), https://www.aipac.org/resources/bds-campaign-against-israel-lxsyw-78xry-bn97z, attached as Exhibit 20.

[12] Anti-Semitism: State Anti-BDS Legislation, AM.-ISRAELI COOP. ENTER., https://perma.cc/33LH-LA6K, attached as Exhibit 21.

[13] *See, e.g.*, Germany labels Israel boycott movement BDS anti-Semitic, BBC (May 17, 2019), https://perma.cc/CZC7-PV8R, attached as Exhibit 22.



58.     It might not be surprising that the union's commentary on Israel does

not end there.  The union has long accused Israel of running an "occupation";[14] has

branded it an "apartheid regime";[15] and has charged it with "ethnic cleansing."[16]  All

---

[14] UE Receives "Thank You" from Over 3,000 People for Palestine Resolution, UE (Sept. 25, 2015), https://perma.cc/TH8N-SKUX, attached as Exhibit 23.

[15] Carol Lambiase, Connecticut Unionists Visit Palestine To See Sources of Conflict, Build Solidarity, UE (Nov. 20, 2015), https://perma.cc/6LQ5-CEFG, attached as Exhibit 24.

[16] UE, *supra* n.7.

of this, for what it is worth, was *years* before October 7; the union has loathed Israel well before campus protest encampments were even a flicker in a radical eye.

59.     But speaking of which, GSU-UE was involved in those too.  Right after the October 7 terrorist attacks, UE called for an immediate ceasefire and complete cessation of military aid to Israel—calls it was quick to make again and again (and again).[17]  On campus, GSU-UE joined those calls, and mirrored its parent union's rather charged rhetoric about Israel—*e.g.*, "genocide," "apartheid," and "occupation."



_____

[17] Labor Calls for Ceasefire in Israel and Palestine Grow, UE (Nov. 21, 2023), https://perma.cc/U6CV-MXHZ, attached as Exhibit 25; UE Members Take Action for Palestine Ceasefire, UE (Dec. 15, 2023), https://perma.cc/5LGD-HWVK, attached as Exhibit 26; UE, Six Other National Unions Launch Ceasefire Effort, UE (Feb. 16, 2024), https://perma.cc/D8UW-GRG5, attached as Exhibit 27.



60.     GSU-UE went further, and decided to join the "UChicago United for Palestine Coalition"—the same Coalition that lead the protest encampment on campus (something GSU-UE student leadership was already involved in), and the same Coalition that also occupied (or in its words, "liberated") the Institute of Politics.



61.     As noted in the left photo, GSU-UE's partnership with the Coalition was announced on May 8, 2024.  And that is as revealing as anything—because the Coalition had built up quite the track record to this point.  It had occupied the admissions office; installed a "memorial" on the quad for the "Palestinian martyrs killed by Israel"; branded all those opposed to their antics as secret "Zionists" among them; and urged a "ceasefire is not the end goal"—but instead, that "<u>liberation</u> is."



62.     Days after GSU-UE publicly joined the Coalition, the Coalition continued its behavior of the previous months.  It continued to run the encampment on campus, and continued with violent rhetoric.  To take one example: "We will keep fighting and heading the call to rise up for a Free Palestine *by any means necessary*. From the River to the Sea, until liberation."  (Emphasis added.)  And then practicing what it preached, the Coalition seized the Institute of Politics, where it made calls to "Bring the Intifada Home"; labeled a known terrorist to be a "martyr" (and purported to rename the building after him); and also repeatedly labeled police officers who (naturally) had been called to respond to the hostile takeover as "pigs."  GSU-UE never disassociated from any of this; it remains a Coalition member in good standing.





63.     In fact, GSU-UE did not merely stand silent in the face of all this—but *embraced* it.  For instance, around June, the President of GSU-UE—again, now the sole "representative" of all graduate students—signed onto an open letter, calling for a "Free Palestine . . . from the river to the sea"; condemning "Zionism"; charging Israel with "murdering" Palestinians; and reaffirming a strong commitment to BDS.[18]

---

[18] Petition in Support of USG's Statement on Palestine (cross-referencing other statements), https://perma.cc/4CVL-9KZR, attached as Exhibit 28.

64.    All this is well past the bounds of reasonable debate. "Intifada" is not Arabic for "two-state solution." It is violent and hateful rhetoric. And it is part of a pattern and practice of speech and behavior that reeks of one thing—antisemitism.

65.    It bears some emphasis too that the many other political positions adopted by the union are not exactly paradigms of moderation. As noted, UE publishes a comprehensive book of policy positions "set by rank-and-file delegates to [their] biennial national convention in the form of resolutions that are discussed and debated on the convention floor," and where local affiliates are expected to "live up" to those agreed policy positions in the field. These issues stretch far beyond wages, hours, and working conditions—and touch on virtually every controversial issue of our time (*e.g.*, abortion, affirmative action, gender ideology, policing, the judiciary).[19]

66.    As some insight, it is "UE Policy" that cops engage in the "murder of countless people of color"; the "Republican Party now mainstreams racism directly" to the country; and "religious liberty" laws are cloaks of bigotry. The list goes on.

*Graduate Students for Academic Freedom*

67.    Many graduate students are understandably devastated at the prospect of being forced to send GSU-UE money. For them, GSU-UE is rotted root-to-branch, and committed to disgusting (if not simply violent) positions. But under the collective bargaining agreement, these students must regularly fork over cash to GSU-UE as the price of continuing their academic pursuits—as an RA, TA, or some similar role.

---

[19] UE Policy, UE, *supra* n.8.

68. GSAF was created in 2024 to fight back against this sort of compulsion. The organization is dedicated to promoting academic freedom, and combatting compelled speech and association on campuses. GSAF's members include a number of graduate students at the University of Chicago subject to the union's agency fees.

69. One such member is Or Goldreich—a second-year PhD student in the Statistics Department, who currently serves as a TA (and thus, will need to pay the union a regular portion of his annual stipend). Or is Israeli. And he is "distraught" he must pay this union money. Goldreich Decl. ¶ 11. He finds the union's support of BDS deplorable—in no small part because it would have stopped him, due to his nationality, from ever attending the University. *Id.* ¶ 12. He also finds the union's "outspoken and longstanding positions on Israel abhorrent—for instance, accusing the country of perpetrating 'apartheid' and 'genocide.'" *Id.* ¶ 11. So too their behavior on campus: "[B]oth the union and its leadership have loudly expressed sympathy (if not outright support) for terrorists and terrorism, in the aftermath of the October 7 attacks." *Id.* ¶ 11. Yet he has no other option but to fund it: Or is here on a student visa, which he will lose if he stops work as a TA; but he cannot continue his work as a TA without cutting a regular check to the union that he sees as revolting. *Id.* ¶ 10.[20]

70. Another member is Student B. Student B is a law student who wants to serve as an RA during its final year at the school. Student B Decl. ¶ 13. At the same time, B is a "proud Jewish Zionist" whose grandfather fought in the Israeli War

---

[20] Or's full declaration is attached as Exhibit 1.

of Independence, and who has family currently serving in the Israeli Defense Force. *Id.* ¶¶ 7, 10.  B is "*disgusted* by how the union and its leaders have branded [their] service as part of some 'colonial' project, or as perpetuating 'genocide,' 'ethnic cleansing,' or 'apartheid.'"  *Id.* ¶ 10.  B also knew victims of the October 7 attacks, and is horrified at how "GSU-UE has tripled-down" on its support for BDS right after the worst massacre of Jews since the Holocaust.  *Id.* ¶ 11.  Student B cannot bring itself to send a penny to GSU-UE—so even though Student B has worked as an RA before, B has opted-out of applying for further RA work, because doing so would violate its conscience.  "It breaks my heart that I have been put in this position. I would love to be an RA this year, . . . [but] I will not contribute to antisemitism."  *Id.* ¶ 13.[21]

71.     Student A, also a law student, is in a similar position—A has concrete plans to start new RA work at the start of the Autumn Quarter, but is agonized at the prospect of having to contribute some of his wages to the union.  A's family was forced to flee A's country of birth when A was two.  And Student A sees in GSU-UE's rhetoric the very radicalism that forced that flight: "The same ideology that caused my family to flee for our lives is the one that animates [GSU-UE's] hateful beliefs. For me, the language of 'martyrdom' and 'intifada' are not empty words; it is the rhetoric of a theology that drove my family from our home, and still rings in our ears every day as we look over our shoulder."  Student A Decl. ¶ 14.  A also has a partner whose extended family was killed in the Holocaust; A "cannot imagine being

---

[21] Student B's declaration is attached as Exhibit 4.

associated with a group that promotes a form of hate that jeopardizes our family and our future." *Id.* ¶ 15. But Student A has no other choice. "My family has contributed all they could to help pay for my education, and I am responsible for covering a good amount of my cost-of-living expenses." *Id.* ¶ 7. Student A depends on regular RA work (often maxing-out hours) to pay for those expenses—and cannot afford to stop.[22]

72.     As the other declarations make plain, these are not outlier accounts. Many graduate students have fundamental objections to GSU-UE—be it the union's antisemitism, or its other political positions—but are nonetheless being "put to the choice of continuing [their] academic pursuits and studies, and contributing money to a group [they] find odious." Student C Decl. ¶ 11; *see also, e.g.*, Student D Decl. ¶ 14 ("Accordingly, come the Autumn Quarter, I expect to have to violate my conscience, as the price of continuing my work as an RA"). Each of these graduate students feels "put to the choice of weighing my career versus my conscience." Shia Decl. ¶ 17. None would have *anything* to do with this union—absent compulsion.[23]

## CLAIM FOR RELIEF

73.     Wielding their powers under the NLRA, UE and GSU-UE have extracted a levy on graduate students at the University of Chicago: In order to carry on with their pursuits as an TA or RA, they must send a portion of their earnings to

---

[22] Student A's declaration is attached as Exhibit 3.

[23] Spencer Shia's declaration is attached as Exhibit 2; Student C's declaration is attached as Exhibit 5; and Student D's declaration is attached as Exhibit 6. This Complaint incorporates all attached declarations and exhibits, as if included herein.

the union. That compulsion is unlawful. The First Amendment bars a union like GSU-UE from forcing students to pay it an fee as the price of continuing their work.

*First Amendment – Governmental Action*

74.     Purely private conduct cannot violate the First Amendment. But the fact a union may be a private entity "does not end the matter . . . because the conduct of private actors, in some cases, can constitute [governmental] action." *Hallinan v. Fraternal Order of Police of Chicago Lodge 7*, 570 F.3d 811, 815 (7th Cir. 2009).

75.     The governmental action doctrine is designed to safeguard "individual liberty." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). Defined too broad—where everyone is a governmental actor—too much private conduct will be restrained by constitutional limitations that ought to apply only to the state. But defined too narrow, nominally private parties will be able to wield state-sanctioned power, all while unshackled by the legal limits that otherwise cabin such authority.

76.     The test for *when* conduct crosses from private to governmental has two-parts: "[T]he deprivation of constitutional rights must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible . . . and the party charged with the deprivation must be a person who may fairly be said to be a State actor." *Hallinan*, 570 F.3d at 815 (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).

77.     For all its adjectives and adverbs, though, the question is this: Whether there is a sufficiently "'close nexus between the [government] and the challenged

27

action' [such] that the challenged action 'may be fairly treated as that of the state itself.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009).

78.     Finally, the governmental action inquiry is a *conduct-specific* inquiry. The fact a private actor is heavily regulated, granted some monopoly, or otherwise boosted by the state does not make everything it does governmental action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351-52 (1974). The analysis instead turns on whether the "very activity" is "supported by state action." *Hallinan*, 570 F.3d at 818.

79.     The "activity" at issue here is UE and GSU-UE (for present purposes, the "union" or just "GSU-UE") compelling graduate students to pay the union a portion of their earnings as an agency fee, as a condition of continuing their academic work. The union's ability to do so is the direct product of federal law. In other words, it is governmental action, and thus subject to the strictures of the First Amendment.[24]

### Step One

80.     Step one asks: "Whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620 (1991). And the answer here is yes: GSU-UE's extraction of fees is the product of its legal power to bind all workers to a single collective bargaining agreement, as their sole and exclusive representative.

---

[24] In *Janus*—plus *Harris* and *Knox*—the issue of governmental action was not present, because those cases involved public-sector unions, where the government was a signatory to the contract (satisfying the governmental-action requirement).

81. The Supreme Court has said as much: The "collection of fees from nonmembers is authorized by an act of legislative grace—one that we have termed 'unusual' and 'extraordinary.'" *Knox v. SEIU, Local 1000*, 567 U.S. 298, 313-14 (2012).

82. Rightly so. The NLRA "[c]reate[d] a regulatory framework governing collective bargaining agreements that differs significantly from the system that would otherwise exist." Topel, *supra*, at 1146. Rather than allow individual workers to negotiate directly—or for that matter, allow multiple unions to negotiate on behalf of different workers—the NLRA empowers a "majority" of workers within a given bargaining unit to designate a single union, at which point that one union "shall be the exclusive representative[] of all the employees in such unit." 29 U.S.C. § 159(a).

83. The NLRA thus "extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees." *Allis-Chalmers*, 388 U.S. at 180; *see Janus*, 585 U.S. at 887 ("rights of individual employees" are "restrict[ed]"); *J.I. Case Co. v. NLRB*, 321 U.S. 332, 338 (1944) (this was "very purpose" of the NLRA).

84. As part of that "created power," the NLRA enables a union to bind all workers, regardless of whether they have consented. *See Allis-Chalmers*, 388 U.S. at 180; *see also* Archibald Cox et al., *Labor Law: Cases and Materials* 362 (11th ed. 1992) (Congress "replaced a bargaining structure based on volunteerism and economic force with one based on legal compulsion."); Topel*, supra*, at 1152 (describing the same).

85. This all satisfies step one of the governmental-action inquiry. The NLRA is the "source" of "authority" that has empowered the union to visit the

constitutional deprivation at issue. *Edmonson*, 500 U.S. at 620. Only with the NLRA does GSU-UE have the authority to both represent *all* graduate workers (whether or not they consent), as well as *bind* those workers to one contract. And here, GSU-UE used that power to extract a union-security clause, which compels graduate students to pay it an agency fee (or join the union) as a condition of continuing their work.

<u>Step Two</u>

86. The second governmental action step asks: "Whether the private party charged with the deprivation could be described in all fairness as a state actor." *Id.*

87. Here too, yes. The line from private to governmental action is crossed "when the involvement of governmental authority aggravates or contributes to the unlawful conduct." *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1149 (7th Cir. 1995). And that is the case here. The NLRA has "significantly encouraged" the "very activity" at issue, *Driscoll v. IUOE, Local 139*, 484 F.2d 682, 690 (7th Cir. 1973). That creates the "close nexus" needed for step two. *Hallinan*, 570 F.3d at 816.

88. To start, recall the three features of the NLRA above: (1) The Act gives the union "broad authority" as exclusive representative to decide workers' conditions of employment, *Beck*, 487 U.S. at 739; (2) the Act then specifically authorizes unions to obtain union-security clauses, and thus "empowers the union to coerce the members of the bargaining unit" to either join the union, or pay a fee, *Wegscheid*, 117 F.3d at 987-88; and (3) the Act creates an effective presumption in favor of such fees.[25]

---

[25] In analyzing governmental action here, some federal circuit courts have found (1) and (2) alone sufficient. *E.g.*, *Beck v. CWA*, 776 F.2d 1187, 1208 (4th Cir. 1985) ("It is true, the actor is a union, but the union acts only under the warrant of

89. The final point here bears emphasis. By making union-security clauses a mandatory subject of bargaining, the NLRA is not agnostic as to whether a collective bargaining agreement includes one. Instead, the Act effectively makes such clauses the default—and subjects an employer's decision to *reject* one to a searching "good faith" review. *See Lincolnshire*, 905 F.3d at 1001. That means that an employer must exhibit a "serious intent to adjust differences and to reach an acceptable common ground." *Ins. Agents' Int'l Union*, 361 U.S. at 485. Or said another way: An employer must show a "real" or "sincere" desire to reach agreement. *Overnite Transp. Co.*, 938 F.2d at 821; *see Glomac Plastics, Inc. v. NLRB*, 592 F.2d 94, 98 (2d Cir. 1979). An employer cannot reject a union-security clause out of hand; or for philosophical reasons; or unilaterally adopt another proposal to break a deadlock. *See Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000). Only a "legitimate business purpose" is sufficient. *CJC Holdings, Inc.*, 320 N.L.R.B. at 1046.

90. That is not always easy. For decades, the NLRB has rejected efforts by employers to resist agency fees in collective bargaining agreements—and the federal courts have regularly affirmed, applying a highly deferential standard of review.[26]

---

federal authority. The union wears the cloak of the government; in making its demands it acts under authority vested in it by the federal government."); *Linscott v. Millers Falls Co.*, 440 F.2d 14, 16 & n.2 (1st Cir. 1971) (this provision "constitutes governmental endorsement in an area in which Congress makes the rules").

[26] NLRB: *See, e.g.*, *Dist. Hosp. Partners, L.P.*, 373 N.L.R.B. No. 55, 2024 WL 2110452, at *10-11 (May 8, 2024) (rejecting employer's philosophical objections to agency fees, its claim that agency fees hindered recruiting, and its claim that employees opposed the imposition of such fees); *S & F Market St. Healthcare LLC*, 2012 WL 1309214 (Apr. 16, 2012) ("In particular, it is well established that an employer's refusal to consider a union security clause solely on 'philosophical' grounds

91. Taken together, these parts of the NLRA—the exclusive representation provision (29 U.S.C. § 159(a)), the Act's express carve-out and allowance for agency fee clauses (*id.* § 158(a)(3)), and its making of union-security clauses the subject of mandatory bargaining (*id.* §§ 158(a)(5); 158(d))—have put the Government's "thumb on the scales" in favor of fees. *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 401 (1950).

92. And the consequence is predictable: Union-security clauses like the one here are the overwhelming norm, not the exception. Intuitively, the "practical" effect of the above has long been that employers are "require[d]" to "incorporate terms in [their] collective agreements which require employees to pay dues or fees to the union on penalty of employment termination." Hugh L. Reilly, *The Constitutionality of Labor Unions' Collection and Use of Forced Dues for Non-Bargaining Purposes*, 32 MERCER L. REV. 561, 563 (1981); *see also* Thomas R. Haggard, *Union Checkoff Arrangements under the National Labor Relations Act*, 39 DEPAUL L. REV. 567, 575

---

is evidence of intent not to reach agreement."); *Chester Cnty Hosp.*, 320 N.L.R.B. 604, 622 (1995) ("Where, as here, the employer adamantly opposes union security and checkoff on vague or generalized 'philosophical' grounds or questionable assertions of policy, the inference is warranted that the Employer entered negotiations with a fixed intention not to consider or agree to any form of union security or checkoff, and thereby violated the Act."); *Preterm, Inc.*, 240 N.L.R.B. 654, 673 (1979) (rejecting family planning clinic's objection to agency fees, because core commitment to "principle of woman's right to choose" was not sufficient).

Courts: *See, e.g.*, *Golden Eagle Spotting Co. v. Brewery Drivers & Helpers*, 93 F.3d 468, 471 (8th Cir. 1996) (substantial evidence supported conclusion that "union security was part of a pattern to frustrate bargaining"); *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 410 (9th Cir. 1977) (faulting employer for not exhibiting "a sincere purpose to find a basis of agreement"); *Sweeney & Co. v. NLRB*, 437 F.2d 1127, 1134-35 (5th Cir. 1971) (similar, because union had made clear that having a "dues checkoff" was an "essential item" for it).

(1990) ("It is not surprising, therefore, that the checkoff is included in ninety-six percent of all collective bargaining agreements in manufacturing industries.").

93. Really, look no further than this case to see the full weight of federal law. The *defining trait* of the University of Chicago is its commitment to academic freedom and institutional neutrality. But that sort of "philosophical" commitment is not a basis for rejecting an agency fee under the Act; in turn, "a university that itself adheres to the principles of the Kalven Report [has presently] agree[d] to a contract that mandates that its students join or support an organization that does not."[27]

94. This is all enough to create a "close nexus" between the government and the "very activity" at issue—the compulsion of agency fees—thereby satisfying step two of the governmental action test. Indeed, the federal courts have consistently found step two met where the government has "created the legal framework governing the challenged conduct," and has "in a significant way involved itself" in that activity. *Edmonson*, 500 U.S. at 624. So too where a federal law specifically empowers a *private* party to accomplish a specific *public* policy. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[T]he choice must in law be deemed to be that of the State."); *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (governmental action if conduct is "entwined with governmental policies").

---

[27] William Baude (@WilliamBaude), X (Mar. 25, 2024, 5:20 PM), https://perma.cc/956X-7BJ5, attached as Exhibit 29; Graduate Students United at UChicago (@uchicagogsu), INSTAGRAM (Oct. 11, 2023) (identifying fees as one of final "sticking points"), https://www.instagram.com/p/CyREHMpr6oq/?img_index=5, attached as Exhibit 30.

95.     And *that* is this case in spades.  Through the NLRA, the government has "put[ ] [its] weight . . . behind the private decision" at issue—the compulsion of agency fees from nonmembers, like the graduate students here.  *Apostol v. Landau*, 957 F.2d 339, 343 (7th Cir. 1992).  Again, not only does the Act give a union tremendous power as the exclusive representative; and not only does the Act specifically allow the union to use its leverage to obtain agency fees; but it also specifically *encourages* such fees by making them mandatory subjects of bargaining, where an employer may only reject a union-security clause for delineated reasons (and always at risk of lawsuit).

96.     Just take Congress's word for it: Congress *itself* has made pellucid that it intended to empower unions to extract union-security clauses.  Congress's singular "purpose" in enacting the above provisions, the Supreme Court has distilled, was "eliminating free riders"—*i.e.*, nonmembers of the union who might benefit from its representation, without kicking back something for the privilege.  *Beck*, 487 U.S. at 748-49, 762; *see also id.* at 766-67 n.5 (detailing legislative history).  And to that end, Congress specifically gave unions the power to command union-security clauses—and intended that unions use that power in predictable ways.  *Oil, Chem. & Atomic Workers v. Mobil Oil Corp.*, 426 U.S. 407, 416, 420 (1976) (Congress adopted policy that "favors" union-security clauses, so "no employees who are getting the benefits of union representation [will do so] without paying for them."); *see also Allis-Chalmers*, 388 U.S. at 180 (describing this effort as the "[n]ational labor policy" of the NLRA).

97.     "But power is never without responsibility."  *Douds*, 339 U.S. at 401. The union cannot wield a government-fashioned cudgel to obtain agency fees,

unbound by the constitutional constraints on governmental action. Because there is a sufficiently "close nexus" between the government and the union's power here, the union must exercise that power consistent with the demands of the First Amendment.

***

98. One last point on governmental action bears mention: While the Supreme Court has not weighed in on this issue, it has previously tipped its hand.[28]

99. To start, the Court has already held a substantively identical provision of the Railway Labor Act (RLA)—authorizing private-sector unions to obtain agency fees from nonmembers—involved governmental action. *Ry. Emps. Dep't v. Hanson*, 351 U.S. 225, 231-32 (1956). And *Hanson*'s author thought that the logic of that decision clearly carried over to the NLRA: "When Congress authorizes an employer and union to enter into union shop agreements and makes such agreements binding and enforceable over the dissents of a minority of employees or union members, it has cast the weight of the Federal Government behind the agreements just as surely as if it had imposed them by statute." *Buckley v. Am. Fed'n of Television & Radio Artists*, 419 U.S. 1093, 1095 (1974) (Douglas, J., dissenting from the denial of certiorari).

---

[28] The courts of appeals have split on this question. *Compare Beck*, 776. F.2d at 1207 (governmental action); *Linscott*, 440 F.2d at 16 & n.2 (same); *Seay v. McDonnell Douglas Corp.*, 427 F.2d 996, 1003-04 (9th Cir. 1970) (same), *with White v. Commc'ns Workers of Am.*, 370 F.3d 346, 350 (3d Cir. 2004) (no governmental action); *Price v. Int'l Union, United Auto.*, 795 F.2d 1128, 1133 (2d Cir. 1986) (same); *Kolinske v. Lubbers*, 712 F.2d 471, 477-78 (D.C. Cir. 1983) (same); *Reid v. McDonnell Douglas Corp.*, 443 F.2d 408, 410-11 (10th Cir. 1971) (same). Of the courts that have found *no* governmental action, none grappled with the NLRA's mandatory bargaining provisions. The Seventh Circuit has not yet weighed in here. *See, e.g.*, *Nielson v. Int'l Ass'n of Machinists*, 94 F.3d 1107, 1113 (7th Cir. 1996).

100. But even putting the RLA to the side, the Court has also warned about the consequences that would follow from *not* subjecting this sort of conduct to any constitutional limitation. In particular, when the Court encountered a labor union that wished to discriminate against workers on account of their race, it shuddered at the notion the Constitution would have nothing to say about such behavior. Instead, the Court stressed (before avoiding the constitutional issue on statutory grounds) that "the congressional grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of employees so represented, would raise grave constitutional problems if unions were free to exercise this power to further racial discrimination." *Vaca*, 386 U.S. at 182; *see Steele*, 323 U.S. at 198-99. The same is true for compelling association and speech.

*First Amendment – Merits*

101. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) (Jackson, J.).

102. GSU-UE is defying the First Amendment. If the freedoms of association and speech mean anything, they mean that a student cannot be forced to fund a group he finds abhorrent, as the price of continuing work in the academy. But the union is using its state-backed power to compel just that. Such compulsion is unconstitutional.

36

<u>The First Amendment Infringement</u>

103.   GSU-UE's agency fee scheme infringes upon the First Amendment.  But it is critical to understand *why* that is so—and in turn, what this suit is (and is not).

104.   Nothing here suggests private-sector agency fees are *always* suspect, or *always* infringe on workers' First Amendment rights in a meaningful way.  *See Janus*, 585 U.S. at 920 (noting "distinction[s]" between public- and private-sector contexts).[29] After all, in *Hanson*—which, again, involved private-sector agency fees authorized under the near-identical terms of the RLA—the Court held that such fees are not *facially* unconstitutional (*i.e.*, unlawful in *every* instance).  *See* 351 U.S. at 236-38.

105.   But as the Court has since made clear, *Hanson* only held that the "bare authorization" of agency fees was constitutional.  *Harris*, 573 U.S. at 636.  *When* such fees would be constitutionally permissible is a distinct question.  "In other words," the Court has made clear agency fees are thus "susceptible to as-applied challenges." *Rizzo-Rupon v. Int'l Ass'n of Machinists*, 822 F. App'x 49, 49-50 (3d Cir. 2020).

106.   And there is no better example of where an as-applied challenge is needed.  As the Supreme Court has also explained, the deficiency in *Hanson* was that "the record contained no evidence that the union had actually engaged in political or ideological activities"—so there was no evidence that compelling a person to send money to that union would present any First Amendment problem.  *Harris*, 573 U.S.

_____

[29] The *Janus* Court held that any agency fee to any public sector union violated the First Amendment, because all speech by such unions is "inherently political" (given it involves negotiations with the state).  585 U.S. at 920.  GSAF is not raising such a claim; this suit is confined to its academic context, and this union's conduct.

at 629.  By contrast, the Court has since emphasized that there *would* be a First Amendment infringement where an agency-fee arrangement "forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought."  *Id.* at 631.  *That* is this very case.

107.  Indeed, the "individual interests at stake" are especially serious—and the constitutional burden especially heavy—for two reasons.  *Janus*, 585 U.S. at 920.

108.  *First*, this case takes place within the walls of the academy.  Both the Supreme Court and Seventh Circuit have long held that the First Amendment has a special solicitude for academic freedom and the freedoms of association and speech on campuses.  *See Keyishian v. Bd. of Regents of University of State of N.Y.*, 385 U.S. 589, 603 (1967) ("academic freedom" is of "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy" over the academy); *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 716 (7th Cir. 2016) ("[A]cademic freedom in a university is 'a special concern of the First Amendment' because of the university's unique role in participating in and fostering a marketplace of ideas."); *see also, e.g.*, *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 681 (1980) (noting that "principles developed for use in the industrial setting cannot be imposed blindly on the academic world").

109.  But the agency fees here contravene that core freedom.  As it stands now, graduate students must associate with—and indeed fund—an ideological group that they abhor, as the price of continuing with their research and teaching.  That sort of levy on the ability to pursue a student's work is anathema to academic freedom.

110.   It also highlights how this case is distinct from a garden variety private-sector agency fee.  Ordinarily, a fee is not a precondition to engaging in expressive activity, because those fees concern non-expressive endeavors (*e.g.*, building a car).  By contrast, this case involves a levy—placed more on students' consciences, than their wallets—on the exercise of academic activity at the core of the First Amendment.  Graduate students cannot do certain *teaching* or *research* activity without first *paying* the union a fee.  That prior restraint creates a distinct First Amendment infirmity.

111.   *Second*, GSU-UE has chosen to "engage[] in political [and] ideological activities" that extend well beyond the traditional subjects of collective bargaining, and (to say the least) has fashioned a controversial political identity around many of the most hot-button issues of the day.  *Harris*, 573 U.S. at 629.  None of this is to say, of course, that the union *cannot* speak as such—the First Amendment shields its ability to say what it wants, however revolting.  But at the same time, the constitutional analysis is naturally different, where a worker is forced to subsidize a traditional union, versus where a worker is forced to fund a hyper-ideological group.

112.   The Supreme Court has already recognized this common sense point in its commercial speech cases, distinguishing disclosures (*i.e.*, compelled speech) where the subject-matter is "controversial" versus "uncontroversial."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018).  The same intuition governs here.  There is a marked difference between forcing a worker to pay an agency fee to the Teamsters, even if he happens to disagree with their approach to a labor issue, and

forcing an Israeli (or anyone, for that matter) to fund a group engaged in antisemitism, or cheering on the "intifada." The First Amendment accounts for these disparities.

113.    It is no answer that, as a statutory matter, the NLRA does not authorize GSU-UE to expend agency fees on political causes (even though, again, the union has set fees the same as dues). *See Sweeney v. Pence*, 767 F.3d 654, 661 (7th Cir. 2014). The *constitutional* infirmity arises here once a graduate student is compelled to give any money to GSU-UE, against the dictates of his conscience. After all, "a union's money is fungible, so even if the [agency] fee were spent entirely for nonpolitical activities, it would free up other funds to be spent for political purposes." *Knox*, 567 U.S. at 317 n.6; *see Retail Clerks Int'l Ass'n, Loc. 1625 v. Schermerhorn*, 373 U.S. 746, 753 (1963) (fee earmarks are "of bookkeeping significance only rather than a matter of real substance."). It would be cold comfort for Jews to have to subsidize Hamas, even if their funds were just set aside for social services; so too its sympathizers.

<u>Exacting Scrutiny</u>

114.    GSU-UE's agency fee scheme thus "imposes a significant impingement on First Amendment rights, and [] cannot be tolerated unless it passes exacting First Amendment scrutiny." *Harris*, 573 U.S. at 647-48; *see also Knox*, 567 U.S. at 302-03; *Hallinan*, 570 F.3d at 819-20; *see generally Morrisey v. W. Va. AFL-CIO*, 842 S.E.2d 455, 478 (W. Va. 2020) ("Workers in the private sector have no less of a right than public sector employees to be free from forced association with a labor organization.").

115.    But following *Janus*, there is nothing for the union to place on the other side of the constitutional ledger to justify its fees. Indeed, in *Abood* itself, the Court

held the same two "interests" justified agency fees in the public and private sectors: (1) preserving "labor peace" (*i.e.*, avoiding the conflict that might occur if multiple unions represented the same unit of workers); and (2) eliminating "free riders." 431 U.S. 209, 221-22, 224 (1977); *Lehnert v. Ferris Fac. Ass'n*, 500 U.S. 507, 517 (1991).

116.    In *Janus*, however, the Court overruled *Abood*—and in so doing, explained neither interest was constitutionally sufficient, in any sector. As for "labor peace," the Court specifically relied on the experience of the private sector—namely, that of the "28 States" with right-to-work legislation—to hold it is "now undeniable that 'labor peace' can readily be achieved 'through means significantly less restrictive of associational freedoms' than the assessment of agency fees." 585 U.S. at 896. And as for "free riders," the Court held that such an interest was illegitimate, under established precedent. *Id.* at 897 ("[A]voiding free riders is not a compelling interest").

117.    The agency fees here thus violate the First Amendment. Because these fees involve compelled association and speech, they are subject to exacting scrutiny. And the union cannot muster a cognizable interest to justify that severe compulsion.

## PRAYER FOR RELIEF

Plaintiff is thus entitled to relief against Defendants, and prays this Court:

A.     Enter a judgment declaring that the extraction of agency fees by Defendants from nonconsenting graduate students violates the First Amendment;

B.     Enter a preliminary and permanent injunction barring Defendants from compelling agency fees from Plaintiff's members, and other nonconsenting students;

C.     Enter an order awarding each of Plaintiff's members who have paid an agency fee $1 in nominal damages as compensation for the agency fees that they have been forced to contribute to the Defendants; and

D.     Grant Plaintiff any other relief that this Court deems just and proper, including an award of reasonable attorneys' fees and the costs of this action.

Dated:  July 22, 2024

Respectfully submitted,

*/s/ Jonathan M. Linas*

Brett A. Shumate*
Harry S. Graver*
Riley W. Walters*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile: (202) 626-1700
bshumate@jonesday.com
hgraver@jonesday.com
rwalters@jonesday.com

Jonathan M. Linas
(ILARDC 6290055)
JONES DAY
110 North Wacker Drive
Suite 4800
Chicago, IL 60606
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jlinas@jonesday.com

* Pro hac vice applications forthcoming

*Counsel for Plaintiff*