# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GRADUATE STUDENTS FOR ACADEMIC
FREEDOM, INC., on behalf of its members,

       *Plaintiff,*

    *v.*

UNITED ELECTRICAL, RADIO AND
MACHINE WORKERS OF AMERICA,
and UNITED ELECTRICAL, RADIO AND
MACHINE WORKERS OF AMERICA
LOCAL 1103 – GRADUATE STUDENTS
UNITED AT THE UNIVERSITY OF
CHICAGO,

       *Defendants.*

Case No. 1:24-cv-6143

Judge John F. Kness

## PLAINTIFF'S CONSOLIDATED RESPONSE
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................... 1

ARGUMENT ................................................................................................ 2

    I.    GSU-UE's Compulsion Of Agency Fees Is Unconstitutional. ........ 2

        A.    GSU-UE's Compulsion of Agency Fees is Governmental Action. ...................................................................................... 2

        B.    GSU-UE's Compulsion of Agency Fees Violates the First Amendment ................................................................................. 18

    II.    Summary Judgment Is Warranted. .................................................. 24

        A.    GSAF Has Established Article III Standing. ............................ 25

        B.    There Are No Genuine Disputes of Material Fact. ................... 29

CONCLUSION ............................................................................................ 38

i

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Advocs. for Highway & Auto Safety v. FMCSA,*
41 F.4th 586 (D.C. Cir. 2022) ...................................................... 34

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation,*
45 F.3d 1144 (7th Cir. 1995) ...................................................... 13

*Alicea v. Cook Cnty.,*
88 F.4th 1209 (7th Cir. 2023) ..................................................... 30

*Am. Coll. of Emergency Phys. v. Blue Cross & Blue Shield of Ga.,*
833 F. App'x 235 (11th Cir. 2020) .............................................. 28

*Am. Commc'ns Ass'n v. Douds,*
339 U.S. 382 (1950) ............................................................. 3, 13

*Am Mfrs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999) ..................................................................... 8

*Apostol v. Landau,*
957 F.2d 339 (7th Cir. 1992) ................................................... 7, 10

*Beck v. Commc'ns Workers of Am.,*
776 F.2d 1187 (4th Cir. 1985) .................................................... 16

*Bell v. Keating,*
697 F.3d 445 (7th Cir. 2012) ...................................................... 26

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
531 U.S. 288 (2001) ..................................................................... 8

*Buckley v. Am. Fed'n of Television & Radio Artists,*
419 U.S. 1093 (1974) ................................................................. 14

*Chamber of Commerce v. CFPB,*
691 F. Supp. 3d 730 (E.D. Tex. 2023) ........................................ 34

*CJC Holdings*,
  320 NLRB 1041 (1996) ...................................................................... 11

*Cntr. for Ind. Freedom v. Madigan*,
  697 F.3d 464 (7th Cir. 2012) ............................................................. 30

*Collins v. Citibank, N.A.*,
  2022 WL 683661 (N.D. Ill. 2022) ....................................................... 33

*Commc'ns Workers of Am. v. Beck*,
  487 U.S. 735 (1988) ...............................................................*passim*

*Davis v. United States*,
  564 U.S. 229 (2011) ........................................................................... 25

*Deere & Co. v. Ohio Gear*,
  462 F.3d 701 (7th Cir. 2006) ............................................................. 32

*Dist. Hosp. Partners, L.P.*,
  373 NLRB No. 55, 2024 WL 2110452 (May 8, 2024) .................... 11, 12

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ........................................................... 34

*Dunham v. Frank's Nursey & Crafts, Inc.*,
  919 F.2d 1281 (7th Cir. 1990) ............................................................. 6

*Edmonson v. Leesville Concrete Co., Inc.*,
  500 U.S. 614 (1991) ................................................................... 3, 4, 5

*Ellis v. Ry. Clerks*,
  466 U.S. 435 (1984) ......................................................... 20, 23, 24, 25

*El Paso Disposal, L.P. and Int'l Union of Operating Eng'rs*,
  2009 WL 1174171 (Apr. 27, 2009) ................................................ 11, 12

*F.C. Bloxom Co. v. Tom Lange Co. Int'l*,
  109 F.4th 925 (7th Cir. 2024) ........................................................... 32

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................. 14, 31, 36

*FEC v. Cruz,*
  596 U.S. 289 (2022) ........................................................................... 23

*FTC v. Publ'g Clearing House,*
  104 F.3d 1168 (9th Cir. 1997) ......................................................... 33

*Grynberg v. Total S.A.,*
  538 F.3d 1336 (10th Cir. 2008) ...................................................... 33

*Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,*
  570 F.3d 811 (7th Cir. 2009) .................................................... 7, 13

*Harris v. Quinn,*
  573 U.S. 616 (2014) ................................................................. 18, 19

*Heredia v. City of Las Cruces,*
  2021 WL 411444 (D.N.M. 2021) ..................................................... 33

*Hospital Council of W. Pa. v. City of Pittsburgh,*
  949 F.2d 83 (3d Cir. 1991) ............................................................. 29

*Int'l Ass'n of Machinists v. Street,*
  367 U.S. 740 (1961) ...................................................................... 9, 19

*Jackson v. Metro. Edison Co.,*
  419 U.S. 345 (1974) ............................................................. 4, 5, 6, 10

*Janus v. American Federation of State, County & Municipal*
  *Employees, Council 31,*
  585 U.S. 878 (2018) ..................................................................*passim*

*Kalthia Grp. Hotels, Inc. and Mana Hospitality,*
  366 NLRB No. 118, 2018 WL 3135480 (June 25, 2018)...................... 12

*Knox v. SEIU, Loc. 1000,*
  567 U.S. 298 (2012) ...................................................................*passim*

*Kolinske v. Lubbers,*
  712 F.2d 471 (D.C. Cir. 1983) .................................................... 16, 17

*Linscott v. Millers Fall Co.,*
  440 F.2d 14 (1st Cir. 1971).............................................................. 14

*Lugar v. Edmondson Oil,*
457 U.S. 922 (1982) ................................................................................ 3, 6, 7, 9

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ...................................................................................... 25

*Mo. Pet Breeders Ass'n v. Cnty. of Cook,*
106 F. Supp. 3d 908 (N.D. Ill. 2015) ..............................................................28

*NAACP v. Alabama,*
357 U.S. 449 (1958) ........................................................................................35

*NAACP v. Trump,*
298 F. Supp. 3d 209 (D.D.C. 2018) ................................................................34

*Nance v. DOJ,*
2021 WL 2329375 (N.D. Ill. 2021) ..................................................................34

*New Concepts for Living, Inc. v. NLRB,*
94 F.4th 272 (3d Cir. 2024) ............................................................................12

*New York v. U.S. Dep't of Commerce,*
351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..............................................................35

*U.S. Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ........................................................................................35

*NLRB v. A-1 King Size Sandwiches,*
732 F.2d 872 (11th Cir. 1984) ........................................................................11

*NLRB v. Allis-Chalmers Mfg. Co.,*
388 U.S. 175 (1967) ................................................................................*passim*

*Oil, Chemical & Atomic Workers v. Mobil Oil Corp.,*
426 U.S. 407 (1976) ..........................................................................................9

*Oto v. Metropolitan Life Ins. Co.,*
224 F.3d 601 (7th Cir. 2000) ..........................................................................33

*Patterson v. Cnty. of Oneida, N.Y.,*
375 F.3d 206 (2d Cir. 2004) ............................................................................35

*Perdue v. Indiana Bd. of Law Exam'rs*,
  2010 WL 5418882 (S.D. Ind. 2010) ........................................................................ 33

*Preterm, Inc.*,
  240 NLRB 654 (1979) ................................................................................................ 12

*Price v. UAW*,
  795 F.2d 1128 (2d Cir. 1986) .................................................................................... 16

*Radio Officers' Union of Com. Telegraphers v. NLRB*,
  347 U.S. 17 (1954) ....................................................................................................... 9

*Reid v. McDonnell Douglas Corp.*,
  443 F.2d 408 (10th Cir. 1971) .................................................................................. 16

*Retired Chicago Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ........................................................................................ 29

*Ry. Emps. v. Hanson*,
  351 U.S. 225 (1956) ........................................................................................... *passim*

*S & F Mkt. St. Healthcare, LLC*,
  2012 WL 1309214 (Apr. 16, 2012) ............................................................................ 12

*Sansone v. Kormex Metal Craft, Inc.*,
  2016 WL 1529900 (N.D. Ill. 2016) ............................................................................ 33

*Spierer v. Rossman*,
  2014 WL 4908023 (S.D. Ind. 2014) .......................................................................... 32

*Steele v. Louisville & Nashville R.R. Co.*,
  323 U.S. 192 (1944) ..................................................................................................... 6

*Stingley v. Laci Transport Inc.*,
  2024 WL 1363627 (N.D. Ill. 2024) ............................................................................ 24

*Sweeney v. Madigan*,
  359 F. Supp. 3d 585 (N.D. Ill. 2019) ........................................................................ 30

*Tarpley v. Keistler*,
  188 F.3d 788 (7th Cir. 1999) ....................................................................................... 8

*Texas & N.O.R. Co. v. Bhd of Ry. & S.S. Clerks*,
    281 U.S. 548 (1930) ................................................................................... 4

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................. 25

*Trinity Health Grand Haven Hosp. Resps. & SEIU Healthcare*
    *Michigan Charging Party*,
    2024 WL 4103443 (Sept. 6, 2024) ......................................................... 12

*United States v. Hansen*,
    599 U.S. 762 (2023) ................................................................................. 26

*United Steelworkers v. Sadlowksi*,
    457 U.S. 102 (1982) ................................................................................... 5

*Universal Fuel, Inc. & Int'l Ass'n of Machinists & Aerospace Workers*,
    358 NLRB 1504 (2012) ....................................................................... 11, 12

*Vaca v.* Sipes
    386 U.S. 171 (1967) ................................................................................. 15

*Warth v. Seldin*,
    422 U.S. 490, 515 (1975) ......................................................................... 28

*Wegscheid v. Loc. 2911, Int'l Union*,
    117 F.3d 986 (7th Cir. 1997) ................................................................. 5, 9

*White v. Comm'ns Workers of Am., AFL-CIO, Loc. 13000*,
    370 F.3d 346 (3d Cir. 2004) ......................................................... 6, 16, 17

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ................................................................................. 26

*Winskunas v. Birnbaum*,
    23 F.3d 1264 (7th Cir. 1994) ................................................................... 32

## OTHER AUTHORITIES

93 Cong. Rec. 3837 (1947) ............................................................................ 9

Archibald Cox et al., LABOR LAW: CASES AND MATERIALS
    (11th ed. 1991) ....................................................................................... 4

Fed. R. Civ. P. 56 ................................................................................. 35

Kelly Hui, *Dispatches from the First Week of SJP's Occupation of the Quad*, The Chicago Maroon (Nov. 29, 2023) ........................................ 36

*Live Updates: Pro-Palestine Encampment Enters Its Second Day on Quad*, The Chicago Maroon (Apr. 30, 2024) ........................................ 36

*Mutual Aid: In the Past*, UChicago United .............................................. 36

Minier Sargent, *Majority Rule in Collective Bargaining Under Section 7(a)*, 29 ILL. L. REV. 275 (1934) ................................................. 4

David Topel, *Union Shops, State Action, and the National Labor Relations Act*, 101 YALE L.J. 1135 (1992) .................................... 4

*UE Grad Worker Locals Fighting for Peace, Free Speech*, UE (May 11, 2024) ...................................................................... 36

Harry H. Wellington, *The Constitution, The Labor Union, and "Governmental Action"*, 70 YALE L.J. 345 (1961) ................................ 14

## INTRODUCTION

At the University of Chicago today, graduate students face a choice: Send some of their wages to GSU-UE, or quit working as a teaching or research assistant. That poses a terrible dilemma for many, who believe that this union has wrapped itself in antisemitism—such as with its zeal for the Boycott, Divest, and Sanction movement.

The union agrees that is how things work. And it admits graduate students have to fork over some of their wages if they want to continue their academic pursuits, even if it comes at the price of their conscience. GSU-UE's sole response is simply that there is nothing this Court can do about it. That is deeply wrong at every turn.

The union starts by saying the First Amendment does not apply here at all. But GSU-UE's ability to extract this agency-fee scheme was the direct and intended product of the NLRA; and when the state throws its weight behind specific conduct, that is textbook governmental action. As for the First Amendment, the union barely proffers a defense. And that is because it cannot say anything more. Among much else, this agency-fee arrangement functions as a prior restraint on students' capacity to engage in core expression (*e.g.*, teaching, research). That is as unlawful as it gets.

Finally, the union urges delay—that the Court should stall summary judgment in light of (mostly unspecified) fact-disputes. But the union's asserted "disputes" are neither genuine, nor material; the uncontroverted record merits final judgment now.

In truth, the Court has all it needs to decide this pure legal claim. And in doing so, the intuitive answer is the right one: The union cannot use its government-backed power to force students to fund it—against their will—and as the price of their work.

1

## ARGUMENT

**I. GSU-UE's Compulsion Of Agency Fees Is Unconstitutional.**

### A. GSU-UE's Compulsion of Agency Fees is Governmental Action.

The union's guiding refrain is that the collective bargaining agreement at issue is nothing more than a private agreement reached by private parties—and the union's power to extract agency fees from nonconsenting graduate students is the product of that private contract, not any governmental support or encouragement. *See* MTD 10.

But that would be news to Congress. One of the central purposes of the National Labor Relations Act (NLRA) was to enable unions to obtain agency fees from nonmembers. And Congress accomplished that goal through a careful statutory scheme: On the front-end, the NLRA gives unions massive bargaining power as the exclusive representative, and statutory authority to pursue agency fees; on the back-end, the NLRA superintends those negotiations, creating a clear presumption in favor of such agency fees—one that can only be displaced by a sufficiently compelling business justification on the part of the employer (as reviewed by the NLRB). PI 10.

The union is of course right that this collective bargaining agreement was reached among technically private parties; and it is right too that the NLRA does not federally mandate agency-fee provisions in every such agreement. But the union is wrong to declare the analysis ends there. And it blinks reality to contend that the contract here is just the result of two private parties reaching some arm's-length deal.

Instead, atop the bargaining table rested a heavy cudgel that the Government provided the union for the very purpose of securing agency fees. But the union may

2

not use that cudgel unbound by constitutional constraint. When a private party seeks to benefit from the "Government's thumb on the scales," it cannot wield that "power … without responsibility." *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 401 (1950). That is precisely why the governmental action doctrine exists—to ensure that those Americans on the receiving end of state-supported power are still shielded by basic constitutional protections. And that is why that doctrine applies here in full measure.

1. **Step One.** The first step of the governmental action test asks whether "the claimed constitutional deprivation"—here, the compulsion of agency fees from nonconsenting graduate students—"resulted from the exercise of a right or privilege having its source in state authority." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620 (1991) (citing *Lugar v. Edmondson Oil*, 457 U.S. 922, 939-41 (1982)).

The answer is plainly yes: A union's "collection of fees from nonmembers is authorized by an act of legislative grace—one that we have termed 'unusual' and 'extraordinary.'" *Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 313-14 (2012). That suffices.

To recap: The NLRA allows a majority of workers to designate a union as the exclusive representative for all workers in a bargaining unit. The Act in turn "creates a power vested in [that] chosen representative" to "order the relations of employees with their employer"—*i.e.*, the power to "b[i]nd" members and nonmembers alike to a single contract. *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 181 (1967). And the Act specifically provides for those agreements to include an agency-fee provision, which requires nonmembers to pay a union as a condition of employment—something even GSU-UE acknowledges would otherwise be an "unfair labor practice." MTD 5.

3

Accordingly, when a union—acting as exclusive representative—binds all workers to the terms of a single collective bargaining agreement, it is wielding power "having its source" in federal law. *Edmonson*, 500 U.S. at 620. Indeed, this power was a pure creation of federal law, and an overhaul of the legal status quo. *Compare Allis-Chalmers*, 388 U.S. at 180 (explaining the NLRA "extinguishes the individual employee's power to order his own relations with his employer" and "clothe[s] the [union] with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents"), *with Texas & N.O.R. Co. v. Bhd of Ry. & S.S. Clerks*, 281 U.S. 548, 571 (1930) (noting the "normal" rule is for people to have the "right" to "representatives of their own choosing").[1] And here, GSU-UE used that power to visit the constitutional deprivation at issue: On behalf of all workers, it agreed to an agency-fee provision—and thus bound them to that obligation.

GSU-UE barely engages with any of this. It instead responds with strawmen and nonsequiturs, resting almost entirely on the Supreme Court's decision in *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974). But *Jackson* offers the union no help at all.

---

[1] *See also, e.g.*, Archibald Cox et al., LABOR LAW: CASES AND MATERIALS 362 (11th ed. 1991) ("Congress has to a considerable degree replaced a bargaining structure based on volunteerism and economic force with one based on legal compulsion."); David Topel, *Union Shops, State Action, and the National Labor Relations Act*, 101 YALE L.J. 1135, 1446 (1992) (the federal labor laws "create a regulatory framework governing collective bargaining agreements that differs significantly from the system that would otherwise exist"); Minier Sargent, *Majority Rule in Collective Bargaining Under Section 7(a)*, 29 ILL. L. REV. 275, 278 (1934) ("The only principle of majority rule known prior to the statute was the principle of rule by a majority within an organization voluntarily chosen by the employee, from which organization the employee was free to withdraw without losing his employment").

GSU-UE repeatedly emphasizes that a union's "monopoly status as exclusive representative does not turn all of its actions as exclusive representative into state action." MTD 12 (citing *Jackson*, 419 U.S. at 351-52). But everyone agrees on that: "The fact a private actor is heavily regulated, granted some monopoly, or otherwise boosted by the state does not make everything it does governmental action." Compl. ¶ 78 (citing *Jackson*, 419 U.S. at 351-52). As GSAF underscored, this is a "conduct-specific inquiry," *id.*—one turning on the nature of the *action*, not status of the *actor*.

The big problem with the union's response is that it conflates two things: It takes the fact monopoly-status is not *dispositive* as to the full governmental action inquiry, as support for it being *irrelevant* to any part. But that is wrong—as *Jackson* itself explains. 419 U.S. at 351 (acts of monopoly "more readily" governmental acts).

To be sure, there are a number of circumstances where a union's status as the exclusive representative has little bearing on the action at issue. A good example is with regards to how a union structures its internal affairs, which directly concern only voluntary members, not others. *See United Steelworkers v. Sadlowksi*, 457 U.S. 102, 121 n.16 (1982) (holding no state action for local rule governing union elections).

But this is simply not one of those circumstances. Here, the union's power as exclusive representative is the precise "source [of] state authority" that enables the constitutional deprivation at issue. *Edmonson*, 500 U.S. at 620. Again, as a feature of this status, the NLRA "empowers the union to coerce the members of the bargaining unit" to either become dues-paying members, or pay the union an "agency fee." *Wegscheid v. Loc. 2911, Int'l Union*, 117 F.3d 986, 988 (7th Cir. 1997) (Posner);

5

*see also Steele v. Louisville & Nashville R.R. Co.*, 323 U.S. 192, 208 (1944) (Murphy, J., concurring) ("While such a union is essentially a private organization, its power to represent and bind all members of a class or craft is derived solely from Congress."). Graduate student workers at Chicago may vehemently "disagree with [that] decision"; but they are "bound by [it]." *Allis-Chalmers*, 388 U.S. at 180. That satisfies step one.

A related problem for the union is that it blurs steps one and two of the analysis. The union also argues here that the NLRA does not "compel" the inclusion of agency-fee provisions—and thus governmental action is lacking. MTD 13. But that is really a step two argument, at best (as discussed next). What the union fails to appreciate is that whether a private party "exercises a right having its source in state authority" is a more basic inquiry, but one that only satisfies the "first requirement" of the test; it alone does not establish a "state actor." *Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281, 1284 (7th Cir. 1990). There must be "something more" to ensure the *specific* act at issue can be fairly attributed to the state—and on *that* issue, the extent of Government support (*e.g.*, compulsion, encouragement) is the deciding factor. *Id.*[2]

---

[2] In this sense, *Jackson*—which was decided before *Lugar*, and accordingly did not expressly use its two-step framework—was really not a step one case at all. That is how the Seventh Circuit reads the decision. *Dunham*, 919 F.2d at 1284. So too the union's favorite case. *White v. Comm'ns Workers of Am., AFL-CIO, Loc. 13000*, 370 F.3d 346, 351-52 (3d Cir. 2004) (Alito). And for good reason. There was little doubt that the challenged act in *Jackson*—kicking someone off their electricity—had its source in state-authority, given the utility's monopoly-status. The whole point of *Jackson* was that something more was still required. And the case thus came down to whether there was a "sufficiently close nexus between the State and the challenged action," so that the act could be "fairly treated as that of the State itself." *Id.* at 351.

But that "something more" inquiry is reserved for step two, not step one. Again, the analysis here turns on a more preliminary point: Does the challenged action have its source in state authority? And on that specific point, the answer is yes: The NLRA has empowered GSU-UE to act as the exclusive representative for graduate students at the University of Chicago; it has extinguished the ability of those students to negotiate with the University directly over the terms of their employment; and it has enabled GSU-UE to bind all graduate student workers to a single collective bargaining agreement—and in particular, one that includes an agency-fee provision. That readily satisfies step one of the analysis; the union offers no persuasive response.

**2.     Step Two.** Even if an action has its source in state authority, that does not mean it is "fairly attributable to the state." *Lugar*, 457 U.S. at 937. Once again, "something more" is required. As relevant, that "something more" is present when the Government has "significantly encourage[d]" the "very activity" at issue. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 818 (7th Cir. 2009). When the state "puts [its] weight … behind [a] private decision," that support amounts to governmental action. *Apostol v. Landau*, 957 F.2d 339, 343 (7th Cir. 1992).

At this turn too, the union primarily jousts with a strawman. Nobody is saying that step two is satisfied because of the union's exclusive representative status alone. And nobody is saying that everything a union decides to put in a collective bargaining agreement is imbued with governmental sanction. The reason step two is satisfied *here* is because the NLRA consciously facilitates agency fees *in particular*. And that deliberate and meaningful support is what crosses the line into governmental action.

7

The union's response is this: The NLRA neither compels nor prohibits agency-fee provisions—and merely permitting some practice is not enough for governmental action. MTD 14. But as the union itself concedes, compulsion is not the standard for governmental action; instead, significant encouragement is sufficient. *Id.* And while the union is right that mere permission is not enough for governmental action, *Am Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999), it is quite wrong to insist that is all the NLRA does: The Act does not simply tolerate agency fees, and walk away.

In arguing otherwise, the union's approach suffers from a basic infirmity: It tries to divide-and-conquer, going provision-by-provision in the Act to say why each is insufficient in isolation. To be clear, even those points are lacking (as detailed later on). But the more fundamental issue is that more than "three decades of cases" have instructed courts "to examine[] the totality of the circumstances in making a state-action determination." *Tarpley v. Keistler*, 188 F.3d 788, 793 (7th Cir. 1999); *see also, e.g.*, *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). And nowhere does the union even attempt to perform that sort of holistic review.

That is a problem. As GSAF explained, step two is satisfied here in light of the *combined effect* of three separate parts of the NLRA. *See* Compl. ¶¶ 19-24 (detailing provisions). On one side of the bargaining table, the Act turbo-charges unions' ability to *obtain* agency fees: It gives them tremendous bargaining power as the exclusive representative for all workers; it specifically carves out agency-fee provisions from the Act's general bar on encouraging or discouraging union membership; and it makes agency-fee provisions a mandatory subject of bargaining. On the other side of the

table, the Act markedly cabins employers' ability to *reject* such agency-fee provisions: As detailed later, the Act creates an effective presumption in favor of such clauses—one an employer can only displace with a sufficiently compelling business rationale.

Taken together, Congress enacted a statutory scheme that "gave unions the power" to readily obtain agency fees. *Radio Officers' Union of Com. Telegraphers v. NLRB*, 347 U.S. 17, 41 (1954). And this was no accident—it was a deliberate policy decision. Congress "designed" the NLRA to promote collective bargaining, and it saw agency fees as essential to that project: If workers could free ride, the idea went, then few would pay the union, rendering it permanently weak. *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 753 (1988); *see Wegscheid*, 117 F.3d at 987. (But as the Court later explained in *Janus*, this prediction did not pan out in practice. *Infra* at 21.) The Act was thus far from agnostic when it came to agency fees; Congress specifically fashioned a scheme to ensure that unions could regularly and easily obtain them. *Cf. Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 789 n. 13 (1961) (Black, J., dissenting) ("Even though [this statutory text] is permissive in form, Congress was fully aware when enacting it that the almost certain result would be the establishment of union shops"). As one of the NLRA's principal authors put it: The "effect" of the NLRA is that every "employee has to pay the union dues." 93 Cong. Rec. 3837 (1947) (Taft).[3]

---

[3] The Supreme Court has recognized this policy decision elsewhere, contrary to what the union suggests (at MTD 14 n.4). For instance, in *Oil, Chemical & Atomic Workers v. Mobil Oil Corp.*, the Court explained that the federal labor laws captured a policy that "favors [union-security agreements] unless a State" preempts them—*i.e.*, it places a thumb on the scale in favor of such agreements in states that allow them. 426 U.S. 407, 420 (1976). And in *Allis-Chalmers*, the Court observed that a driving purpose of the NLRA was to enable effective collective bargaining by an exclusive

GSU-UE offers no meaningful response. It never explains why this statutory scheme—taken as a whole—does not amount to the Government throwing its "weight" behind agency fees. *Apostol*, 957 F.2d at 343. And it does not dispute—nor could it— the NLRA has worked as intended, with agency-fee clauses being the overwhelming norm, rather than the exception. *See* Compl. ¶ 92. At most, the union quibbles about the effect of isolated provisions within the NLRA. But even these latter points falter.

*First*, the union focuses on its status as exclusive representative. It begins by returning to *Jackson* to defeat an "argument" that nobody raised—that monopoly-status transforms every single thing the monopolist does into governmental action. MTD 16. After that, the union presses the broader point that increased bargaining leverage—standing alone—is also not enough for governmental action. *Id.* at 17-18.

But even if that is right, that is not this case. The Act does not just give unions generic leverage as the exclusive representative for an entire bargaining unit. It also channels—indeed, increases—that leverage with respect to agency fees in particular. The NLRA specifically authorizes agency-fee provisions; makes them the subject of mandatory bargaining; and (as discussed next) creates a presumption in their favor. The result, as noted, is that unions have a greater ability to *obtain* such fees, while employers have a cabined ability to *reject* them. The Act does not just make unions generally more powerful at the bargaining table—it trains that power on agency fees.

---

representative, 388 U.S. at 180—something, as noted, Congress feared may not be possible if workers could free-ride, *Beck*, 487 U.S. at 749-50 & n.4 (legislative history).

*Second*, the union tries to downplay the consequence of making agency fees a subject of mandatory bargaining.  MTD 18-19.  Notably, the union does not dispute that the NLRA creates an effective presumption in favor of agency-fee provisions, by making them a mandatory subject of bargaining that an employer must displace; it just disagrees about the extent to which the NLRA does so.  MTD 18.  So much for its argument that the Act does nothing more than "not prohibit agency-fee agreements." *Id.* at 11.  Regardless, the union's attempt at minimization fails on its own terms.

For starters, the union gets the law wrong.  As one of its cases makes plain: "In order to satisfy the good-faith requirement, any opposition to such a provision *must reflect* a legitimate business purpose." *CJC Holdings*, 320 NLRB 1041, 1046 (1996) (emphasis added) (cited at MTD 18).  Said otherwise, when an employer fails to put forward a "legitimate business reason" for rejecting a provision that is subject to mandatory bargaining, it "does not satisfy the statutory obligation to bargain in good faith." *NLRB v. A-1 King Size Sandwiches*, 732 F.2d 872, 877 (11th Cir. 1984).[4]

The union (unsurprisingly) also appears to accept that this is no small showing.  Its only response is that philosophical objections can sometimes pass muster.  But

---

[4] *See also, e.g.*, *Dist. Hosp. Partners, L.P.*, 373 NLRB No. 55, 2024 WL 2110452, at *11 (May 8, 2024) ("[W]e adopt the judge's finding that the Respondent failed to advance a legitimate business justification for its proposed elimination of the union-security clause, and thus its bargaining conduct regarding union security independently reflects the Respondent's unlawful intent to frustrate the bargaining process."); *Universal Fuel, Inc. & Int'l Ass'n of Machinists & Aerospace Workers*, 358 NLRB 1504, 1504 (2012) (objection must advance a "legitimate business justification"); *El Paso Disposal, L.P. and Int'l Union of Operating Eng'rs*, 2009 WL 1174171 (Apr. 27, 2009) ("[A]n employer is required to bargain in good faith … and any opposition must reflect a legitimate business purpose." (internal marks omitted)).

11

even that is overstated. The NLRB has consistently held that a "purely philosophical" objection is not a "legitimate business justification." *Universal Fuel, Inc. & Int'l Ass'n of Machinists & Aerospace Workers*, 358 NLRB 1504, 1504 (2012). And it has seriously kept to that commitment. *See, e.g.*, *Preterm, Inc.*, 240 NLRB 654, 673 (1979) (rejecting family planning clinic's objection to agency fees, because definitional commitment to "principle of woman's right to choose" was not adequate justification).[5]

Perhaps as important, the union totally ignores the practical costs that come with the NLRB superintending every rejection of an agency-fee provision. To be sure, sometimes employers prevail. But as the union's cases show, that is typically after years on years of litigation. *See, e.g.*, *New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 277-79 (3d Cir. 2024) (resolving decade-long dispute). Rejecting an agency-fee provision thus comes with a price-tag: It hazards years of lawyers' fees and litigation burdens, even if the employer ultimately wins out. That too presses down on the scales, and amounts to another external pressure on employers, courtesy of the NLRA.

---

[5] *See also, e.g.*, *Trinity Health Grand Haven Hosp. Resps. & SEIU Healthcare Michigan Charging Party*, 2024 WL 4103443 (Sept. 6, 2024) ("[T]he assertion of 'philosophical' objections does not satisfy the statutory obligation to bargain in good faith."); *Dist. Hosp. Partners*, 373 NLRB No. 55, 2024 WL 2110452, at *10 (same); *Kalthia Grp. Hotels, Inc. and Mana Hospitality*, 366 NLRB No. 118, 2018 WL 3135480 (June 25, 2018) ("[P]hilosophical objections to union security clause do not satisfy the obligation to bargain in good faith."); *S & F Mkt. St. Healthcare, LLC*, 2012 WL 1309214 (Apr. 16, 2012) ("[I]t is well established that an employer's refusal to consider a union security clause solely on 'philosophical' grounds is evidence of intent not to reach agreement."); *El Paso Disposal*, 2009 WL 1174171 (Apr. 27, 2009) (same).

The upshot is this: Through a carefully calibrated scheme, Congress used the NLRA to specifically facilitate agency fees—*i.e.*, it threw its "support[]" behind the "very activity" at issue. *Hallinan*, 570 F.3d at 818. True enough, Congress decided not to require agency-fee clauses in each collective bargaining agreement. Instead, it created a presumption in their favor, which select businesses could displace when the circumstances demanded—all while empowering unions to seize such provisions in the mine-run of cases. Or in plainer terms: The Government placed its heavy "thumb on the scales" in favor of agency fees. *Douds*, 339 U.S. at 401. That is enough for governmental action. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1149 (7th Cir. 1995) ("[S]tate action is present when the involvement of governmental authority aggravates or contributes to the unlawful conduct."). The union cannot benefit from the weighty support of the state, without enduring any of its strictures.

**3. Supreme Court.** Elsewhere, the union argues the Supreme Court has "implied" that private sector agency-fee arrangements do not involve governmental action. MTD 6. But there is little need to parse implications: The Court already *held* that parallel provisions of the Railway Labor Act (RLA)—those that gave unions the power to act as exclusive representative and specifically obtain agency fees, and are "in all material respects identical" to the NLRA, *Beck*, 487 U.S. at 745—involved governmental action. *Ry. Emps. v. Hanson*, 351 U.S. 225, 232 (1956). While the union hints this holding is out of step with doctrine today (it isn't), the "Supreme Court alone has the prerogative of overruling its own decisions." MSJ Opp. 11 n.1.

13

The union's sole basis for distinguishing *Hanson* is the RLA preempts state laws barring agency-fee arrangements, while the NLRA does not. But that cannot be right, because it proves too much. Preemption simply clears the field; it does not affirmatively empower anyone to do anything. If preemption alone were enough, then "all private action taken under the authority of federal legislation that occupies a field … [would become] governmental action." Harry H. Wellington, *The Constitution, The Labor Union, and "Governmental Action",* 70 YALE L.J. 345, 357 (1961).

Instead, *Hanson* rested on what every other governmental action case rests on: The state-backed *power* that the private actor wields—which, again, under the RLA was a railroad union's power to act as the exclusive representative and pursue agency fees. *Linscott v. Millers Fall Co.*, 440 F.2d 14, 16-17 (1st Cir. 1971). When that union agreed to an agency fee for *all* workers, "the federal statute [wa]s the source of the power and authority by which any private rights [we]re lost or sacrificed." *Hanson*, 351 U.S. at 232. So too here—which is exactly why *Hanson*'s author thought the case extended to the NLRA, preemption or not: "When Congress authorizes an employer and union to enter into union shop agreements and makes such agreements binding and enforceable over the dissents of a minority of employees or union members, it has cast the weight of the Federal Government behind the agreements just as surely as if it had imposed them by statute." *Buckley v. Am. Fed'n of Television & Radio Artists*, 419 U.S. 1093, 1095 (1974) (Douglas, J., dissenting from denial of certiorari).

Indeed, little else makes sense. In a state where agency fees are not prohibited, a railroad workers' union is wielding the *exact same powers* under the RLA as a

14

private sector union is under the NLRA. It cannot be that those same actions, backed by the very same authority, are governmental acts in one instance, and private acts the next. *Linscott*, 440 F.2d at 16. And even if preemption was some "plus factor" to help tip the scales, the NLRA has a bigger one: Again, the Act makes agency fees a mandatory subject of bargaining; and creates an effective presumption in their favor.

In short, if *Hanson*'s governmental action holding is to be taken seriously, this is a straightforward case: The RLA and NLRA are "statutory equivalents" here. *Beck*, 487 U.S. at 746; *see* MTD 19 (recognizing the statutes are "materially identical," but for preemption). If there is governmental action with one, then there is with the other.

The union raises a couple of other cases, but neither do much. It is true that in *Janus v. American Federation of State, County & Municipal Employees, Council 31*, the Court labeled *Hanson*'s governmental-action holding "questionable" in a footnote. 585 U.S. 878, 918 n.24 (2018). But none of the advocates in *Janus* had any incentive to suggest the NLRA beget governmental action; and anyway, *Hanson* still binds the lower courts. It is also true that in *Beck*, the Court cited two cases holding union action under the NLRA was not governmental action. But as noted, those cases involved a union's internal affairs—precisely where governmental action is lacking.

By contrast, the union wholly ignores where the Supreme Court has offered insights cutting in the other direction. Namely, in *Vaca v. Sipes*, the Court found it intolerable to conclude that a union—after receiving extensive state-backing under the NLRA—could then use those powers to discriminate on the basis of race, without the Constitution having anything to say about it. 386 U.S. 171, 182 (1967) ("[T]he

congressional grant of power to a union to act as exclusive collective bargaining representative, with its corresponding reduction in the individual rights of the employees so represented, would raise grave constitutional problems if unions were free to exercise this power to further racial discrimination."). But on the union's theory of labor law, it would present no constitutional problem for a union to pick its favorite race, religion, or gender, and discriminate away. GSU-UE does not deny this.

   **4. Circuit Courts.** The union agrees that the Seventh Circuit has not yet addressed the governmental action question presented here. But it emphasizes that a majority of the circuits to reach the issue have come out the union's way. MTD 8.

   That holds little water, however, because none of those circuits considered the full picture. Each reasoned that governmental action was lacking, because it was not enough the NLRA (i) made the union the exclusive representative, and (ii) specifically authorized agency-fee arrangements. *See, e.g.*, *White v. Commc'ns Workers of Am., AFL-CIO, Loc. 13000*, 370 F.3d 346, 350 (3d Cir. 2004) (Alito); *Price v. UAW*, 795 F.2d 1128, 1133 (2d Cir. 1986); *Kolinske v. Lubbers*, 712 F.2d 471, 477 (D.C. Cir. 1983); *Reid v. McDonnell Douglas Corp.*, 443 F.2d 408, 410-11 (10th Cir. 1971). To be sure, that holding is very hard to square with *Hanson*—as just explained. *See also Beck v. Commc'ns Workers of Am.*, 776 F.2d 1187, 1206-07 (4th Cir. 1985). But in all events, it ignores a key part of the analysis: That the Act *also* makes agency-fee provisions a subject of mandatory bargaining and creates an effective presumption in their favor.[6]

------

[6] The union says Judge Alito considered this argument "implicitly." MTD 17. Not so. By its terms, *White*'s analysis is limited to "addressing" certain "arguments that White ha[d] advanced." 370 F.3d at 350. Nowhere did Judge Alito grapple with

This omission matters, because it addresses the precise thing that these courts said was missing. The D.C. Circuit, for instance, reasoned that "the NLRA is neutral with respect to the content of particular agreements." *Kolinske*, 712 F.2d at 478. But that is just not so with agency fees; it creates a presumption in their favor. Likewise, the Third Circuit held a private party is not a "state actor" simply because it has been "furnished … with more bargaining power than it would have otherwise possessed." *White*, 370 F.3d at 351. But even if *generalized* leverage is insufficient, the analysis is different when the statute *specifically channels* that leverage toward certain ends. And the NLRA does exactly that, by mandating that agency-fee provisions be placed on the bargaining table, and that employers acquiesce to those provisions unless they are able to put forward a sufficiently weighty business justification for their exclusion.

***

Again, the union is of course right that the Government did not come down to Chicago and "force" the University to agree to an agency fee. MTD 19. But there is no grounded argument that this agreement was purely "private." *Id.* By intent and design, the NLRA empowered GSU-UE to extract for itself an agency-fee provision; and through that Act, the Government put its sizable weight behind that campaign.

That specific, targeted, and significant assistance gives rise to governmental action. The union thus cannot use its state-backed power to violate the Constitution, or wield it to the detriment of the First Amendment rights of these graduate students.

---

the argument that GSAF presses now—let alone reject it, in any way. *See id.* at 351 (citing Appellant Br. 19, which relies on the union's exclusive representative status).

**B.  GSU-UE's Compulsion of Agency Fees Violates the First Amendment.**

If the union is subject to the First Amendment, it is violating it here.  GSU-UE is forcing graduate students at Chicago to subsidize the union's work—and in turn, scar their consciences—as the price of continuing their academic pursuits.  It is near impossible to envision something more offensive to basic constitutional principles of free speech and association.  And the union barely offers any defense to the contrary.

1.  ***Hanson***.  After spending pages distinguishing *Hanson*, a section later GSU-UE comes to fully embrace the decision—resting its principal merits argument entirely on that case.  MTD 19-20.  But just as the union underreads *Hanson*'s governmental action holding, it dramatically overreads its First Amendment holding.

The union says *Hanson* broadly blesses private sector agency fees.  In particular, it takes *Hanson* for the proposition the First Amendment allows all agency fees so long as they are not "used for purposes other than collective bargaining."  *Id.*

But the union's maximalist reading of *Hanson* runs into a problem: The Court has expressly rejected it.  In *Harris v. Quinn*, the Court stated that *Hanson*'s holding is "really quite narrow," and that it would be a mistake to read its "single" sentence of First Amendment analysis for more than it's worth.  573 U.S. 616, 635-36 (2014). The *Hanson* Court did nothing more than hold that the "*bare authorization*" of agency fees was constitutional—*i.e.*, that it was tolerable in at least some circumstances.  *Id.* at 631.  But in rejecting that "facial First Amendment challenge," the Court said nothing as to *when* such fees would satisfy the Constitution.  *Janus*, 585 U.S. at 919. And it never "suggest[ed]" an agency fee would be permissible if it were to "force[]"

18

men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought." *Harris*, 573 U.S. at 631.

The union does not even *mention* these parts of *Harris* or *Janus*. And that is because its reading of *Hanson* is irreconcilable with them. In no sense is categorically blessing all private sector agency fees a "narrow" holding. *Id.* at 631. And even if the union's reading of *Hanson*'s single-sentence of First Amendment analysis was tenable before these cases—and that's quite a stretch—it is untenable now. As the Court has since affirmed, *Hanson* did nothing more than reject a "facial challenge" to agency fees; it never grappled with the constitutional question here. *Janus*, 585 U.S. at 919.

**2.** ***Street*, etc.** The union goes on to say that the Supreme Court—in *Street* and its progeny—held the First Amendment tolerates any agency fees "for expenses germane to collective bargaining." MTD 21. But here too, the union runs headlong into precedent: As the Court recently confirmed, those cases were not "constitutional decision[s] at all," and thus could not—and did not—answer the constitutional question here. *Harris*, 573 U.S. at 635; *see Janus*, 585 U.S. at 919 ("*Street* was decided as a matter of statutory construction, and so did not reach any constitutional issue.").

Starting in *Street*, the Court dealt with a number of cases where workers brought *partial* challenges to an agency-fee scheme—arguing not that the fee was unlawful in full, but that part of it was unlawfully going to "political candidates and causes with which they disagreed." *Harris*, 573 U.S. at 631. The Court then resolved those cases on *statutory* grounds, reasoning that neither the RLA nor NLRA permit unions to extract fees for those purposes. *Id.* at 632. This distinction—between

19

"chargeable" expenses (*i.e.*, those germane to bargaining) and "nonchargeable" ones (*i.e.*, those related to politics)—beget a series of cases where the Court fashioned fine distinctions about how to draw this statutory line. *Janus*, 585 U.S. at 921. But none of these cases involved a constitutional challenge to an *entire* agency-fee arrangement; all involved challenges to particular expenditures—and the Court took those cases on their terms. *See, e.g.*, *Beck*, 487 U.S. at 739-40 (employees brought suit "challenging [the union's] use of their agency fees for purposes other than collective bargaining").

From this statutory distinction, the union tries to conjure a constitutional holding—that an agency fee poses no First Amendment burden so long as it is not spent on politics. MSJ Opp. 11. But the Court has said the opposite: <u>Any</u> compelled agency fee constitutes "a significant impingement on First Amendment rights." *Ellis v. Ry. Clerks*, 466 U.S. 435, 455 (1984); *see Janus*, 585 U.S. at 894 ("[T]he compelled subsidization of private speech seriously impinges on First Amendment rights"). Of course, sometimes those burdens can be justified as serving compelling governmental interests; but that does not eliminate the existence of the burden in the first place.[7]

**3.** ***Harris*** **and** ***Janus.*** The union next urges this Court to shield its eyes from *Harris* and *Janus*, since they involved public-sector unions. But that too does

_____

[7] In *Ellis*, the Court did review whether a handful of expenditures (*e.g.*, money for publications, conventions) comported with the First Amendment. 466 U.S. at 456. But in upholding those requirements, the Court relied exclusively on *Abood* to hold the constitutional burdens in *Ellis* were no greater than those the Court had "already accepted." *Id.* Like *Abood* itself, that derivative holding is no longer good law. Regardless, this case presents distinct First Amendment burdens not presented in *Ellis*, and demands a distinct constitutional analysis not done there. *Infra* at 22-24.

not work. While *Harris* and *Janus* do not resolve the full constitutional question presented, both cases are highly relevant to answering it. Two points merit mention.

*First*, the union stresses that neither case "overruled" *Hanson* (or any other case involving "agency-fee arrangements in the private sector"). MTD 22. But nobody is saying that. GSAF has no problem with *Hanson*, properly read; its issue is with the union's attempt to rewrite it. And as for *that* dispute, both *Harris* and *Janus* are right on-point, because they are express about what *Hanson* held (and what it didn't).

*Second*, the union says that neither case offers relevant First Amendment analysis because neither "implicated" the private sector. MTD 22. But this repeats a now familiar mistake: Just because *Harris* and *Janus* are not *conclusive*, does not mean that they are not *relevant*. Namely, *Janus*'s exacting scrutiny analysis remains critical here. As GSAF explained, *Janus* held that neither of the purported governmental interests justified the First Amendment burden in that case. 585 U.S. at 896-901; *see* Compl. ¶¶ 114-17; PI 14. It held that eliminating "free riders" was unjustified in practice and, more important, was illegitimate as a matter of law. 585 U.S. at 897 ("[A]voiding free riders is not a compelling interest"). And it held that preserving "labor peace"—*i.e.*, avoiding the conflict that may follow multiple unions representing the same workers—never materialized, as proven by the *private sector*. *Id.* at 896 ("[It's] now undeniable that 'labor peace' can readily be achieved 'through means less restrictive of associational freedoms' than the assessment of agency fees."). As such, even if *Harris* and *Janus* did not resolve the first part of the constitutional analysis here (the burden side), they bear heavily on the second part (the benefit side).

21

That said, it is also no doubt important to be precise about where *Janus* does not apply. A key part of *Janus* was its holding that every cent of every fee that goes to a public-sector union is *necessarily* political—because all matters of public sector employment are matters of public policy—and thus any compelled fee presented an especially serious First Amendment burden. *Id.* at 920. That does not apply here: GSAF has been clear that this case is *not* a broadside against all private-sector agency fees; nor does GSAF suggest every forced payment to a private-sector union presents an unjustifiable constitutional burden (as so in the public sector). Compl. ¶¶ 103-04.

Instead, GSAF's suit is premised on an agency-fee arrangement in *this* context, paid to *this* union. As discussed next, the "individual interests at stake [] differ" here from a garden variety private-sector agency-fee arrangement. *Janus*, 585 U.S. at 920. And for that reason, *this* agency-fee arrangement contravenes the First Amendment.

**4. The Merits.** Outside of its argument that GSAF's challenge is somehow foreclosed by precedent, the union offers little on the merits. Most telling, the union does not identify a *single* compelling interest to satisfy exacting scrutiny; it does not even try. And its passing replies to GSAF's merits arguments do not say much more.

*First*, the union points out that the agency-fee arrangement here only applies to graduate students as "employees." MTD 22-23. So what? Employees or not, the point is that graduate student workers—unlike certain other fields—are engaged in core expressive activity under the First Amendment (*e.g.*, teaching, research, writing). And in turn, the agency-fee arrangement here functions as a prior restraint on such protected activity, because these graduate students cannot continue those academic

pursuits (even as "employees") without first paying the union against their will. *That* is what creates a particularly severe First Amendment burden—greater than the already "significant impingement" a typical agency fee causes. *Ellis*, 466 U.S. at 455.[8]

*Second*, the union challenges the notion that the content of its speech should have any role to play in the constitutional analysis—and floats that doing so would risk a First Amendment problem of its own. MTD 23. But nobody is suggesting any "restraint" on the union's expression. *Id.* The union is free to say whatever it wants. The point instead is that what the union *chooses* to say naturally affects its ability to *compel* the association of others. Again, any agency fee—any compelled subsidy of an organization—constitutes a real burden on the compelled's "associational freedoms." *Janus*, 585 U.S. at 894. It cannot be right that those burdens are all the same, across contexts; they vary depending on *what* one is being dragooned into associating with. Acknowledging this reality would not force courts into saying what ideas are right or wrong. All it would involve is saying that when a union's expression extends beyond traditional subjects of collective bargaining—and into "controversial subjects"—then the associative burdens posed by agency fees are greater than usual. *Id.* at 913-14.

And again, it is no answer that the union sequesters the agency fees of *Beck* objectors from political expenditures. To start, "money is fungible, so even if the

---

[8] To the extent the union is hinting there is no First Amendment issue, because graduate students voluntarily *choose* to work as teaching and research assistants, the Supreme Court has rejected that argument time and again. *FEC v. Cruz*, 596 U.S. 289, 297 (2022) ("[W]e have made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred.").

[agency] fee were spent entirely for nonpolitical activities, it would free up other funds to be spent for political purposes." *Knox*, 567 U.S. at 317 n.6. More fundamental, there is a First Amendment burden *whenever* one is forced to subsidize—and thus associate with—an entity (even if, in other cases, that relative burden can be justified by offsetting compelling interests). *Janus*, 585 U.S. at 891-94; *Ellis*, 466 U.S. at 455. The First Amendment protects people's freedom to have *nothing* to do with a group. The Constitution would not allow the Government to force Democrats to help fund the RNC—even if those funds are earmarked for staff healthcare. And here, it does not allow a governmental actor to force graduate students to fund an entity that they deem antisemitic—even if those funds do not go straight to promoting antisemitism.[9]

## II. SUMMARY JUDGMENT IS WARRANTED.

If the Court agrees with the above, it should not only deny the union's motion to dismiss, but it should also award summary judgment to GSAF. This case presents a pure legal challenge to GSU-UE's agency-fee arrangement. And GSAF "is entitled to a judgment as a matter of law." *Stingley v. Laci Transport Inc.*, 2024 WL 1363627, at *3 (N.D. Ill. 2024) (Kness). The union urges delay on two grounds; neither work.

---

[9] To be clear, GSAF is not bringing a statutory *Beck* claim as to the *amount* of agency fees its members are forced to pay. MTD 23. GSAF objects to any agency fee in any form: Its members want nothing to do with this union. Related, per this Court's procedures, GSAF believes that GSU-UE's motion to dismiss turns on purely legal issues—and thus any identified deficiencies would not be curable by amendment.

### A.  GSAF Has Established Article III Standing.

The union agrees that to establish associational standing, all GSAF needs is "one" member who has "standing to sue in their own right."  MSJ Opp. 11; *see also, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992).  But the union contends none of GSAF's members—graduate students at the University of Chicago, all bound to this contract, against their will—clear this bar.  That is not a very good argument.

GSU-UE's principal point is that none of GSAF's members are required to pay agency fees that go to political activities—and thus none have suffered (or will suffer) a First Amendment violation.  MSJ Opp. 11-12.  But this confuses standing with the merits.  For Article III purposes, a federal court accepts the plaintiff's legal theory as true, and then assesses whether he would be entitled to relief.  *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011) ("[S]tanding does not depend on the merits of a claim.").  That is why in all of the cases the union raises above—where employees challenged an agency-fee arrangement as impermissibly collecting nonchargeable expenses—the Supreme Court rejected their claims on the merits; it did not hold that they lacked *Article III standing*, once rejecting their statutory claim on its terms.  MSJ Opp. 6-7.

So too here.  GSAF members obviously have standing to challenge the contract that binds them.  As subjects of the agency-fee provision, they either must pay a fee in violation of their conscience—both a quintessential pocketbook and constitutional injury—or forgo certain teaching, research, or related opportunities—another First Amendment harm.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("monetary harms" are "obvious" Article III injuries); *Ellis*, 466 U.S. at 455 (any compelled fee is

a "significant impingement on First Amendment rights"); *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012) ("Chilled speech is, unquestionably, an injury supporting standing."). Those injuries are directly caused by the agency-fee arrangement; and they would be redressed by a judicial decision holding it unlawful (and unenforceable).

True enough, the union disputes what it is doing is ultimately unlawful—*i.e.*, it disagrees its agency-fee arrangement actually violates the First Amendment. But that is purely a *merits* point; it has zero to do with *standing*. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of the petitioner's contention that particular conduct is illegal.'").

The union raises a couple other points in passing, but those fare no better.

*First*, the union suggests GSAF lacks standing for each form of relief it seeks. MSJ Opp. 12-13. Not so. It is true GSAF also requested relief for nonmembers (*i.e.*, "other nonconsenting students"). But that flows right from bedrock First Amendment doctrine. *Janus*, 585 U.S. at 930. It is black-letter law that while a litigant *ordinarily* lacks the ability to vindicate the rights of third parties, the First Amendment is an exception: When a law facially violates the First Amendment—*i.e.*, when it's unlawful in virtually all applications—a plaintiff may seek to "vindicate the rights of the silenced," and have the provision invalidated in full. *United States v. Hansen*, 599 U.S. 762, 770 (2023). There is no reason why the rationale for facial challenges would extend to statutes, but not other binding legal instruments that visit the same harms (*e.g.*, a contract). (And even if this Court disagrees here, this is purely a legal matter.)

26

The union also notes that GSAF sought nominal damages, which may involve individualized proof. MSJ Opp. 13. But that has become a moot point. GSU-UE has agreed not to enforce its agency-fee scheme against GSAF's members for the duration of this litigation (and to not seek back fees), ECF 23, at 2; and GSU-UE agrees that the only member to have paid any fees so far has been Or Goldreich, MSJ Opp. 11. Nothing more is needed: Or is the only person who is eligible for nominal damages.

*Second*, the union disputes GSAF's standing on the ground that each member must affirmatively opt-out of agency fees—and that this lawsuit thus requires their individual participation. MSJ Opp. 12-13. But this gets the law wrong at every turn.

Foremost, the union's premise is mistaken. It is true that to raise a *Beck* claim under the NLRA, a worker must affirmatively opt-out; but the remedy is the precise *opposite* for a constitutional claim like this one. As the Court held in *Janus*, a waiver of First Amendment rights "cannot be presumed." 585 U.S. at 930. And accordingly, the Constitution compels an *opt-in* remedy: "Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay." *Id.*; *see Knox*, 567 U.S. at 312-13 (distinguishing opt-in and opt-out).

Notably, the Court explained this "procedure" was required in light of the First Amendment stakes posed by an unlawful agency-fee arrangement. *Janus*, 585 U.S. at 930. "An opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree." *Knox*, 567 U.S. at 312. And given this risk, the "default rule" must be different. *Id.* Thus

27

in *Janus*, the Court held that workers must "clearly and affirmatively consent before any money is taken from them"—they need not opt-out, or confirm that like Mr. Janus they objected to the union's political positions or activities. 585 U.S. at 930. That they chose not to associate with the union was sufficient. *See Knox*, 567 U.S. at 313.

There is no reason this case would be any different. As explained, *this* agency-fee arrangement levies a particularly severe constitutional toll—it amounts to a prior restraint on expressive activity, and an especially heavy associational burden. Given those hazards, consent cannot be presumed; the required First Amendment remedy is instead to require *affirmative* consent for every worker. And until then, the union "may no longer extract agency fees from nonconsenting employees." 585 U.S. at 929.

Even putting that aside, the union conflates what is required for an association to obtain a remedy on behalf of its members, with what is required for those members to benefit from that remedy in the real world. Every time that an association wins a prospective remedy for its members, those members will need to make some personal showing on the back-end to actually benefit from the relief—*e.g.*, a business will need to show that it is in fact a member of the Chamber of Commerce, and that it is subject to the challenged regulation. That inevitability is obviously insufficient to defeat associational standing. *Mo. Pet Breeders Ass'n v. Cnty. of Cook*, 106 F. Supp. 3d 908, 915 (N.D. Ill. 2015) ("When an 'association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'") (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *see, e.g., Am. Coll. of*

28

*Emergency Phys. v. Blue Cross & Blue Shield of Ga.*, 833 F. App'x 235, 241 n.8 (11th Cir. 2020) ("[F]or prospective relief, organizational plaintiffs 'need not name names'").

And in all events, *even if* some individual participation were needed, the union is wrong to suggest that such participation would defeat associational standing. The Seventh Circuit has squarely rejected the argument that "representational standing" is destroyed whenever it is "necessary to take any evidence from individual members of an association." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 601-02 (7th Cir. 1993). Rather, there is only a problem when "individual participation of *each* injured party [is] indispensable to proper resolution of the cause." *Id.*; *see also Hospital Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (Alito).

In short, the union's *legal* arguments regarding GSAF's standing are meritless. And its *factual* arguments are just as baseless—as explained next. Together, this is a textbook example of where associational standing is proper: Uncontroverted record evidence makes plain that GSAF's members have standing to challenge the agency-fee arrangement that binds them; and GSAF has standing to sue on their behalf. The union marshals no basis for departing from that straightforward Article III analysis.

## B. There Are No Genuine Disputes of Material Fact.

GSU-UE tries to delay the demise of its unlawful agency-fee arrangement (for at least a bit longer) by claiming there are "multiple disputed facts" that are "essential" to the Court resolving the challenge before it. MSJ Opp. 13-14. But its supposed fact-disputes are either not genuine, or immaterial. This Court has before it everything it needs to render summary judgment. The union's arguments otherwise are wrong.

29

*First*, the union's primary argument is that it needs discovery in order to explore whether any GSAF member has filed a "*Beck* objection" or has been forced to pay an agency fee. *Id.* But neither point is material; both are irrelevant. And in turn, the union has failed to carry its burden of identifying specific material needed still to resolve this case. *See Alicea v. Cook Cnty.*, 88 F.4th 1209, 1219 (7th Cir. 2023).

Once again, GSAF is not pressing a *Beck* claim. Its members object to paying *any* agency fee to this union. They are not looking to shave a few cents off the dollar.

Likewise, it makes no difference whether GSAF's other members have in fact paid agency fees in the past. The union agrees that teaching and research assistants are covered by their agency-fee scheme. And the union agrees that absent judicial relief, GSAF's members will have to pay such agency fees—indeed, that is why the union had to *waive such fees* as part of its agreement with GSAF to avoid preliminary injunction proceedings (and also why GSU-UE agreed there remained a "live case or controversy" here). ECF 23, at 2. For GSAF's members other than Or Goldreich, this is thus a classic pre-enforcement challenge, where GSAF's members are seeking relief *before* their consciences are scarred, and First Amendment rights permanently violated. *Sweeney v. Madigan*, 359 F. Supp. 3d 585, 590 (N.D. Ill. 2019); *see Cntr. for Ind. Freedom v. Madigan*, 697 F.3d 464, 473-74 (7th Cir. 2012) (describing doctrine).

*Second*, the union contends that it needs discovery—maybe even depositions— to "inquire" into GSAF members' "extraordinary position" that their "free speech rights are somehow infringed" here. MSJ Opp. 14. But this too is obviously not right.

30

To start, the union's objection is a legal one, not a factual one. The union does not assert that any GSAF declarant—of any stripe—is lying, or insincere about their objections to the union. Instead, its sole argument is that these objections do not give rise to a First Amendment claim, under "decades of Supreme Court precedent to the contrary." *Id.* Merits aside, that is the subject of briefing—not student depositions.

Equally so, the union's assertion that it needs to confirm *why* every GSAF member wants to disassociate from GSU-UE is foreclosed by *Janus* (and *Knox*). As discussed above (at 27-28), when an agency-fee scheme hazards severe constitutional burdens that outstrip its benefits—and therefore fails exacting scrutiny—the remedy is to require an *opt-in* system for *all* workers. *Janus*, 585 U.S. at 930; *see Knox*, 567 U.S. at 312-13 (explaining rationale for prophylactic rule). Workers need not justify or establish their "dissent[]" to the union's satisfaction. *Knox*, 567 U.S. at 313. The First Amendment instead requires affirmative *consent* for such an agency-fee scheme.

Anyway, it is impossible to see what the union needs to "inquire" about. There is nothing "extraordinary" about an Israeli-student like Or Goldreich not wanting to send money to a group that has joined the Boycott, Divest, and Sanction movement— *i.e.*, a movement that would make Or ineligible "for the graduate program that [he] is now a part of, because [he's] an Israeli national." ECF 25-10, Goldreich Decl. ¶ 12. Nor is there anything "extraordinary" about graduate students not wanting to send money to a union they find antisemitic—or espouses other views they find abhorrent.

Put together, even though the union gestures toward Rule 56(d) throughout its Local Rule 56.1(b)(2) response, GSU-UE has failed to offer a single sound "reason[]"

31

for why discovery is warranted, or identify any outstanding "facts" that are "essential to justify its opposition." Fed. R. Civ. P. 56(d); *see, e.g.*, *F.C. Bloxom Co. v. Tom Lange Co. Int'l*, 109 F.4th 925, 936 (7th Cir. 2024) ("A Rule 56(d) affidavit must do more than express 'a fond hope' that additional discovery would uncover useful evidence. . . . It must instead identify with specificity the information that additional discovery is expected to uncover. Even more, it must explain how that information would allow the non-movant to proceed to trial on the legal theory articulated by its adversary.").

*Third*, while the union does not press the point in its brief, it elsewhere insists that everything it cannot personally verify in the declarations is "disputed"—such as the existence of GSAF members' beliefs—and that discovery is therefore needed. MSJ Opp. 14; ECF 29-1, Luscombe Decl. ¶ 6; Deft. 56.1(b)(2) Response ¶¶ 31-57. But this mirrors a mistaken tack, oft-rejected. *See, e.g.*, *Spierer v. Rossman*, 2014 WL 4908023, at *4 (S.D. Ind. 2014) ("Simply claiming that a party has not had the opportunity to conduct discovery is not enough to defeat a motion for summary judgment").[10]

A signed-and-sworn declaration is competent evidence at summary judgment. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). And that is not made contingent on the opposing party confirming for itself that every line does not harbor

---

[10] The union's invocation of Rule 56(d) is odder still, because it did not file any accompanying motion to delay its summary judgment opposition. The point of Rule 56(d) is to provide relief, where the non-moving party is unable to put together an opposition to summary judgment, without further information. *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006). But it must obtain that relief through a "properly filed motion." *Rossman*, 2014 WL 4908023, at *6. That the union never filed this motion—and in fact, filed a thorough opposition brief—only further confirms its discovery claims ring hollow, and that no more is needed for this Court's review.

perjury. *See Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 604-05 (7th Cir. 2000). A party cannot rely on Rule 56(d)—or any rule, for that matter—to discount a sworn declaration merely because that party does not yet believe its contents, or has not yet had an opportunity to attack its credibility. *Heredia v. City of Las Cruces*, 2021 WL 411444, at *8 (D.N.M. 2021) (collecting cases rejecting discovery requests under Rule 56(d) that all "essentially hinge[d] on the hope that one or all of [the declarants] will suddenly change their story under the heat of cross-examination"); *see, e.g.*, *Perdue v. Indiana Bd. of Law Exam'rs*, 2010 WL 5418882, at *2 (S.D. Ind. 2010) (rejecting such a request, which sought "to do little more than verify the substance of the affidavits").

Simply put, a party cannot "characterize undisputed facts as disputed merely because he disagrees (without evidentiary support) that they exist, or has no knowledge to admit or deny them." *Sansone v. Kormex Metal Craft, Inc.*, 2016 WL 1529900, at *1 n.2 (N.D. Ill. 2016); *see Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008) ("A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, much less an assertion of ignorance, does not suffice."). A party cannot "generally deny[]" everything it cannot personally confirm; it must offer some "specific" reason why an assertion is disputed. *Collins v. Citibank, N.A.*, 2022 WL 683661, at *2 (N.D. Ill. 2022) (Kness); *see FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1170 (9th Cir. 1997) ("Once the [plaintiff] has made a prima facie case for summary judgment, the defendant cannot rely on general denials"). Especially so here, where GSU-UE's disputes almost exclusively concern subjective beliefs that are entirely within the declarants'

"personal knowledge." *Nance v. DOJ*, 2021 WL 2329375, at *3 n.2 (N.D. Ill. 2021). And all the more so where the declarants' assertions track all available material. *E.g.*, Deft. 56.1(b)(2) Response ¶¶ 33-34, 38-39 (confirming Goldreich and Shia are covered by contract); ECF 29-4, Srivastava Decl. Ex. A, at 1-3 (Goldreich nonmember card).

*Fourth*, the union insists that, at minimum, GSAF's anonymous declarations must be ignored, because they are "not competent evidence" as a matter of law. MSJ Opp. 5. But that has to be wrong. (And even if not, it would not stave off summary judgment.) The federal courts often award summary judgment to organizations representing pseudonymous members—something that would be impossible, if the union were right. *See, e.g.*, *NAACP v. Trump*, 298 F. Supp. 3d 209, 225 n.10 (D.D.C. 2018) (awarding partial summary judgment to NAACP even when it refused to "name [its] members"); *see also Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 592-94 (D.C. Cir. 2022) (holding on "summary judgment" standard that Teamsters had standing even though court did "not know the names of [the injured] individuals").

Rather, it is the union's categorical rule as to anonymous declarations that has no basis in law. Here as elsewhere, what matters is whether there is some actual ground to "dispute the veracity of those declarations." *Chamber of Commerce v. CFPB*, 691 F. Supp. 3d 730, 739 (E.D. Tex. 2023). There is no total bar on such declarations serving as competent evidence on summary judgment. *See, e.g.*, *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (explaining on summary judgment posture that an association need not "name the members on whose behalf suit is brought"). Rather, anonymous declarations follow directly from the First Amendment, and its

fundamental protections for those who seek to vindicate their basic rights without enduring the risk of public sanction or retribution. *See, e.g.*, *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) ("[T]o hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous."), *aff'd in part, rev'd in part on other grounds, and remanded sub. nom*, 588 U.S. 752 (2019) (relying on *NAACP v. Alabama*, 357 U.S. 449, 458-60 (1958)).[11]

Nevertheless, even if anonymous declarations harbored some evidentiary problem, it does not matter: There are more than sufficient uncontroverted facts to support summary judgment, regardless. *See* Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may[] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it"). GSAF has named two of its members, both of whom clearly have standing. The union agrees that both Or Goldreich and Spencer Shia are covered by its agency-fee arrangement. Deft. 56.1(b)(2) Response ¶¶ 33-34, 38-39. And for both, paying this union a penny would

---

[11] On its side of the ledger, the only support that the union unearths is a *partial* quote from a Second Circuit opinion. But what the Second Circuit rejected was an attempt by *one* unnamed person to describe the experience of *other* unnamed people—as the full quote shows. *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 223 (2d Cir. 2004) ("Rule 56(e) … is not satisfied by an affiant whose identity is not disclosed purporting to describe the treatment of another person whose identity also is not disclosed"). That anonymity-squared problem doesn't exist with these declarations.

irreparably violate their consciences.  ECF 25-10, Goldreich Decl. ¶ 13; ECF 25-11, Shia Decl. ¶¶ 12, 17; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 387 (2024) (conscience injuries are Article III injuries).  All told, since GSAF only needs to have one member with standing—and since there are sufficient facts in the record to support summary judgment from the named declarants alone—this issue is academic.

*Finally*, the union raises a single actual challenge of fact—whether it has ever been part of UChicago United's "Coalition for Palestine."  MSJ Opp. 5-6, 9-10.  The union now says no, and that the Coalition simply listed them as a member for months without their permission.  Deft. 56.1(b)(3) Statement ¶ 30; *see, e.g.*, Bock-Hughes Decl. ¶ 26 ("I do not know what 'uchicagounited' is.").  In full candor, the union's "Coalition, who?" response is hard to square with the public record: the union was an outspoken supporter of the encampment; called efforts to discipline its participants "political repression against those who speak up against the ongoing genocide in Gaza"; promoted how GSU-UE members were part of the protests; donated "buckets and sticks" for the encampment's drum circles; and years prior, partnered with "UChicago United" (the same group) as part of a self-described initiative to fight the University of Chicago Police Department's efforts at being a "colonial force in the South Side."[12]

---

[12] Deft. 56.1(b)(2) Response ¶ 24 (affirming social media posts, included at Compl. ¶ 59); *Live Updates: Pro-Palestine Encampment Enters Its Second Day on Quad*, The Chicago Maroon (Apr. 30, 2024), https://perma.cc/97AA-VW4Y; *UE Grad Worker Locals Fighting for Peace, Free Speech*, UE (May 11, 2024), https://perma.cc/HBR8-BB5Y; Kelly Hui, *Dispatches from the First Week of SJP's Occupation of the Quad*, The Chicago Maroon (Nov. 29, 2023), https://perma.cc/XU2D-KGAV; *Mutual Aid: In the Past*, UChicago United, https://perma.cc/6PMQ-BWAN.

But far more important, the union's affiliation with the Coalition is immaterial. The union's support for the Coalition was cream cheese on a bagel already schmeared. Had GSU not affiliated with the Coalition, but just affiliated with UE—and its controversial stances regarding Israel, plus other hot-button issues—it would have been enough. Had GSU not affiliated with the UE, but just accused Israel of "genocide" and "apartheid," it would have been enough. Had GSU-UE not accused Israel of "genocide" and "apartheid," but just recommitted to Boycott, Divest, and Sanction the week after October 7, it would have been enough. The uncontroverted record reveals many independent reasons for GSAF members to want to have nothing to do with this union. The union's formal membership in the Coalition is immaterial.

*\*\**

There is no genuine dispute about the facts material to this First Amendment challenge to the union's agency-fee scheme. Summary judgment is appropriate now.

The union accepts, after all, every important fact regarding how its agency-fee arrangement works: It agrees that it binds teaching and research assistants at the University of Chicago; that it is in full effect now; and that under it, in particular, bargaining unit members must pay the union some measure of an agency fee, even if doing so violates their conscience. Deft. 56.1(b)(2) Response ¶¶ 1-19 (accepting that all of the collective bargaining agreement's material terms work as GSAF described).

The union also agrees that it has taken the political positions that GSAF's members find abhorrent—including those regarding Israel. *Id.* ¶¶ 20-22. The union

agrees too that GSU-UE has endorsed many of the same positions on its own—such as with Boycott, Divest, and Sanction. *Id.* ¶¶ 23-24 (affirming social media posts).

As explained, the union's sole basis for opposing summary judgment seems to rest on a categorical denial as to everything GSAF-specific in the various declarations. But as explained, that does not make a "genuine" dispute of fact. The uncontroverted record evidence thus establishes that GSAF's members are (i) a collection of graduate students at the University of Chicago, (ii) covered by the agency-fee arrangement, whose (iii) consciences would be violated if they had to pay a dime to the union. *See* GSAF 56.1(a) Statement ¶¶ 28-57 (collecting cites from relevant GSAF declarations).

Nothing more is needed for this Court to resolve this pure First Amendment challenge, and to put a prompt end to GSU-UE's unconstitutional agency-fee scheme.

## CONCLUSION

This Court should deny the motion to dismiss, and award summary judgment.

Dated:  September 30, 2024

Respectfully submitted,

*/s/ Harry S. Graver*

Jonathan M. Linas
JONES DAY
110 North Wacker Drive
Suite 4800
Chicago, IL 60606
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jlinas@jonesday.com

Brett A. Shumate*
Harry S. Graver*
Riley W. Walters*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
bshumate@jonesday.com
hgraver@jonesday.com
rwalters@jonesday.com

*Pro Hac Vice

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2024, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record.


Dated:  September 30, 2024                              */s/ Harry S. Graver*
                                                        Harry S. Graver