1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2     EASTERN DIVISION

3   GRADUATE STUDENTS FOR ACADEMIC   )  Case No. 24 C 6143
    FREEDOM, INC.,                   )
4                                    )
              Plaintiff,             )
5                                    )
         v.                          )
6                                    )
    UNITED ELECTRICAL, RADIO AND     )
7   MACHINE WORKERS OF AMERICA; and  )
    UNITED ELECTRICAL, RADIO AND     )
8   MACHINE WORKERS OF AMERICA LOCAL )
    1103 — GRADUATE STUDENTS UNITED  )
9   AT THE UNIVERSITY OF CHICAGO,    )  Chicago, Illinois
                                     )  December 19, 2024
10            Defendants.            )  1:54 p.m.

11          TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
             BEFORE THE HONORABLE JOHN F. KNESS
12
    APPEARANCES:
13
    For the Plaintiff:        JONES DAY
14                            BY:  MR. HARRY S. GRAVER
                              51 Louisiana Avenue, N.W.
15                            Washington, D.C.  20001

16  For the Defendants:       DOWD, BLOCH, BENNETT, CERVONE,
                              AUERBACH & YOKICH
17                            BY:  MR. GEORGE A. LUSCOMBE III
                              8 S. Michigan Avenue, 19th Floor
18                            Chicago, Illinois  60603

19  Court Reporter:           NANCY C. LABELLA, CSR, RDR, FCRR
                              Official Court Reporter
20                            219 S. Dearborn Street, Room 2128
                              Chicago, Illinois  60604
21                            (312) 435-6890
                              Nancy_LaBella@ilnd.uscourts.gov
22

23            * * * * * * * * * * * * * * * * * *

24
              PROCEEDINGS REPORTED BY STENOTYPE
25     TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1    (Proceedings heard in open court:)

2         THE CLERK:  24 cv 6143, Graduate Students for Academic

3    Freedom, Inc. v. United Electrical, Radio and Machine Workers

4    of America.

5         THE COURT:  Good afternoon.  Why don't we come up to

6    the podia.  Plaintiffs on this side and defendants on this

7    side, please.

8         And please state your names.

9         MR. LUSCOMBE:  Good afternoon, your Honor.  George

10   Luscombe for the Union defendants.

11        THE COURT:  Mr. Luscombe, good afternoon.

12        MR. GRAVER:  Harry Graver for the plaintiff.

13        THE COURT:  And good afternoon to you, Mr. Graver.

14        MR. GRAVER:  Good afternoon.

15        THE COURT:  Thank you all for being here.  First, let

16   me offer my sincere regrets for the late start for our hearing

17   today.  We had a court meeting, an administrative meeting that

18   was scheduled to end a little before 1:30.  It did not end a

19   little before 1:30.  And I'm sorry for keeping you all, but we

20   had some matters we had to discuss.  So I thank you for your

21   patience.

22        We're here for, I guess we could call it an oral

23   argument or just a hearing on the various pending motions in

24   this case.  This is not a Court of Appeals, so the argument

25   will be a little more free-form.  And it's really intended, at

1    least from my perspective, to help me focus on the positions of

2    the parties and to understand how best to proceed.  I will

3    probably interrupt with a fair number of questions.  But I

4    thought we would start with the plaintiff and give you

5    15 minutes or so and then go to the defense and give you

6    15 minutes or so.  And I'll interrupt as appropriate with

7    questions.  But I want you to take this opportunity to get me

8    to focus on what you think are the most salient and beneficial

9    points for your positions.

10          And we don't have green, yellow, and red buttons up

11   here on your lectern, so we don't have to worry about that.

12   The afternoon is yours.  And I'm here to try to get a better

13   understanding of the challenging and important legal questions

14   in this case.

15          So with that preamble, if you're not arguing, you're

16   free to sit at the table, or you're free to stand at the

17   podium, either way.  But I'll turn to the plaintiff and

18   recognize you.

19          MR. GRAVER:  I appreciate.  Thank you, Judge Kness.

20   Harry Graver for the plaintiff.

21          Graduate students at the University of Chicago are

22   currently being put to a choice of following their conscience

23   or continuing their academic work.  That is so because the

24   Union was able to use its powers under the NLRA to extract a

25   collective bargaining agreement from the University that forces

1   every graduate student employee, whether they like it or not,

2   to first pay the Union an agency fee before they can perform

3   their research and teaching work.  The results of that scheme

4   are stark.

5        One of our members, Student B, has family right now

6   fighting in Israel for the IDF.  If Student B wants to be a

7   research assistant for a law professor this year, Student B

8   must first pay a fee to a union that is accusing his loved ones

9   of committing genocide.

10       Or take Or Goldreich, who now, in order to still work

11  as a teaching assistant, must send money to a group championing

12  the BDS movement that targets his homeland of Israel.  And as

13  we detail in the complaint, these students are far, far from

14  alone.

15       For its part, the Union says that whatever you might

16  think of this, a federal court is powerless to do anything

17  about it.  On their view, the First Amendment does not apply

18  here at all; and even if it did, they go so far as to say

19  everything they're doing is perfectly constitutional.  That is

20  deeply wrong at both turns.

21       And if I may, I'll make three points at the start, two

22  on the governmental action front, one on the merits.

23       So, first, the entire function of the governmental

24  action doctrine is to ensure that people on the receiving end

25  of government-backed power still retain their basic

1    constitutional rights.  Otherwise, the government can freely

2    violate people's rights at will and avoid judicial review by

3    simply laundering its policy choices through nominally private

4    action.  And nowhere is that more so than here.  A driving

5    point behind the NLRA was to ensure that unions would be able

6    to extract agency-fee provisions, like the one here, and

7    accomplish that goal through a careful statutory scheme that

8    makes them the reliable default.

9         And that brings me to point two.  The best way to see

10   that we are right on the law here is to look at the reality on

11   the ground.

12        The governmental action doctrine is a very practical

13   doctrine.  If the NLRA was neutral or agnostic as to agency-fee

14   provisions, you would expect to see a diversity of experience

15   on the ground, as you see with virtually every other clause in

16   a collective bargaining agreement; but you don't because the

17   Act isn't.

18        And as my friends agree, agency fees are the

19   overwhelming norm with virtually non-existent exceptions.  Our

20   basic point is that is not a coincidence.  It is the clear and

21   intended product of governmental action.

22        And the last main point I'd make to start is that on

23   the merits, the most important thing to note is that the

24   agency's fee scheme here presents a distinct First Amendment

25   burden that the Supreme Court has never addressed, let alone

1    sanctioned.  When compelled association takes place within the

2    four walls of the academy, that creates a distinct First

3    Amendment infirmity, separate and apart from the associative

4    burdens that already accompany an agency-fee scheme.

5         THE COURT:  Let me jump in with a practical question,

6    actually I have two unrelated questions.

7         But, first, it is noteworthy to me who isn't here as a

8    party and that is the University.  And do you think that

9    matters?

10        MR. GRAVER:  I don't think it matters.  I think that

11   we would be able to obtain -- our legal obligation, as a formal

12   matter, is from our members as graduate student employees

13   running towards the Union.  And if this Court was to hold that

14   that legal obligation was unlawful, then I think that the

15   contractual enforcement mechanisms that would come with the

16   University of Chicago would fall away.

17        The most practical way to look at it is the quasi

18   settlement we have in place in this case now.  We've agreed, in

19   order to put the preliminary injunction proceeding to the side,

20   that the Union would not enforce the agency-fee scheme here and

21   would not go to the University of Chicago to enforce it as a

22   condition of employment.

23        The exact same thing would happen in the event that

24   this Court issues an injunction or a declaratory --

25        THE COURT REPORTER:  Could you please slow down,

1    counsel.

2         MR. GRAVER:  Oh, I'm sorry.

3         -- would issue an injunction or a declaratory remedy

4    running towards the Union, extinguishing that legal obligation.

5         THE COURT:  But if we talk about the question of state

6    power, state actor power, why isn't the University -- why

7    shouldn't they be here?  It takes, as they say, two to tango.

8    And, here, there is a labor agreement between the Union and the

9    University.  And the University presumably had to -- "had to"

10   is not the right phrase.  The University agreed to the agency-

11   fee provision in the collective bargaining agreement.  So why

12   shouldn't they be here?

13        MR. GRAVER:  Because I think the only group wielding

14   government-backed power to visit the constitutional deprivation

15   at issue here is the Union.

16        And I think this is a key point about how the

17   bargaining system is structured.  And my friends mentioned that

18   this is a voluntary system; it takes two to tango.  The key

19   defining trait of a voluntary contractual system is where one

20   party can freely say no, for a good reason, for a bad reason,

21   for no reason at all.

22        That is fundamentally not the dynamic that the NLRA

23   set up.  The NLRA gave the Union tremendous power on the front

24   end to extract an agency-fee provision like this and then

25   superintended any rejection of that clause on the back end.

1   What happens is that they're put, essentially, to a yes or no

2   to the employer.  But in order for an employer to say no, he

3   needs to marshal sufficiently good reason as supervised by the

4   NLRB.

5           So the reason the University of Chicago doesn't need

6   to be here is essentially the University of Chicago is getting

7   bulldozed like everybody else.  The key issue here is who is

8   the governmental actor and who has the government thrown its

9   weight behind.  And the only --

10          THE COURT:  So you're saying that because -- I want to

11  make sure I have your argument straight -- because the

12  University, even though it agreed to the CBA, it didn't really

13  have a choice on this provision; so they said, fine, we'll go

14  along with that.  But we're really here because it's the Union,

15  in your view, that is enrobed in this state actor power

16  conferred by the NLRB through the statutory scheme?

17          MR. GRAVER:  Exactly.  It's who has the government

18  thrown its weight behind.  And it's thrown its weight behind

19  the Union and the Union alone.

20          THE COURT:  Okay.  You can continue.  Thank you.

21          MR. GRAVER:  So I think that the last -- well, I'll

22  stay on the governmental action point.  I think it's worthwhile

23  disentangling the step one, step two pieces of Lugar.

24          So with step one, the key point that we want to make

25  is that the Union's ability to reach out and bind non-members

1   is a direct product of its powers under the NLRA, as its

2   exclusive representative.

3          And I think the clearest way to see this is just to

4   look at how the Supreme Court and the Seventh Circuit has

5   described the powers at issue.  As the Supreme Court put it,

6   the NLRA creates a power vested in the chosen representative to

7   bind non-members and gives the union powers not unlike a

8   legislature to set the terms and conditions for employees.

9          So if turning a union into a mini legislature does not

10  satisfy step one, I don't really know what does.

11         I think the real action in this case comes down to

12  step two.  And the NLRA -- the reason that the NLRA crosses the

13  line into governmental action, why we're not in the mold of

14  cases like Sullivan or Jackson, is that the NLRA specifically

15  authorizes a type of agency-fee arrangement, forces it on the

16  bargaining table, and says that an employer can only reject it

17  if it proffers a sufficiently good reason.

18         All of that amounts to tremendous governmental

19  pressure.  And, again, that is completely by design.  As the

20  Supreme Court cataloged in Beck, this is exactly what Congress

21  was going for.

22         So our basic point is a common sense one; it's that

23  the Union cannot benefit from this massive government-backed

24  cudgel with no strings attached.  At the very least, it is

25  bound by the strictures of the First Amendment and it cannot

1   use that cudgel to violate our members' First Amendment rights.

2           THE COURT:  Let me ask you another sort of pragmatic

3   question.  And this could have absolutely zero relevance to

4   your argument, but that's not going to stop me.

5           This being a university setting, it calls to mind some

6   of the litigation that has occurred in this circuit over the --

7   I'm dating the issue a little bit here -- but over the COVID

8   vaccine mandates and some of the COVID vaccine mandate related

9   cases.

10          And I have a pretty clear recollection in one of the

11  cases, I think it was Klaassen, K-l-a-a-s-s-e-n, or something

12  like that, v. Indiana University, where some students with

13  religious views did not want to be bound by the vaccine mandate

14  that Indiana University had.  And the Seventh Circuit said --

15  perhaps it was dicta -- in an opinion by Judge Easterbrook

16  that -- the net comment was, well, you don't have to go to

17  Indiana University.

18          So as a practical matter -- and maybe this doesn't

19  matter -- should I be thinking along the lines that, well,

20  these graduate students don't really have to go work as

21  graduate teaching assistants at University of Chicago; they

22  could go somewhere else?

23          MR. GRAVER:  So a formal and functional answer to

24  that.  The formal answer is that at least in this First

25  Amendment context, that's not the right way to think about it.

1    That's the Cruz case that we think we cite ultimately in a

2    footnote.  If a First Amendment violation is some part willed

3    upon you -- you've decided to teach, you've decided to speak,

4    you've decided to start a newspaper -- it is not as if the

5    First Amendment falls away.

6         The practical answer, also, is that that doesn't

7    describe a lot of our members' circumstances.  As we talked

8    about with someone like Or, Or is here on a student visa, he

9    can't walk away from his teaching assistant job.  And if he

10   does so, he'll lose his visa and get kicked out of the country.

11        Or you have somebody like Student A who depends upon

12   what that person receives as a research assistant in order to

13   cover his costs of living.  So the idea that, you know, they

14   just want to -- like the choice is study bankruptcy or help a

15   bankruptcy professor is a luxury and that, you know, you get it

16   by pure, you know, state grace.  They put that to the side

17   even.  Our students need to participate in these programs as a

18   financial and legal matter as well.

19        But the more fundamental point -- and I think it's a

20   point from Cruz -- that that's not exactly the right way to

21   think about the First Amendment.

22        THE COURT:  And that's fair.  But while I have your

23   time here -- your attention, rather, what do you make of

24   footnote 24 in Janus; and, specifically, the tenor of that

25   footnote might be read to be somewhat against your position.

1    The Supreme Court said:  No First Amendment issue could have

2    properly arisen in those cases -- I'm omitting the citations --

3    unless Congress's enactment of a provision allowing, but not

4    requiring, private parties to enter into union-shop

5    arrangements was sufficient to establish governmental action.

6    That proposition was debatable when Abood -- that's

7    A-b-o-o-d -- was decided, and is even more questionable today.

8            How should I read that?

9            MR. GRAVER:  I think -- I mean, I think you read it as

10   written.  Where I think Justice Alito might be skeptical that

11   there's state action in this circumstance, consistent with his

12   opinion in White, which makes all the sense in the world,

13   because, you know, I think, as happened -- you don't think that

14   you usually get it wrong on the circuit court when you're up

15   there.  No one was pressing private state action during Janus.

16   And I think, though, a footnote is sort of just that.  And for

17   the purposes of a district court and for the purposes, for that

18   matter, of the Seventh Circuit, there's always a danger in sort

19   of reading the music that comes with a footnote.  And the much

20   better course is just to read the binding precedent as it

21   exists today.

22           And as the Seventh Circuit at least has made clear,

23   there is still state action, or governmental action, so long as

24   the government throws its weight behind the activity at issue;

25   so long as it consciously facilitates the activity at issue.

1    Maybe the Supreme Court wants to walk that back one day.  It

2    hasn't yet.  The Seventh Circuit certainly hasn't.

3          So, noted as to the footnote, amongst friends it would

4    be better if it wasn't there.  But for purposes of rule of

5    decision for deciding this case, I think that it is something

6    that doesn't really play a role.

7          THE COURT:  What do you think is the most on-point,

8    binding authority for purposes of this case?

9          MR. GRAVER:  I think that --

10          THE COURT:  Let me be clearer, Mr. Graver.  For

11    purposes of this being read as a state actor question.

12          MR. GRAVER:  Right.  So I think that when it comes to

13    binding authority, the cases that I think are most helpful for

14    us are the civil peremptory challenge cases that culminate in

15    the Supreme Court's Edmondson decision.

16          And, there, as here, you know, the government didn't

17    force anyone to do anything.  A party was free to use a

18    peremptory challenge or not, just as parties here, as you noted

19    at the start, are nominally free to participate in a contract.

20    But the Court still found governmental action there because the

21    government had developed a procedure to advance certain

22    policies, and a private party used that procedure with

23    significant assistance of the state.  And I think those

24    fundamentals are exactly present here.

25          THE COURT:  Could it be argued, though, Mr. Graver,

1    that the facts were perhaps better in Edmonson for that point,

2    given that we were talking about -- I think it was a judge that

3    had to pass on whether the peremptory would actually be issued,

4    right?

5         MR. GRAVER:  So I think that's a different role for

6    the state in that regard.  The judge was sort of the enforcer

7    in that one respect.  But, on the other hand, it cuts the other

8    way, in that the judge's role there was awfully ministerial.

9    And Justice Kennedy at the beginning of Edmonson disclaimed, so

10   long as the state is involved in just executing the remedy,

11   we're not saying that causes state action.  He disclaimed that

12   point at the start.  And it was a much more holistic analysis

13   being like, why did the government set up a procedure like

14   this?  What are the policies the government is trying to

15   advance?  And what is the degree in which the state is

16   involved?

17        And if you look at those fundamental principles, I

18   think all of those are implicated here because the government

19   has developed a very detailed bargaining scheme to advance

20   specific labor policies and then makes itself available to be

21   used by the union in order to advance those policies.

22        When an employer says no to an agency fee, the next

23   stop is the NLRB to supervise that decision.  The state is

24   enmeshed in this procedure and, again, completely by design.

25   This was not a coincidence that we're stumbling into that

1    agency fees are the overwhelming norm.

2              THE COURT:  Could you slow down just a bit, please.

3              MR. GRAVER:  Sorry.

4              This was entirely a policy decision set up by the

5    federal government and accomplished with resounding success.

6    Just the basic point though is that I think that's awfully good

7    evidence that the government has put a lot of pressure here,

8    and it's done so by intent.

9              THE COURT:  I'm going to ask you to touch on two more

10   points before we start thinking about changing horses here.

11             And one is the First Amendment substantive point, and

12   then we'll come to the second one after you discuss that.  Just

13   your view of why you feel the First -- what role the First

14   Amendment plays substantively and why you feel there's a

15   violation here.

16             MR. GRAVER:  So I think that any time you're dealing

17   with compelled association, you are on risky First Amendment

18   ground.

19             But I think the big question for this Court sort of is

20   what -- why is this private-sector agency fee different from

21   all other private-sector agency fees.  And I think that what

22   that involves is understanding what Hanson held and what it

23   didn't hold.  And this is a key point from Janus.  What Justice

24   Alito made very clear is that all Hanson did -- it was a very

25   narrow decision in his words -- all Hanson did was reject a

1    facial challenge -- a facial challenge -- such that agency fees

2    might, in some applications, be lawful.

3            So if you look at the -- I think what Hanson then lays

4    out is sort of a spectrum of First Amendment options.  You can

5    imagine on one end of the spectrum a traditional private-sector

6    union that might fall more comfortably into Hanson's holding.

7            Our basic point is that we are on the other end of the

8    spectrum because the burdens suffered here are distinct.  And

9    the key reason why is that so long as compelled association

10   stands in the way of being able to participate in core academic

11   work, that is a separate First Amendment infirmity because the

12   First Amendment independently protects academic freedom.  So

13   you have an additional First Amendment burden on one side of

14   the ledger.  And for this Court's purposes, I think that's very

15   important.  I think that almost ends the analysis because,

16   again, my friend has not offered a single offsetting benefit on

17   the other side of the ledger.  They have not even tried to

18   identify a justifying interest that could satisfy exacting

19   scrutiny.

20           So, so as long as this Court recognizes -- this is a

21   distinct First Amendment question; there are different burdens

22   here than the garden-variety private-sector agency fee.  And,

23   based on the papers before me, there's zilch on the other side

24   of the ledger.  I think that makes this a straightforward and

25   narrow First Amendment merits case.

1      THE COURT:  Thank you.  And then tell my why you think

2  there are no genuine issues of material fact such that I could

3  resolve this on summary judgment.

4      MR. GRAVER:  So, I think that the main point where I

5  think we end up talking past each other a little bit in the

6  papers -- and why there's a -- my friend sort of asked for

7  discovery -- is the idea that, yes, we agree that some of our

8  members are at Chicago; yes, they agree that some of our

9  members are bound by this contract; but, it sounds like there

10  needs to be -- they've asked for discovery to figure out

11  whether or not they are sincere, they really do object to this

12  Union.

13      I don't think that has purchase in any event, for the

14  reasons we detailed in the brief.  But the real reason it

15  doesn't have purchase is because sincerity is just doctrinally

16  irrelevant.  There's a reason that Janus -- Janus' holding and

17  remedy applies to everyone in the country, whether or not they

18  think -- had the same views as Mr. Janus about public-sector

19  unions.

20      The analysis here is objective when it comes to

21  compelled association.  You look to the objective burdens

22  versus the objective benefits.  For instance, a federal law

23  that says you have to give money to the Republican Party would

24  be as unconstitutional if it applied to Republicans versus

25  Democrats.  It's not a person-by-person analysis.  It's an

1  objective First Amendment analysis when it comes to compelled

2  association.

3          So I think that's the main point, is that I just

4  cannot find anything anywhere that is material that remains

5  outstanding.  I think it's a straightforward challenge.  We

6  have students at Chicago that are bound to a contract that

7  violates their conscience.  That's everything this Court needs

8  to know factwise to figure out whether or not this is unlawful.

9          THE COURT:  Thank you.  I'll give you a few minutes to

10 focus on some other things since I derailed you here.

11         MR. GRAVER:  No.

12         I think I want to return a little bit to the state

13 action point, or the governmental action point.

14         One thing that my friend brought up in his brief is

15 there can't be governmental action here because unions were

16 able to do this before the NLRA was passed.  I think it's a

17 worthwhile point to pause on.

18         The governmental -- at least at step one, none of this

19 turns on whether the ability to obtain agency fees is some

20 novel pure creation of federal law.  For purposes of step one,

21 the question is, is the action at issue the product of an

22 exercise of a right or privilege with its roots in federal law.

23 And I think that, as a descriptive matter, is undoubtedly true

24 here.

25         One point I would add, that I think is in the briefs

1    but could be pulled out a little clearer, is looking at the

2    text of Section (a)(3).  What happens with (a)(3) is that

3    there's a general bar on collecting a -- or there's a general

4    bar on employers discriminating against employees based on

5    their union status.  But then there's a carve-out.  And the

6    carve-out allows for agency-fee arrangements like that here.

7    But the only group that can avail itself of a carve-out is the

8    Section 9 representative, exclusive representative.

9           So when you are the Section 9 exclusive

10   representative, you are the only show in town.  And you're the

11   only person who is able to avail themselves of that federal

12   carve-out.  That is by definition exercising a privilege with

13   its source in federal law.

14          Step one is -- again, we say very preliminary

15   inquiry -- whether federal law has any role to play.  I think

16   it's very naturally satisfied by that alone.

17          The other point I would make is just, when it comes to

18   step two, the big part of this, I think, is what makes this

19   case different from a case like Sullivan, different from a case

20   like Jackson.

21          And the big difference, to my mind at least, is it's

22   not just that the NLRA makes you a lot more powerful; It's not

23   just that the NLRA makes you the exclusive representative, but

24   that there is a conscious effort to train that power on agency

25   fees in particular.  And I think that's important because

1    agency fees stand somewhat alone when it comes to the NLRA's

2    broader statutory scheme.  It is the one specific contractual

3    provision that the NLRA forces onto the bargaining table.

4          And it's worthwhile maybe contrasting two examples.

5    One, the NLRA makes a mandatory subject of bargaining hours.

6    But there's no content behind that command.  It's a generic

7    discussion that the two parties need to haggle out.  An

8    agency-fee provision is different in kind because the NLRA

9    provides content to the sort of provision that can be allowed

10   and then forces that provision onto the bargaining table for a

11   "Yes," "No" from the employer.  That sort of targeted

12   assistance, that sort of deliberate support and that binary

13   option that it forces upon the employer, supervised by the NLRB

14   on the back end, separates agency-fee provisions from

15   everything else that you would see within a routine contract.

16   And I think it's further evidence of the government's targeted

17   support for this kind of contractual term.

18          THE COURT:  Let me ask you this, and this is based off

19   of ignorance on my part, how exactly does the issue of having

20   the NLRB pass on whether there's a good business reason for --

21   let's say, there was no agency fee -- how does that get before

22   them?  Is it after a contract has been reached that doesn't

23   have that provision?  Or is it during negotiations?  And is

24   there an unfair labor practice charge?  Just practically, how

25   does that work?

 1          MR. GRAVER:  I think practically -- and, you know, I

 2    might rely on my friend a little bit for this too -- is that

 3    you -- the NLRB, I believe, cannot act unless there's a

 4    complaint filed.  I'm not sure there is a time limit when that

 5    claim necessarily needs to be filed, whether a bargain is first

 6    struck or whether negotiations have fallen through.

 7          THE COURT:  And on this point of -- and I'll recast

 8    your argument just so that I make sure I have it right, and you

 9    can correct me -- but on this point that the NLRB really puts a

10    thumb on the scale that employers get hometowned when they try

11    to not have an agency-fee arrangement in a CBA, is that

12    something that we need discovery on?  Is that a contested fact?

13    Or do you think that the record as it exists now is sufficient

14    for me to rule on it as a matter of law?

15          MR. GRAVER:  No.  But I think the basic point is a

16    statutory one.  It's looking at the government's intent by the

17    scheme that it set up.  So you're looking both at how the NLRA

18    is structured and then you're looking at how the NLRB has

19    discharged its command.  And in Moose Lodge, Justice Rehnquist

20    explained that when you're figuring out governmental action,

21    you look at the whole kettle of fish.  You look at both the

22    statute, the -- how it's enforced.  You look at the

23    regulations.  You look at it all.

24          And I think what is important -- and this is a pure

25    legal point that doesn't need discovery -- is -- there's a part

1   in the papers where I think we're talking past each other, but

2   the key part is that in order to reject an agency fee, you need

3   to marshal a sufficiently good business justification.

4          And we were talking a little bit about how

5   philosophical objections factor into this.  Our only point is

6   that you need to put forward a business justification.  And a

7   stand-alone philosophical objection does not count as that.

8   You need something more.  And as my friend agrees, that

9   something more is not necessarily a small showing.

10         And I think if you take a step back, just be mindful

11  about why this mandatory duty to bargain exists just in the

12  first place.  The whole idea here is to reach comprise and, in

13  particular then, to stop labor strikes.  So if philosophical

14  objections alone could count, the scheme falls apart overnight

15  because you can't bargain with a philosophical objection.  It's

16  first principles.  It's philosophy.  It's morals.  You can't

17  put that on the bargaining table.  That's why it's necessary to

18  put forward some economic rationale because that can get traded

19  across terms.  And that is not necessarily a small showing.

20         And the last piece -- and, again, this is not

21  something that needs discovery; it's just a common sense

22  piece -- is that, if you say no, you know to an almost

23  certainty that you're going to get an unfair labor practices

24  charge and you're going to be in years of litigation.

25         THE COURT:  Well, it's that point that I'm wondering

1   whether we need to have discovery on.  Because that's a

2   statement you make, and it may be true, but how do I know that

3   that's an uncontested fact?  Maybe it's not a material fact.

4   But being a trial-level Court, we look at things from this

5   perspective a fair amount.  And so when you make that statement

6   that you know -- you, the employer -- know for an almost

7   certainty that you're going to get an unfair labor practice

8   charge if you try to not have an agency-fee arrangement.  How

9   do we know that?

10          MR. GRAVER:  I think the basic point is that -- and I

11  think all you need to do to see this is both look at the case

12  law and just the frequency of litigation.  I'm not saying

13  necessarily for discovery.  This is the litigation risk.  And

14  the litigation risk is by design in just the statutory

15  structure.  You know to a certainty that this is the sort of

16  thing that you need to bargain with in good faith.  You know to

17  a certainty that good faith is sort of a pliable standard by

18  design.  And you know to a certainty that the union has a right

19  to challenge your bargaining practices before the NLRB.

20          Now, granted, in a given case, you might feel like you

21  have a great chance to win.  But certainly your counterparty --

22  and this is not really something for discovery because it's

23  union by union and party by party -- but you know to a

24  certainty that your counterparty can drag you through years of

25  litigation.  Maybe that's not so frequent, maybe it's very

1    frequent.  But the key point here is looking to see, what is

2    the scheme the government set up; and, from that, what can we

3    distill about their intent about where they threw their weight.

4            THE COURT:  So your argument is that an employer who

5    is trying to get a labor contract in place would look at the

6    statutory scheme and say, well, I know I'm going to buy

7    litigation uncertainty if I fight over this agency-fee issue; I

8    don't really care because I don't have to pay it; the employees

9    have to pay it; it's important to the union; it's cost-free for

10    us, so just give it to them.  Is that basically the argument?

11            MR. GRAVER:  I mean, it happens a lot.  The only

12    footnote I would say is that there is a reason for an employer

13    to care -- and I think it speaks to the pressure that the

14    government has been able to create here -- is that, you might

15    have a genuine philosophical objection.  We collect cases where

16    that's the case.  Or it might be a retention problem.  And I

17    can give a very concrete example here.  You know, the defining

18    trade of the University of Chicago is institutional neutrality.

19    They didn't want to agree to this.  But that is not the kind of

20    thing you can put on the bargaining table here.

21            And -- but they have very good reasons not to want to

22    agree to it.  It might be harder to get students, as much as it

23    is harder for, you know, an employer to attract people if they

24    know they need to contribute to a union, especially a union

25    that violates your conscience.  But it's all to say, is that

1  the government has been able to structure a system where the

2  power on the other side of the table is so large and the scheme

3  has such a heavy thumb on the scale that you never see these

4  exceptions get bucked.

5        THE COURT:  You did say, Mr. Graver, something along

6  the lines of, we know that the university didn't want -- may

7  not have wanted this.  How do we know that?  Where in the

8  record is that?

9        MR. GRAVER:  So we know that from the Union's own

10 Instagram, which I believe they verified, is that they

11 cataloged quite well the remaining sticking points that

12 exist -- and we cite this in the complaint; it's one of the

13 exhibits -- agency-fee provisions was one of the last holdout

14 pieces here.

15       THE COURT:  All right.  Thank you.  Why don't you take

16 a minute or two to wrap up, and then I'm going to turn to Mr.

17 Luscombe.

18       MR. GRAVER:  I think the basic point that we want to

19 make is that there's a common sense and practical element to

20 governmental action doctrine.  Here, the Union has received

21 tremendous federal power.  As the exclusive representative, it

22 has the ability to extinguish how others organize their own

23 affairs.  It can force the University to the bargaining table.

24 And, by statutory design, it can train that power on agency-fee

25 provisions, exactly as Congress wanted.

1     Congress wanted to make sure that agencies would be

2   able to eradicate free riders.  And they accomplished that

3   statutory goal with tremendous success.  The basic point here,

4   the entire reason the governmental action doctrine exists, is

5   that when you are on the receiving end of that power -- when

6   you are a non-member, when you are an individual student -- you

7   still have some basic constitutional protections because,

8   otherwise, the government will be free to launder its authority

9   through nominally private actors to the compromise of your

10  rights.

11     THE COURT:  Thank you, Mr. Graver.  You may stay here

12  or have a seat.  It's up to you.

13     MR. GRAVER:  I might go back that way.

14     THE COURT:  Mr. Luscombe.

15     MR. LUSCOMBE:  Yes, good afternoon, your Honor.

16  Again, George Luscombe for the Union defendants.

17     Plaintiff has an uphill climb here.  They challenge a

18  private union agency-fee agreement in a private public

19  sector -- a private-sector, excuse me, collective bargaining

20  agreement with a private-sector employer under the First

21  Amendment.  In the nearly a hundred years of the NLRA, no case

22  has ever held that.

23     Simply put, as we've been discussing and that I'll

24  begin my focusing on, is that there is no state action here and

25  that the First Amendment simply does not apply.

1       As we've cited to your Honor, that is the strong

2   majority view of the appellate courts, the cases we've cited in

3   our briefs from the Second Circuit, the Third Circuit, the D.C.

4   Circuit, and the Tenth Circuit.  And it is also very much so

5   what the Supreme Court in Janus in footnote 24 tilted its hand

6   to.  Of course, they did not decide the question; it was just a

7   footnote; but I think it's a strong indication of what the

8   Supreme Court thinks of this.

9       You asked opposing counsel what are -- what's their

10  best case.  And, tellingly, the best thing they can come up

11  with is Edmonson, which is just strikingly different facts.  To

12  say that this case has anything to do with the state

13  involvement involved in the peremptory challenges of potential

14  jurors, they're just radically different situations.  As the

15  court in that case explained, it's not just that at the end

16  it's the judge who dismisses the jurors, but it's the entire

17  process of civil litigation is a state action, that is a

18  traditional state power, that all of that is involved with the

19  state.  Collective bargaining between private employers and

20  private unions is simply not anything like that.

21      THE COURT:  Let me ask you, Mr. Luscombe, the pantheon

22  of appellate decisions that you referred to -- and even maybe

23  Supreme Court earlier decisions -- remind me, do any of those

24  postdate the decision in Janus?

25      MR. LUSCOMBE:  No, your Honor, none of them postdate

1    Janus.

2         THE COURT:  Does that matter?

3         MR. LUSCOMBE:  No, your Honor, I don't think it does.

4    For the state action piece, it certainly doesn't matter because

5    Janus did not decide the state action question.  If anything,

6    it tilted its hand to say -- Justice Alito tilted his hand to

7    say that he believes his decision in White was correct.

8         And to the merits First Amendment decision, the Court

9    very much distinguished and made clear that it was not making

10   any decision for private-sector labor law; that it was limiting

11   its issues to the public-sector labor law.

12        Now, we're not blind --

13        THE COURT:  Well --

14        MR. LUSCOMBE:  I'm sorry.

15        THE COURT:  No, no, go ahead.  I'm sorry.

16        MR. LUSCOMBE:  I was going to say, we're not blind to

17   the fact that the Court's view of the traditional

18   justifications -- state interests of labor peace, preventing

19   industrial strife, and the free rider issue -- that they have

20   questioned those.  We're not -- you know, that's, of course,

21   true.  But we think, you know, if this had to go up to the

22   Courts -- because, again, I think it's not this Court, but it

23   would have to be the Supreme Court to overrule Janus -- you

24   know, we would have arguments why those interests have a

25   different implication in the private sector.

1          THE COURT:  Going back to the state actor test, the

2     Lugar test and whether this can be fairly viewed as state

3     action, you heard Mr. Graver's argument about why, from a

4     common sense, practical viewpoint, this is a state action

5     because, effectively, employers know -- and this employer

6     knew -- that if they tried not to have an agency-fee

7     arrangement in their CBA, they'd be buying an NLRB proceeding

8     and would very likely lose that.  Doesn't that at least move

9     the needle somewhat towards a finding that this is not entirely

10    a situation with private actors?

11         MR. LUSCOMBE:  No, your Honor, I don't think so.  I

12    don't think it moves the needle at all.

13         First, preliminarily addressing the factual issues,

14    you'll peruse their 56.1 statement and you won't see a thing

15    about why the University of Chicago did or did not ultimately

16    agree to an agency-fee clause.  There's zilch in the record

17    about that.

18         And if the reason that this employer specifically

19    needed -- this employer specifically agreed to the agency-fee

20    clause was dispositive of this case, we would absolutely need

21    discovery on that.

22         The assumption that he makes that because agency-fee

23    clauses -- and it's not uncommon that agency-fee clauses, union

24    security agreements, dues checkoff -- come at the end of a

25    contract cycle, isn't because, oh, the employer cares so much

1   about opposing it.  Most employers really don't care, right?

2   It is because they know that's a cudgel against the union.  The

3   employers hold that hostage to try and get economic concessions

4   out of the union.

5          THE COURT:  And where is there support in the record

6   for that assertion?

7          MR. LUSCOMBE:  So, I'm going outside the record as

8   well, your Honor, if we're going there.  But I'm just saying

9   the assumption that the plaintiff is making, that because an

10  employer waits to agree to that till the last day because the

11  employer is so objectioned to it and feels compelled by law to

12  agree to it, is just speculation and is wrong.  So that

13  point --

14         THE COURT:  Before I forget --

15         MR. LUSCOMBE:  Yes.

16         THE COURT:  Let me interrupt you.  You heard my

17  practical question earlier.  I simply don't know -- I've been

18  involved tangentially in some labor negotiations -- but if

19  there was a charge of an unfair labor practice for not wanting

20  to include an agency-fee arrangement and that went up to the

21  NLRB, how practically does that work?  Where does it come in

22  the life cycle of a negotiation, or after?  Can you help me out

23  with that?

24         MR. LUSCOMBE:  Yeah, sure, your Honor.

25         All of this type of NLRB proceeding has to be started

1　by an unfair labor practice charge. In this case, it would

2　presumably be filed by the Union. That has to be filed within

3　six months of the alleged unfair labor practice. So in this

4　case, it would be a 8(a)(5), duty to -- failure of the duty to

5　bargain charge that would to be filed by, presumably the Union

6　in this case, within six months.

7　　　　Now, that -- generally, that would be filed in the

8　course of bargaining because the union's need to file it would

9　be if they're not getting to a contract because, in the union's

10　view, the company is refusing to bargain in good faith.

11　　　　THE COURT: So that would come about if, let's say at

12　the bargaining table, a representative of the employer says, by

13　the way, we're not agreeing to any agency fee; that's our

14　position. Would that be the triggering event for a potential

15　NLRB unfair practice charge?

16　　　　MR. LUSCOMBE: So if --

17　　　　THE COURT: Or would --

18　　　　MR. LUSCOMBE: -- a union --

19　　　　THE COURT: -- that impact --

20　　　　MR. LUSCOMBE: If that -- if that was what the union

21　filed its unfair labor practice charge about, the union could

22　do it but the union would lose. That's the Phelps Dodge NLRB

23　case that we cited. It is absolutely not -- and in no case

24　cited by the plaintiff -- ever the case that an employer's

25　stand-alone refusal to agree to an agency-fee clause is found

1  to be a bad faith bargaining charge -- or an actual bad faith

2  bargaining violation.  That's just simply not the law.

3         It is perfectly clear from cases that we cited, like

4  H.K. Porter from the Supreme Court, that the NLRB cannot find

5  an unfair labor practice charge simply because of the

6  employer's refusal to agree to a mandatory subject of

7  bargaining.

8         What the cases discuss is this: the duty to bargain in

9  good faith polices the process of bargaining, not the

10  substantive outcome of the terms of the agreement.  It polices

11  the process.

12         Some of the cases -- and I'll back up and say, and

13  that's reviewed under a "totality of circumstances" review of

14  the entire, overall bargaining conduct of the employer or the

15  union.  The union can file a -- its duty to bargain in good

16  faith.

17         The duty to bargain is often described as the parties

18  have to approach the bargaining table with a sincere intent to

19  reach an agreement.  And where the cases talk about finding

20  suspicion in an employer's stated philosophical objection to an

21  agency-fee clause, where the employer then refuses to bargain

22  at all, refuses to discuss it because they just say, we have a

23  philosophical objection, we're not going to do this, where the

24  cases say, well, that's evidence -- not a finding of bad faith;

25  that's simply evidence of overall bad faith if combined with

1    other evidence.  Because employers generally don't have

2    philosophical objections.  Employers generally look at the

3    dollars and cents of a deal.

4              And so when an employer simply says, I'm not going to

5    talk about this because I just don't believe in it and so I'm

6    not even going to talk about it; I'm not going to hear your

7    compromises; I'm not going to discuss trading it back and forth

8    for something else you want; I'm just not going to talk about

9    it, they say that, the Board says, that's suspicious to us

10   because if you can't articulate a legitimate business reason,

11   if you're not even willing to say and explain your position,

12   well, that suggests -- that's evidence that you're not really

13   trying to come to an ultimate deal with the union.  You're just

14   using this -- because you know it's important to the union --

15   to frustrate getting the contract overall.

16             But even if we just have that, it's still not an

17   unfair labor practice.  It's still not a violation.  The Board

18   then has to look, well, is there other evidence.  And if we --

19   that piece combined with other things can be evidence of bad

20   faith bargaining.

21             THE COURT:  Practically speaking, do you think that --

22   who has more support from the NLRB on this point, the agency-

23   fee point, unions or employers?  Who do you think tends to do

24   better on this issue?

25             MR. LUSCOMBE:  I think unions would be surprised to

1 think that they had a slam dunk at the NLRB if -- when

2 employers are holding the cudgel of agency fee over them and

3 saying, we're not going to agree to union security until you

4 come to this kind of concession.  Unions would be very

5 surprised to know -- to think that the law was what the

6 plaintiffs describe it as.

7    If they -- the plaintiffs say the bad faith bargaining

8 law, good faith bargaining law creates a presumption in favor

9 of agency fee, they can't point to a single case that says

10 anything close to that because none exists.  And if the Board

11 ever went in that direction, the courts would slap them down

12 very quickly, like the Supreme Court case in H.K. Porter.

13    THE COURT:  For purposes of my reviewing these various

14 motions, it seems to me that both the Supreme Court in Beck and

15 the Seventh Circuit in the Wegscheid, W-e-g-s-c-h-e-i-d, case

16 seemed to decline to answer the issue on state action -- or

17 state actor status that we have present here.  That's my

18 tentative read of it.  Do you agree that the issue has not been

19 squarely addressed?

20    MR. LUSCOMBE:  In the Seventh Circuit, the state

21 action question here has not been answered, that is correct.

22    THE COURT:  Has it been answered squarely at an

23 appellate level anywhere?

24    MR. LUSCOMBE:  Yes.  The state action question has

25 been squarely rejected by the Third Circuit in the White

1   decision, the Second Circuit in the Price decision, the Tenth

2   circuit in the Reid decision, and D.C. Circuit in the Kolinske

3   decision.

4            THE COURT:  I asked a bad question there.  I'm

5   familiar with those cases.  I guess my question is, do you

6   think that those are directly on point here?

7            MR. LUSCOMBE:  Yes, I think those are directly on

8   point --

9            THE COURT:  All right.  I wanted --

10           MR. LUSCOMBE:  -- that there's no state action --

11           THE COURT:  -- to make sure --

12           MR. LUSCOMBE:  -- under the NLRA.

13           THE COURT:  I wanted to make sure I understood your

14   position there.

15           MR. LUSCOMBE:  Yes.

16           THE COURT:  If you could talk about the merits under

17   the First Amendment for a bit, I would be grateful for that.

18           MR. LUSCOMBE:  Of course.

19           So assuming that the First Amendment applies here at

20   all, the Hanson case controls here, and its progeny.  Now, what

21   the Hanson case held is that an agency-fee agreement in a

22   private-sector collective bargaining agreement -- in that case

23   the RLA, but for these purposes there's no -- there's no

24   principal difference between the RLA and the NLRA on this

25   merits question -- that an agency-fee agreement that required

1   no more than all -- and even objecting employees pay their fair

2   share of collective bargaining expenses, and where there's no

3   evidence that the agency fee is being used on any political

4   expenses to which the employees object, Hanson held that's

5   constitutional.  Okay.

6           It's correct, Hanson said we're just applying that to

7   those facts, to that principle.  If there were facts before

8   us -- which there weren't in Hanson -- that the agency fee was

9   actually being used on political expenses, we would have to

10  decide that in another case.

11          THE COURT:  Correct me if I'm wrong, but I think --

12  and I recognize that Janus was in a different posture and that

13  you've argued that Hanson is more directly on point, but humor

14  me.  Didn't Janus sort of grapple with that issue and say, at

15  least for purposes of that case, it was a broader

16  associational, almost compelled speech issue that raised the

17  First Amendment challenge?  Do I have that much right?

18          MR. LUSCOMBE:  Your Honor, I don't believe you do.

19          THE COURT:  All right, correct me.

20          MR. LUSCOMBE:  Yeah, I would argue that Janus, and

21  Harris v. Quinn before it, were very careful to say, we're

22  talking about the public sector here, not the private sector.

23          So, for example, there's the quote at page 920 of

24  Janus -- and I apologize for the echo from the microphone -- at

25  page 920, the Court wrote, largely quoting Harris, Assuming for

1   the sake of argument that the First Amendment applies at all to

2   private-sector agency-shop arrangements, the individual

3   interests at stake still differ.  In the public sector, core

4   issues, such as wages, pensions, and benefits are important

5   political issues.  But that's generally not so in the private

6   sector.

7           And there's other provisions in the case as well that

8   address that point.

9           Now, I understand that plaintiff can make arguments of

10  trying to bring Janus into the private sector, but those are

11  arguments that plaintiff, if they want to do it, are going to

12  have to try and make to the Supreme Court itself to overrule

13  Hanson and the cases that followed it.

14          THE COURT:  All right.  Thank you.

15          MR. LUSCOMBE:  Yes.

16          So to finish that line on how Hanson gets to where we

17  are at the NLRA, because I think it is important to track this,

18  is Hanson left open the question of, okay, bring me -- if you

19  bring us a case where agency fees are being used for political

20  expenses that employees object to, that will be a different

21  case.

22          Then we got the Supreme Court's decision in Street,

23  where the Court expressly said, clear as day, okay, now we're

24  addressing the question that was left open by Hanson; we have

25  evidence here that the agency fee is being used for political

1    expenses over the objection of some employees.

2           And so what the Court said is this, it said, well,

3    state action is here under the RLA, this does raise significant

4    First Amendment concerns to us, but we can avoid those by

5    reasonably interpreting, in that case Section 2, Eleventh of

6    the Railway Labor Act, to say the statute does not permit a

7    union, over an employee's objection, to use an agency fee for

8    political expenses that the employee objects to.  That's not

9    permitted by the statute; therefore, we don't reach those

10   constitutional questions.

11          Now, right, that's not a constitutional case.  It's

12   not making a First Amendment decision, as plaintiff points out

13   and as Janus said.  But what's the necessary implication of

14   that holding?

15          The necessary implication is that the Court found that

16   its interpretation of the statute was constitutional.  What did

17   the Court do?  It said, by statute the only thing the union was

18   allowed to use the agency fee for over an employee's objection

19   were expenses germane to collective bargaining and contract

20   administration.  So you don't -- so that is necessarily

21   constitutional if that's the interpretation that the Court

22   adopted in order to avoid any constitutional questions.  That's

23   what the Doctrine of Constitutional Avoidance does for us,

24   okay?

25          So then we get to Beck, which now we are in an NLRA

1  case.  So the first thing the court said is, well, we're not

2  going to touch these First Amendment issues because we don't

3  need to; if we wanted to get there, we would have to start --

4  decide the state action question, which we're not going to.

5          Now, that court also cast doubt on whether it thought

6  there was state action because it cited two cases where the

7  court had found no state action in actions by private-sector

8  unions.

9          One of those, Sadlowski, was an internal union matter,

10  so that I see that -- that is distinguishable.  Another case

11  was Steelworkers v. Weber, which was where the court held that

12  an affirmative action policy in a collective bargaining

13  agreement, negotiated between an employer and a union, a

14  mandatory subject of bargaining over which the employer had a

15  duty to bargain, they said, no state action in that case.

16  Somebody was trying to challenge it under the Equal Protection

17  Clause, and the court said no state action.

18          So Beck -- that aside -- Beck said, okay, we don't

19  need to get to that First Amendment question again, deciding

20  whether there is or isn't state action, because we're going to

21  interpret the words of Section 8(a)(3) of the NLRA the same as

22  Section 2, Eleventh of the Railway Labor Act; that union can

23  only use its agency-fee clause to collect fees over the

24  objection of an employee to be used for expenses germane to

25  collective bargaining and contract administration.  They

1    adopted the same interpretation.  If that interpretation is

2    constitutional in the RLA, it's constitutional in the NLRA.

3    Full stop.  That's where we get here.

4         And in this case, despite their rhetoric, all of their

5    allegations, some of which are not supported by their 56.1

6    statement as we point out, they have not pointed to any

7    evidence that a single cent of any objecting member's agency

8    fee here is being used on political expenses.  And, in fact,

9    they expressly disclaim that they're making any claim that

10   we're using agency fees for anything that is not countenanced

11   under the statute under Beck.  Instead, they're taking the

12   full-frontal attack on agency fees, which is a full-frontal

13   attack on Beck, on Street, on Hanson, on Ellis, on these cases.

14   If they want to overrule that law, they need to go to the

15   Supreme Court.

16        THE COURT:  Is there an associational concern here

17   though, for the reasons that Mr. Graver talked about earlier,

18   namely that -- recognizing that the plaintiffs are not members

19   of the Union, but still their money is going toward the

20   Union -- is there an associational issue with some of the more

21   heated positions, political positions, taken by the Union?  Or

22   is that not a concern?

23        MR. LUSCOMBE:  I think that's not a concern.  That's,

24   again, an issue that the cases, like Hanson, reject; that

25   those -- that associational concern is not right.  When all

1    you're doing is using the -- the employees having to pay their

2    fair share of the economic matters of collective bargaining and

3    contract administration, that does not violate the First

4    Amendment in any -- based on the idea of compelled speech or

5    association.

6            And, of course, as your Honor pointed out, they do not

7    have to be members of the Union.  You know, cases like General

8    Motors of course made clear that all that they have to

9    contribute is their fair share of those economic expenses.

10   They're free to say anything they want to oppose the Union,

11   oppose the Union's actions.  They're free to teach, to

12   research, whatever they want at the University, limited of

13   course by what their bosses at the University say they'll pay

14   them for, which I'm sure they don't think is a First Amendment

15   violation.  But the Union has no role in any kind of

16   restriction on their teaching, on their researching.  They're

17   free to do that all day long.

18           THE COURT:  All right, Mr. Luscombe, I'll give you a

19   minute to wrap up, and then I'm going to give Mr. Graver just a

20   couple of minutes to rebut, and then we'll move on.

21           MR. LUSCOMBE:  Thank you, your Honor.

22           For much of what we've just been discussing, the

23   overwhelming weight of authority here, from Supreme Court cases

24   to the appellate court cases, the appellate court cases that

25   have specifically addressed this square issue, there's no state

1    action here.

2           This is a case, as then-Judge Alito recognized in

3    White, and the other appellate court recognized, where a union

4    and private-sector employer are making a private decision that,

5    yes, it's allowed by federal law, but that is not state action.

6    These cases have also held, including Judge -- then-Judge

7    Alito's decision in White, that even if the National Labor

8    Relations Act puts a thumb on the scale, gives unions added

9    bargaining leverage, court decisions, like Jackson, make clear

10   that is not sufficient for state action.

11          Jackson's holding was even if the added leverage that

12   a monopoly status gave a utility company, the utility company

13   was able to use that leverage to force someone to accept the

14   terms of their contract and have their electricity turned off,

15   said that's not state action.

16          That added leverage that some government policy might

17   give a private actor, that that private actor can use to do

18   something that's permitted under law, that's not state action.

19   That's what all of these cases say.  And the plaintiff has not

20   pointed to a single case to the contrary that's anywhere

21   remotely close to this.  Okay.  So there's simply no state

22   action.

23          The Supreme Court in Janus has said, you know, we're

24   not -- very much pointed, that we're not interested in

25   revisiting that question.  This is something that there's not a

1     First Amendment concern here at all.

2              I think I walked through the issues about our merits

3     argument on the First Amendment, and I'll leave it at that as

4     well.

5              On the summary judgment issues, again, I will just

6     point out, we brought up issues of 56(d) because of all these

7     anonymous affidavits that the plaintiffs put forward.  To be

8     clear, their summary judgment motion should be denied

9     regardless of the consideration of those anonymous affidavits.

10    Our motion to dismiss should be granted.  The summary judgment

11    should be -- the summary judgment motion should be denied as

12    moot or, on the merits, for the same reason.  So, therefore,

13    the Court doesn't need to get to those issues.

14             If plaintiff thinks and wants to rely on these issues

15    of what specifically the University of Chicago did in this case

16    or if it wants to try and create a record about what happens

17    out in the world of collective bargaining, they didn't do it on

18    their motion here.  And they were required to bring all their

19    evidence forward that they wanted to bring forward if they

20    wanted their summary judgment motion granted.  It's not there.

21    It shouldn't be considered by the Court, and their motion for

22    summary judgment should be denied.

23             Thank you, your Honor.  I'll leave it there unless you

24    have any other questions.

25             THE COURT:  No.  Thank you, Mr. Luscombe.  I

1 appreciate it. You may remain standing or you may be seated,

2 whatever you prefer.

3        Mr. Graver, I will give you a couple of minutes to

4 make any points you would like to make.

5        MR. GRAVER:  I appreciate it.  I think I have five --

6        THE COURT:  Go ahead.

7        MR. GRAVER:  -- four-and-a-half.

8        So the first is on the governmental action point.  My

9 friend kept saying that no one agrees with us.  I will spot

10 him --

11        THE COURT:  I'm going to give you the yellow flag

12 caution for speed.

13        MR. GRAVER:  Appreciate it.

14        My friend kept saying that no one has ever agreed with

15 us.  And I will spot him that more circuits have agreed with

16 their position.  But the First and the Fourth Circuits are on

17 our side, and we talk about it a lot in the brief.  So I don't

18 want to give them short shrift.

19        The more important point, I think, is -- we were

20 talking about the effective presumption; does the NLRA create

21 an effective presumption.  I think it's a lot simpler.  We end

22 up talking past each other a lot.

23        The basic point is that an agency-fee provision like

24 this is a mandatory subject of bargaining.  That means you need

25 to bargain over it in good faith.  It means you can't just say,

1   pound sand.  It means you can't just close your ears.  You need

2   to have some dialogue; you need to proffer some reason.

3          That is a presumption -- and, again, we can fight

4   about if the showing is big or small or something in between.

5   But if you can't say no without some showing, that is by

6   definition a presumption.  And, again, we're not hanging our

7   hat entirely on that; but it's the key point about why the NLRA

8   is not neutral.  It gives the unions all of these powers to

9   extract this on their own but then supervises it on the back

10  with the targeted support of this presumption before the NLRB.

11         And, again, just to the point we were talking about

12  with discovery, before turning to the First Amendment merits,

13  there's, I don't think, any need for discovery here because the

14  state action question is a programmatic question.  It's how

15  this Act works.  It's how it's designed.  It's what the

16  government was going for.  It's not party by party.  It doesn't

17  matter whether General Motors is able to stand up to a union,

18  or University of Chicago couldn't.  It's how the statute is

19  designed and has the government thrown its weight behind it as

20  a matter of regulatory law and statutory law.

21         So that's kind of the points I have on governmental

22  action.

23         Turning a bit to the First Amendment, with Janus, I

24  think it's very important to explain what Janus said and what

25  it didn't say; where it is relevant and where it is not.

1        Here, I think, is where Janus is relevant: one, it

2    underscores that any agency fee of any stripe poses a First

3    Amendment burden.  Everyone agrees there's an infringement.

4    Maybe they're offsetting benefits, but everyone agrees there's

5    a burden.

6        Two, what Janus said is that the traditional interests

7    on the other side of the ledger for that kind of burden don't

8    work.  My friend said Janus may have questioned it, may have

9    not.  I would urge the Court to read it.  Justice Alito

10   couldn't have been clearer.  He said free ridership is an

11   illegitimate ground.  It never counts.  In never counts in

12   ordinary context.  It doesn't count in labor either.  And then

13   when he rejected labor peace, the only other rationale, Justice

14   Alito used the private sector as the reason why.  Agency fees

15   are not needed for exclusive representation as evidenced by

16   right-to-work states.

17       So the interests on the other side of the ledger, none

18   of that turned on the sector at issue.  All of that was about

19   the compelling interests on the other side.  Janus eliminated

20   them.

21       Now, I would agree on the First Amendment burden

22   side -- or on the burden side, a key part of Janus was that any

23   time you give money to a public-sector union, that's political

24   speech because public-sector unions affect public policy by

25   design.  Hours, wages, whatever, all of that is public policy.

1          We're not saying that.  We're not saying every dime

2     that goes to a private-sector union has the same infirmity.

3     But all of that is a question about burdens.  And as we've

4     explained in our brief, we have distinct burdens different from

5     a normal private-sector agency fee.  Janus does not discuss

6     that at all.

7          And that relates to the other points too.  My friend

8     was talking about Hanson and Street and all of that.  I

9     disagree with how he reads those cases.  Reasonable minds might

10    be able to disagree.  It's really hard to disagree after Janus

11    because Justice Alito rejected everything he said pretty

12    expressly.  He said Janus -- or he said Hanson is a very narrow

13    opinion that merely rejected a facial challenge.  He said that

14    in cases like Street, they didn't touch the Constitution at

15    all.

16         And a key part there too -- as my friend was trying to

17    kind of conjure a constitutional holding from constitutional

18    avoidance.  But the key part there, as I would urge the Court

19    to look at those cases, the litigants there were not

20    challenging agency fees writ large.  They were challenging that

21    their agency fees were being used for certain political

22    expenditures.  And the court took those challenges on those

23    terms.  These are narrow decisions that decided the case in

24    controversy before them.  They did not paint in this broad

25    brush.

1    Here, though, is one point where I would completely

2    agree with my friend: constitutional avoidance cases sometimes

3    tell you a lot about the constitutional issues.  But the way

4    that's relevant, and where this Court should look, is the

5    exclusive representative cases and the duty for fair bargaining

6    case -- or duty for fair dealing cases.

7    What the Court has said for 80 years, from this -- the

8    creation of the NLRA to cases like Vaca, all the way through

9    Janus, is that in light of all of the powers that the NLRA

10   gives to unions, it would be really bad if the Constitution

11   never applied.

12   So the entire reason that the Court grafted onto the

13   NLRA this duty of fair representation was to avoid the

14   constitutional ill that would follow from unions being able to

15   discriminate on the basis of race, gender, religion, what have

16   you.  So the constitutional nugget in those cases is that

17   unions are sometimes governmental actors.  Not always.  Not

18   never.  Sometimes.  It depends whether the government has

19   thrown its weight behind the decision at issue.

20   On the merits -- just on the benefits side of the

21   merits, my friend mentioned that they would make arguments

22   later as to whether there's justifications here.  But they have

23   the same burden that the government would as a governmental

24   actor.  It is their burden, once we show a First Amendment

25   infringement at this stage in the proceeding, to make some

1  effort to say there is an offsetting benefit that can survive

2  exacting scrutiny.  They don't mention it once in their briefs,

3  didn't mention it here.  At most, I understood my friend to be

4  pressing this free ridership argument.  But that's the exact

5  argument that Justice Alito expressly rejected in Janus.  It's

6  not viable.  I think their side of the ledger is blank.

7           The final point I would say -- I know I'm running a

8  little bit long.  But the final point I would say is that my

9  friends are saying that, you know, there's no restriction

10  really here at work; people are free to write and teach and do

11  whatever they want, but just so long as they give us an agency

12  fee first.

13           That could not be more wrong just as a matter of

14  reality for our members.  And this is a deeply painful decision

15  that they've been put to.  Some are opting out of research

16  activities because they cannot bring themselves to associate

17  with this union.  Others are suffering under having to violate

18  their conscience versus being kicked out of this country.  This

19  is the exact sort of burden that the First Amendment was

20  supposed to solve for.  And I do not think the government

21  action doctrine shields what is intuitively and fundamentally a

22  tremendous First Amendment problem here.

23           THE COURT:  Thank you, Mr. Graver.  And thank you, Mr.

24  Luscombe.  Indeed, my thanks to counsel on both sides for a

25  very well-presented argument here, both orally and in writing.

1          I will take the motions under advisement.  There's

2    some weighty stuff here, so we will endeavor to rule as quickly

3    as we can.  It would be a fool's errand to try to predict when

4    we will get a ruling out, but we will try to move it along

5    smartly, given the issues at play.

6          I do thank you all for coming in.  I do believe that

7    in-person hearings are generally better.  And thank you for the

8    professionalism you've brought to this case.  Again, the matter

9    is under advisement.  Thank you.

10       (Concluded at 3:02 p.m.)

11                    *    *    *    *    *

12   I certify that the foregoing is a correct transcript of the

13   record of proceedings in the above-entitled matter.

14

15   */s/ Nancy C. LaBella*                    *February 7, 2025*
     Nancy C. LaBella, CSR, RDR, CRR
16   Official Court Reporter

17

18

19

20

21

22

23

24

25