**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| GRADUATE STUDENTS FOR ACADEMIC FREEDOM, INC., on behalf of its members, <br><br> Plaintiff, <br><br> v. <br><br> UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, and UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA LOCAL 1103 – GRADUATE STUDENTS UNITED AT THE UNIVERSITY OF CHICAGO, <br><br> Defendants. | No. 24-cv-06143 <br><br> Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Graduate Students for Academic Freedom, a 501(c)(4) membership organization that includes graduate students at the University of Chicago, brings the present First Amendment lawsuit against the Graduate Students Union at the University of Chicago ("GSU-UE") and its parent union, alleging that Plaintiff's members are unconstitutionally forced to support and finance a student union that has engaged in antisemitic rhetoric following the October 7, 2023 terrorist attacks in Israel. Plaintiff alleges that GSU-UE joined a student coalition that installed a "memorial" on University grounds for "Palestinian martyrs," called for the liberation

of Palestine "From the River to the Sea,"[1] and encouraged an "Intifada." (Dkt. 1 ¶¶ 60–62.) Plaintiff further alleges that the President of the GSU-UE embraced these provocative statements by signing on to an open letter. (*Id.* ¶ 63.) It is thus unsurprising that some Israeli, Jewish, and other students want nothing to do with GSU-UE and certainly do not want to be compelled to send it money. (*Id.* ¶ 67.) But under a collective bargaining agreement between GSU-UE and the University of Chicago, graduate students either must, as a condition of working as a teaching assistant, research assistant, or in a similar position, become dues paying members of the GSU-UE or pay it an equivalent "agency fee." (*Id.* ¶ 5.)

Plaintiff's sole claim for relief—that this agency fee arrangement violates the First Amendment associational and speech rights of its members under the exacting scrutiny of *Janus v. AFSCME*, 585 U.S. 878 (2018)—runs into a threshold issue: both the University of Chicago and the union Defendants are private entities to which the First Amendment does not ordinarily apply. Plaintiff, therefore, devotes much of its briefing to arguing that the agency fee arrangement between the University of Chicago (which is not a party to this case) and Defendants implicates state action such that the First Amendment applies. Although the Seventh Circuit has not had occasion to weigh in on this issue,[2] the Third Circuit has rejected any suggestion that

---

[1] This slogan calls for the dismantling of a Jewish state between the Jordan River and the Mediterranean Sea. *See, e.g., Slogan: "From the River to the Sea Palestine Will be Free"*, Anti-Defamation League (Oct. 10, 2023), https://www.adl.org/resources/backgrounder/slogan-river-sea-palestine-will-be-free.

[2] *See Wegscheid v. Local Union 2911*, 117 F.3d 986, 988 (7th Cir. 1997) ("[W]e left open the question whether union-shop clauses in collective bargaining agreements with private employers are governmental action in *Nielsen. . . .*"); *Nielsen v. Int'l Ass'n of Machinists & Aerospace Workers*, 94 F.3d 1107, 1113 (7th Cir. 1996) ("We do not address the issue here

private sector agency fee arrangements are state action subject to First Amendment scrutiny. *See White v. Commc'ns Workers of Am.*, 370 F.3d 346 (3d Cir. 2004). More generally, the Supreme Court has emphasized the importance of "faithful application" of the state action requirement so as not to subject private behavior to constitutional scrutiny. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

For the reasons that follow, the Court holds that Plaintiff—which seeks to vindicate the sincerely-held views of its members—must pursue means other than this lawsuit to disassociate itself from Defendants' politicized philippics. In short, private sector agency fee arrangements do not constitute state action. Plaintiff's theory of state action is unsupported in existing law and would effectively constitutionalize any substantive provision agreed to between private employers and unions. Such a blurring of private and public risks an impermissible expansion of the judicial role to contexts beyond the confines of labor law. Whether that law should be changed, and to what extent such agreements should be subject to constitutional scrutiny, is questions not within this Court's bailiwick. Accordingly, Defendants' motion to dismiss (Dkt. 26) is granted.[3]

---

whether an agency shop clause under § 8(a)(3)'s first proviso amounts to state action, thereby raising First Amendment concerns, both because the Supreme Court saw no need to go that far in *Beck* itself and because Nielsen has not argued this point.")

[3] The Court notes with appreciation the exemplary briefing and oral argument presented by counsel for both sides.

## I.     BACKGROUND[4]

Plaintiff Graduate Students for Academic Freedom, Inc. is a Virginia 501(c)(4) nonprofit membership organization founded to promote academic freedom and combat compelled speech and association across American campuses. (Dkt. 1 ¶ 15.) Plaintiff's members include Israeli, Jewish, and other concerned graduate students who object, on First Amendment grounds, to funding Defendant United Electrical, Radio and Machine Workers of America UE Local 1103 – GSU ("GSU-UE"), the graduate student labor union and sole and exclusive bargaining agent of University of Chicago graduate students. (*Id.* ¶¶ 7–17.) Plaintiff also sues Defendant United Electrical, Radio and Machine Workers of America ("UE"), the parent union (collectively, "the Union"), which is a signatory to the collective bargaining agreement at issue. (*Id.* ¶ 16.)

In February 2023, the Graduate Students Union ("GSU"), a long-running effort at the University of Chicago toward creating a graduate students union, ultimately gained success when a majority of covered graduate students voted to unionize. (*Id.* ¶¶ 29–33.) Unlike previous attempts, the NLRB certified the results of the election, and the University of Chicago agreed to recognize the union. (*Id.* ¶ 33.) GSU decided to affiliate with UE, which became the parent union of GSU, and GSU-UE became the local chapter of UE. (*Id.* ¶ 34.)

---

[4] Because the Court resolves the case on Defendants' motion to dismiss, the relevant facts are drawn from Plaintiff's Complaint and viewed in its favor. (Dkt. 1.) Accordingly, the Court does not consider the summary judgment factual record, although the Court references arguments presented in the summary judgment briefing, which overlapped with the motion to dismiss briefing. (*See, e.g.,* Dkt. 31.)

Under the bargaining agreement reached between GSU-UE, UE, and the University of Chicago, GSU-UE is the sole and exclusive bargaining agent for graduate student workers at the school. (*Id.* ¶¶ 35–39 (citing Article 2).) More specifically, the agreement applies to graduate teaching assistants ("TAs") and research assistants ("RAs") but does not include undergraduates or "graduate students who are not employed to provide instructional or research services." (*Id.* ¶ 39.) Under Article 3, all graduate students covered by the contract must "as a condition of employment (i.e., assignment) . . . become and remain members of the Union in good standing insofar as the payment of periodic dues and initiation fees, . . . or in lieu of such membership, pay to the Union an agency fee." (*Id.* ¶ 42.) In other words, to remain a TA or RA (or some similar role), a graduate student must either become a dues-paying member of the union or pay an agency fee (which is set to the same amount) drawn from a percentage of their regular earnings. (*Id.* ¶ 43.)

Plaintiff alleges that both UE and GSU-UE have an antisemitism problem, as evidenced by their support for the "Boycott, Divest, and Sanction" ("BDS") movement. (*Id.* ¶¶ 52–56.) In the wake of the October 7 terrorist attacks in Israel, Plaintiff recounts the actions that it believes reflects the Union's antisemitism, which, at a minimum, underscore the objections its members have to funding GSU-UE. These incidents include GSU-UE calling for BDS shortly after October 7; UE offered charged rhetoric about Israel in the wake of October 7, including labeling Israel's response a genocide; and GSU-UE joining the "UChicago United for Palestine Coalition." (*Id.* ¶¶ 57–62.) Plaintiff also highlights that the President of GSU-UE signed onto an open

5

letter that called for a "Free Palestine . . . from the river to the sea," condemned "Zionism," charged Israel with "murdering" Palestinians, and reaffirmed a strong commitment to BDS. (*Id.* ¶¶ 57–63.)

Plaintiff's members include an Israeli PhD student who is distraught at having to pay money to GSU-UE; a law student who identifies as proud Jewish Zionist, whose grandfather fought in the Israeli War of Independence, and who has family serving in the Israel Defense Forces; and a law student whose family had to flee his country of birth, and who sees in GSU-UE the same ideology that forced his family to flee. (*Id.* ¶¶ 68–71.) Plaintiff brings a sole claim for relief under the First Amendment, alleging that the requirement to pay GSU-UE a compulsory agency fee is state action that abridges the associational rights of its members. (*Id.* ¶¶ 73–113.) Plaintiff alleges that the agency fee fails the test of exacting scrutiny under *Janus* and is therefore unconstitutional under the First Amendment. (*Id.* ¶¶ 114–17.)

Plaintiff initially moved for a preliminary injunction (Dkt. 5), but Plaintiff, by agreement, converted that motion into a motion for summary judgment under Fed. R. Civ. P. 65(a)(2). (Dkt. 23, 24.) Defendants then filed a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Dkt. 26.) Both motions are now before the Court for resolution. (Dkt. 43.)

## II.    LEGAL STANDARD

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain

6

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. But even though factual allegations are entitled to the assumption of truth, mere legal conclusions are not. *Id.* at 678–79.

## III. DISCUSSION

Before it can consider the merits of Plaintiff's argument that the agency fee arrangement violates the First Amendment associational rights of its members under *Janus*'s exacting test, the Court must first consider whether the First Amendment applies to a private sector union agency fee agreement such as this one. That implicates the state action requirement, because the First Amendment "protect[s] citizens from conduct by the government, but not from conduct by private actors, no matter how egregious that conduct might be." *Hallinan v. FOP*, 570 F.3d 811, 815 (7th Cir. 2009). The conduct of private actors, in some cases, "can constitute state action." *Id.* First, under step one of the test laid down in *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982), the deprivation of the constitutional right "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Hallinan*, 570 at 815 (cleaned up). Second, under *Lugar*'s step two, the party charged with the deprivation "must be a person who may fairly be said to be a State actor."

*Id.* (cleaned up); *see Lugar*, 457 U.S. at 937 (describing this "two-part approach" to the question of state action). Private action can therefore become state action when, for example, there is "such a close nexus between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself." *Hallinan*, 570 F.3d at 816.

After close consideration of the issue and existing precedent, the Court finds that the agency fee arrangement negotiated between the University of Chicago and the Union does not satisfy the state action requirement and thereby does not raise a First Amendment issue. Although Plaintiff offers a persuasive argument that federal labor law facilitates agency fee arrangements by making them a subject of bargaining and by giving unions greater leverage to extract concessions at the bargaining table, the Supreme Court has made clear that the state providing one side with greater leverage and placing an option on the table for consideration (without mandating it) is not sufficient to satisfy the state action requirement. This view, voiced by the Third Circuit in *White v. Commc'ns Workers of Am.*, 370 F.3d 346 (3d Cir. 2004), was echoed in footnote 24 of the Supreme Court's opinion in *Janus*, 585 U.S at 918 n.24, and is adopted here.

### A. The Agency Fee Arrangement

Under the bargaining agreement reached between GSU-UE, UE, and the University of Chicago, all covered graduate students must either become a dues-paying member of GSU-UE or pay it an agency fee. (Dkt. 1 ¶ 43.) Plaintiff's argument is that this arrangement satisfies the state action requirement because the National

8

Labor Relations Act ("NLRA") creates the regulatory framework that governs the parties' collective bargaining process, and that a combination of features of that framework renders the end product of that bargaining—here, the agency fee arrangement—state action. (*See* Dkt. 6 at 7–9.) Enacted in 1935, the NLRA "encourages the practice and procedure of collective bargaining between labor and management to resolve industrial disputes arising out of differences as to wages, hours, or other working conditions." *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775 (2023) (cleaned up); *see* 29 U.S.C. §§ 151–169.

Three features of the NLRA are relevant here. First is the grant of exclusive representation. Section 9(a) provides that the union "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining. . . ." 29 U.S.C. § 159(a).

The second relevant feature of the NLRA is the authorization of an agency fee. Section 8(a)(3) "permits an employer and an exclusive bargaining representative to enter into an agreement requiring all employees in the bargaining unit to pay periodic union dues and initiation fees as a condition of continued employment, whether or not the employees otherwise wish to become union members." *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 738 (1988) (citing 29 U.S.C. § 158(a)(3)). Although Section 8(a)(3) generally "forbids an employer to discriminate in terms and conditions of employment in order to encourage or discourage union membership," *Wegscheid v.*

9

*Local Union 2911*, 117 F.3d 986, 987 (7th Cir. 1997), this general prohibition does not preclude an employer from making an agreement with an exclusive bargaining representative to require union membership "as a condition of employment." 29 U.S.C. § 158(a)(3). That is, the agreement may include a so-called "union shop" clause "provided that membership is not denied for any reason other than the employee's failure 'to tender the . . . dues . . . uniformly required as a condition of acquiring or retaining membership.' " *Wegscheid*, 117 F.3d at 987 (quoting 29 U.S.C. § 158(a)(3)).

Courts "have interpreted this proviso as entitling an employee to retain his employment, notwithstanding his refusal to join the union or pay the full dues that members are required to pay, as long as he pays so much of the dues as represent the cost to the union of carrying out its responsibilities with respect to negotiating the collective bargaining agreement and enforcing its terms." *Id.* (describing this as an "agency fee" that "compensates the union for its services as the exclusive bargaining representative of the employees in the bargaining unit.").[5] But although an agency fee is authorized, it is not required. The NLRA "provides a framework to assist employees to organize and bargain collectively with their employers, [but] is neutral with respect to the content of particular agreements." *Kolinske v. Lubbers*, 712 F.2d 471, 478 (D.C. Cir. 1983).

---

[5] The Seventh Circuit has voiced some concern that this "interpretation of section 8(a)(3) that allows the substitution of the agency fee for union membership and full dues does considerable violence to the 'plain meaning' of the section," *id.*, but the propriety of that approach is beyond the scope of this case. *See Nielsen*, 94 F.3d at 1108 (noting that the Supreme Court in *Beck* held that § 8(a)(3) "authorizes unions operating with an 'agency shop' agreement to exact only those fees and dues necessary to perform the duties of an exclusive representative of the employees.").

10

The third relevant NLRA feature is the duty to bargain in good faith. Under Section 8(a)(5) and 8(d) of the NLRA, the parties have a "duty to meet and confer in good faith with respect to wages, hours, and other terms and conditions of employment." *NLRB v. Katz*, 369 U.S. 736, 742–43 (1962) (cleaned up). Numerous "terms and conditions of employment have been held to be the subject of mandatory bargaining under the NLRA," *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 199 (1991), including the duty to bargain over a union-security clause. *See, e.g., Tribune Publ'g Co. v. NLRB*, 564 F.3d 1330, 1333 (D.C. Cir. 2009) ("[D]ues checkoff is a matter related to 'wages, hours, and other terms and conditions of employment' within the meaning of the Act and is therefore a mandatory subject for collective bargaining."); *CJC Holdings, Inc.*, 320 NLRB 1041, 1046 (1996) ("A union-dues checkoff is a mandatory subject of bargaining.").

An employer "does not have to agree to include such a provision [a union-security clause], [but] it is required to bargain in good faith over the term." *CJC*, 320 NLRB at 1046. And although an employer's failure to offer a "legitimate business purpose" for refusing a union-security arrangement can constitute evidence of a failure of good faith, it is part of a "totality of the circumstances" inquiry. *Id.* at 1046–47; *see also Phelps Dodge Specialty Copper Prods. Co.*, 337 NLRB 455, 457 (2002). The ultimate question is whether the proposal is one of "bad faith," and "an employer's philosophical opposition does not, by itself, constitute bad-faith bargaining." *New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272, 287 (3d Cir. 2024) (cleaned up) (citing the NLRB decision below).

Plaintiff argues that the combination of these features satisfies the state action requirement under *Lugar*. At step one, Plaintiff argues that GSU-UE's ability to extract the agency fee provision from the University of Chicago at the bargaining table is the product of the government granting it the status as the sole bargaining representative of graduate students. (*See* Dkt. 6 at 13) ("GSU-UE used its power as exclusive representative to extract an agency-fee provision in the collective bargaining agreement."). In Plaintiff's view, this means that the agency fee provision is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar*, 457 U.S. at 937. Defendants respond that the agreement between the Union and the University is a fundamentally private one because "[a]ll the statute does is *not prohibit* agency-fee agreements, if the parties agree to them and they are otherwise permitted under state law." (Dkt. 27 at 17 (emphasis in original).) As such, Defendants assert, the agency fee is not caused or imposed by the NLRA, putting aside the question of their enhanced bargaining power, which they say is not sufficient to create state action. (*See id.* at 16–19.)

At step two, where Plaintiff suggests the "real analytical action" resides, GSU-UE's compelled agency fees "can in all fairness be attributed to the government" because it has, through the NLRA, "significantly encouraged" the activity at issue, such that there is a sufficiently close nexus between the government and the private act. (Dkt. 6 at 14) (internal quotations omitted.) Plaintiff's argument, which restates to a degree its argument at step one, is that the NLRA "significantly encourages and

12

facilitates the ability of unions to compel agency fees" by granting exclusive representation to the Union, authorizing the adoption of union-security clauses, and making them a mandatory subject of bargaining that the employer must consider in good faith. (*Id.* at 14–15.) Defendants respond that the Union cannot fairly be said to be a state actor because the government has not coerced the agency fee arrangement, and because increased bargaining power and federal approval of the agreement is not sufficient to satisfy the state action requirement. (*See* Dkt. 27 at 19–25.)

## B.    *Janus v. AFSCME*

*Janus v. AFSCME*, the landmark decision that concerned *public* sector agency fee arrangements, is the starting point. In *Janus*, the Supreme Court overruled *Abood*[6] to hold that the First Amendment applied to, and barred, an Illinois law that forced public sector employees "to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities." 585 U.S. 878, 884–86 (2018). Because *Janus* involved a state law requiring subsidization of unions by public sector employees, there was no question that there was state action, so the First Amendment, made applicable to the States by the Fourteenth, applied. *Id.* at 891–92. *Janus*'s holding thus did not address the applicability of the First Amendment to private sector union arrangements. But through *Janus*, the Supreme Court (perhaps) revealed its preliminary thoughts on the subject.

As part of its discussion questioning the propriety of *Abood* (which had

---

[6] *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209 (1977).

previously approved of the constitutionality of public sector agency fee arrangements), the Supreme Court remarked that *Abood* wrongly relied on *Hanson*[7] and *Street*,[8] cases that concerned the Railway Labor Act, a federal law that applied to, and permitted, union shop agreements for (private sector) railways. *Janus*, 585 U.S. at 918. As part of its justification for applying First Amendment scrutiny to public sector employees in *Janus,* the Supreme Court contrasted "Congress's bare authorization of private-sector union shops under the Railway Labor Act" with the "very different First Amendment question [that] arises when a State requires its employees to pay agency fees." *Id* (cleaned up). In a footnote, *Janus* then questioned whether the First Amendment applies to a law that permits, but does not require, private parties to enter into union-shop arrangements. Because the footnote bears a close reading, and is reproduced below in full:

> No First Amendment issue could have properly arisen in those cases [referring to *Hanson* and Street] unless Congress's enactment of a provision allowing, but not requiring, private parties to enter into union-shop arrangements was sufficient to establish governmental action. That proposition was debatable when *Abood* was decided, and is even more questionable today. See *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 53, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Compare, *e.g., White v. Communications Workers of Am., AFL–CIO, Local 1300,* 370 F.3d 346, 350 (C.A.3 2004) (no state action), and *Kolinske v. Lubbers,* 712 F.2d 471, 477–478 (C.A.D.C.1983) (same), with *Beck v. Communications Workers of Am.,* 776 F.2d 1187, 1207 (C.A.4 1985) (state action), and *Linscott v. Millers Falls Co.,* 440 F.2d 14, 16, and n. 2 (C.A.1 1971) (same). We reserved decision on this question in *Communications Workers v. Beck,* 487 U.S. 735, 761, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988), and do not resolve it here.

---

[7] *Ry. Emps. v. Hanson,* 351 U.S. 225 (1956).

[8] *Machinists v. Street,* 367 U.S. 740 (1961).

*Id.* at n.24. This footnote previews and encapsulates the present dispute. At issue here is the question, not resolved but mentioned in *Janus*, whether Congress's enactment of the NLRA—which permits union-shop arrangements between private employers and the union—establishes governmental action. As the Supreme Court noted, and as discussed below, *Sullivan* and *Jackson* make that proposition even more questionable today because those cases limited the scope of what constitutes state action. *Janus* also identified the purported circuit split on this issue and cited the Third Circuit's opinion in *White* on the subject. As discussed below, when read in the light of *Sullivan* and *Jackson*, the Third Circuit's approach in *White*, which echoed the D.C. Circuit's approach in *Kolinske*, is persuasive.

### C. State Action Requirement

As the Supreme Court explained in *White*, private sector agency fee arrangements do not satisfy the state action requirement as delineated in *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) and *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). *See White*, 370 F.3d at 350–53. *Jackson* established that the grant of heightened bargaining power is insufficient to turn the action of an otherwise private entity into that of the state. In that case, the plaintiff brought a due process claim against a private utility company after it terminated her electricity service. *See Jackson*, 419 U.S. at 349–52. Although the utility was privately owned and operated, it was heavily regulated by the state and could perhaps have been considered a monopoly. *See id* at 350. That the utility was "subject to extensive state regulation" did not automatically convert its actions into those of the State for purposes of

15

constitutional scrutiny. *See id.* at 350–52.

Discussing *Jackson*, the Third Circuit explained that the state's "grant of a monopoly to the utility" "surely increased the utility's power to bargain with its customers concerning the terms on which the utility would supply power—including, presumably, the process due customers suspected of failing to pay their bills. Nonetheless, the Court held that the utility's termination of the plaintiff's service was not state action." *White*, 370 F.3d at 352; *see also Kolinske v. Lubbers*, 712 F.2d 471, 478 (D.C. Cir. 1983). That the utility company arguably had monopoly power was "not determinative in considering whether [its] termination of service to petitioner was 'state action' for purposes of the Fourteenth Amendment." *Jackson*, 419 U.S. at 351– 52. *Jackson* therefore rejected the rationale that increased bargaining power, up to and including monopoly power status, satisfies the state action requirement.

For its part, *Sullivan* established that the state's authorization of an option does not constitute state action. *Sullivan* concerned Pennsylvania's (heavily state-involved) worker compensation regime, which provided that "an employer or insurer may withhold payment for disputed medical treatment pending an independent review to determine whether the treatment is reasonable and necessary." *Sullivan*, 526 U.S. at 43. To obtain permission to withhold benefits during this so-called "utilization review," an insurer "was required to file a form with a state agency 'detailing the employee's injury, and the medical treatment to be reviewed.' " *White*, 370 F.3d at 354 (quoting *Sullivan*, 526 U.S. at 45). *Sullivan*'s plaintiffs "claimed that the defendant insurers' act of withholding payment of their medical expenses pending

16

utilization review violated their constitutional right to due process," and their argument that this constituted state action was predicated "on the state legislature's express permission to engage in the utilization review procedure." *Id.*

But the Supreme Court rejected the argument that the express permission by the state turned the actions of the private insurers into those of the state, despite its heavy involvement in the process. At the outset, *Sullivan* stressed the need for "[f]aithful application of the state-action requirement" to ensure "that the prerogative of regulating private business remains with the States and the representative branches, not the courts." 526 U.S. at 52. Because Pennsylvania "authorize[d], but d[id] not require, insurers to withhold payments for disputed medical treatment," the decision was one made "by concededly private parties" and turned on judgments made by private parties. *Id.* That the state provided insurers the option of deferring payment pending review was a "kind of subtle encouragement," but it was more akin to the state creating a legal remedy for which it would enforce; it did not "so significantly encourage[] the private activity as to make the State responsible for it." *Id.* at 53. Stated differently, that the state provided the option could "just as easily be seen as state inaction, or more accurately, a legislative decision not to intervene in a dispute between an insurer and an employee over whether a particular treatment is reasonable and necessary." *Id.* It is true that, by providing the option, the state "shifted one facet from favoring the employees to favoring the employer," but "[t]his sort of decision occurs regularly in legislative review of such systems" and did not transform the insurers actions into those of the state. *Id.* at 54. *Sullivan* therefore

17

rejected the proposition that "express legislative authorization of an act makes that act state action." *White*, 370 F.3d at 354.

Putting *Jackson* and *Sullivan* together, the Third Circuit in *White* explained that a private sector union arrangement could not satisfy the requirement of state action. Of relevance here, the plaintiff in *White* presented a nearly analogous argument: that "[b]ut for the additional leverage that the NLRA affords unions . . . [,] unions would never be able to extract concessions like agency-shop clauses from employers at the bargaining table." *Id.* at 351; (*see* Dkt. 31 at 11 ("Instead, atop the bargaining table rested a heavy cudgel that the Government provided the union for the very purpose of securing agency fees.") But under *Jackson*, the union's "statutorily enhanced bargaining power is insufficient to warrant a finding of state action," and under *Sullivan*, the express authorization of agency fees also does not turn such agreements into state action. *White*, 370 F.3d at 352–54.

Plaintiff's argument here is nearly identical to the one rejected in *White*. A fair reading of Plaintiff's complaint and briefing suggests that nearly all of the Union's ability to extract an agency fee, which is not mandated by the NLRA, is the product of its enhanced bargaining power. Perhaps reading the precedential tea leaves, Plaintiff suggests that *other* factors at play, combined with the increased bargaining power of exclusive representation, satisfy the state action requirement. Those factors are that the NLRA authorizes union-security clauses and that such terms are a mandatory subject of good faith bargaining. (*See* Dkt. 6 at 14–15.)

In this Court's view, those additional factors Plaintiff cites do not tip the scales

18

toward a finding of state action. As to the first, legislative authorization runs up against *Sullivan*, which expressly rejected the theory that "express legislative authorization of an act makes that act state action." *White*, 370 F.3d at 354. Perhaps that was because a private employer and union could agree to a union-security clause on their own, without state intervention, and consistent with what contract law already permits.[9]

Accordingly, Plaintiff emphasizes the requirement that the union and employer bargain in good faith, suggesting that it "markedly cabins employers' ability to reject such agency-fee provisions" because it may require the employer to assert a "legitimate business purpose" in opposition. (Dkt. 31 at 18, 20.) In dispute is the burden of this requirement. (*See* Dkt. 27 at 24.) Plaintiff asserts that the NLRB "has consistently held that a 'purely philosophical' objection is not a 'legitimate business justification.' " (Dkt. 31 at 21 (quoting *Universal Fuel, Inc. & Int'l Ass'n of Machinists & Aerospace Workers*, 358 NLRB 1504, 1504 (2012)).) Defendant says this greatly overstates the level of scrutiny placed on an employer's steadfast, even philosophical, objections. (Dkt. 27 at 24.) Although it is true that "the opposition to union security and dues checkoff based on philosophical grounds without business justification has

---

[9] This suggests that the real conflict is over the grant of exclusive representation. Granting exclusive representation rights itself might be state action, but Plaintiff does not make that point. Rather, Plaintiff appears to challenge the agency fee arrangement that was negotiated under the influence of the increased bargaining power afforded to the Union by virtue of its exclusive status. *Jackson*'s rule is therefore pertinent: increased bargaining power (even monopoly status) that arises because of government action is insufficient to meet the state action requirement. A contrary finding would blur the line between what is private and what is public because other governmental influence (regulation, tax policy, and the like) can also cause a benefit to one interest over another.

been held to constitute *evidence* of bad-faith bargaining," so too can being late in negotiations; introducing new proposals without good cause; reneging on tentative agreements; and providing false information to employees. *See Universal Fuel*, 358 NLRB at 1504 (emphasis added). It is, ultimately, a "totality of the circumstances" inquiry, which appears to be a bit less "searching" of an inquiry than suggested by Plaintiff. *CJC*, 320 NLRB at 1047; (Dkt. 6 at 15.).

This largely theoretical dispute is, however, beside the point. Plaintiff does not allege that the University of Chicago was *actually* burdened by this good faith requirement during bargaining negotiations. Plaintiff also does not address why the University chose to agree to the agency fee arrangement and whether (or what) concessions it obtained from the Union in response. If anything, Plaintiff's pleadings suggest that the University of Chicago is perhaps the institution of higher education best positioned to justify opposition to an agency fee arrangement that limits the associational rights of its students on either philosophical or business grounds, because it is defined by its commitment to academic freedom, freedom of speech, free expression, and institutional neutrality. (*See* Dkt. 1 ¶¶ 25–27 (discussing the canonical 1967 Kalven Report, which explained the University's commitment to these values).) It is not hard to imagine that the University of Chicago—with its identity, brand, and these institutional beliefs—could muster a legitimate justification, business or otherwise, in opposition to an agency fee arrangement, if it were so inclined. But it is unknown why the University agreed to the agency fee provision; whether it received any concessions in return; or even that it opposed the provision

20

at all. Plaintiff's argument that the good faith standard placed any burden on this employer is therefore speculative.

In any event, to constitute state action under step two of *Lugar*,[10] the unconstitutional conduct must be "fairly attributable to the State"; that is, the Union must "fairly be said to be a state actor." *Sullivan*, 526 U.S. at 50. For the reasons stated in *White*, and under the doctrine as currently understood, *Lugar*'s step two is not satisfied here.[11]

### D.    Railway Labor Act

Plaintiff separately argues that the state action requirement is met by citing *Hanson*, which found state action under a parallel provision of the Railway Labor Act. *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225 (1956); (*e.g.*, Dkt. 31 at 27–29.) But

---

[10] Because Plaintiff fails to establish state action under *Lugar* step two, the Court (as in *White*) does not consider whether Plaintiff satisfies step one. *White*, 370 F.3d at 350.

[11] As to the purported circuit split on this issue, the Court agrees with *White*'s conclusion that *Beck v. Commc'n Workers of Am.*, 776 F.2d 1187 (4th Cir. 1985) and *Linscott v. Millers Falls Co.*, 440 F.2d 14 (1st Cir.1971), are unconvincing in the light of more recent Supreme Court precedent. *White*, 370 F.3d at 353–54. Both cases held that Congress's express authorization or sanction of agency-shop clauses satisfies the state action requirement, but that justification was rejected in *Sullivan*. *See id.* The D.C. Circuit, for its part, has held that section 8(a)(3) of the NLRA is not state action under step two of *Lugar*, for essentially the same reasons found by the Third Circuit in *White*. *See Kolinske*, 712 F.2d at 478; *White*, 370 F.3d at 351–54. The Second and Tenth Circuits have likewise questioned the presence of state action in these circumstances. *See Price v. Int'l Union, United Auto. Aerospace & Agr. Implement Workers of Am.*, 795 F.2d 1128, 1133 (2d Cir. 1986), *cert. granted, judgment vacated*, 487 U.S. 1229 (1988), *and abrogated by Commc'ns Workers of Am. v. Beck*, 487 U.S. 735 (1988) ("Since the union security clause was a product of private negotiations and was not attributable to the government, appellants' constitutional challenges were properly dismissed for lack of government action."); *Reid v. McDonnell Douglas Corp.*, 443 F.2d 408, 410–11 (10th Cir. 1971) ("In NLRA matters, the federal government does not appear to us to have so far insinuated itself into the decision of a union and employer to agree to a union security clause so as to make that choice governmental action for purposes of the first and fifth amendments.")

21

*Hanson*'s rationale turned on federal preemption, which is not present here. As does the NLRA, the RLA includes a provision permitting union shop arrangements. *See Hanson*, 351 U.S. at 231. And like the NLRA, Congress did "not compel[] nor require[] carriers and employees to enter into union shop agreements." *Id.* But by expressly permitting union shop provisions in the RLA, Congress overruled prior federal law that prohibited such agreements and overturned the laws of 17 states.[12] As relevant here, the Court reasoned that the state action arose from the federal preemption of the issue. *See id.* at 232 ("If private rights are being invaded, it is by force of an agreement made pursuant to federal law which expressly declares that state law is superseded.").

Section 14(b) of the NLRA, by contrast, "protect[s] states' authority to enact laws prohibiting union-security arrangements that are permissible under Section 8(a)(3) and other provisions of the NLRA." *Sweeney v. Pence*, 767 F.3d 654, 659 (7th Cir. 2014).[13] In other words, there is no federal preemption of union shop agreements under the NLRA and states remain free to enact laws prohibiting them. For that reason, both the Third Circuit the D.C. Circuit have explained that *Hanson*'s federal preemption-based rationale for state action is inapplicable to the NLRA. *See White*,

---

[12] *Id.* at 231–32 ("The union shop provision of the Railway Labor Act was written into the law in 1951. Prior to that date the Railway Labor Act prohibited union shop agreements. . . . Congress, by the union shop provision of the Railway Labor Act, sought to strike down inconsistent laws in 17 States.")

[13] 29 U.S.C. § 164(b) ("Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.")

22

370 F.3d at 353 ("Thus, the rationale for finding that an act done pursuant to a collective bargaining agreement governed by the RLA is state action is not applicable to an act authorized by an agreement controlled by the NLRA."); *Kolinske*, 712 F.2d at 476 ("In *Hanson* it was the preemption of a contrary state law by federal law. . . . A crucial distinction between this case and *Hanson* is that no similar preemption of state law exists under the NLRA."). Although superficially appealing, *Hanson* does not supply Plaintiff with its needed state action rationale.

## IV.    CONCLUSION

For these reasons, the Court finds that the state action requirement is not met. Accordingly, the First Amendment does not apply to the present dispute. Defendants' motion to dismiss must therefore be granted.

SO ORDERED in No. 24-cv-06143.

Date: March 31, 2026

_____
JOHN F. KNESS
United States District Judge

23